Matthew L. Lalli (6105)
Annika L. Jones (16483)
Brandon S. Fuller (17215)
**SNELL & WILMER L.L.P.**
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
mlalli@swlaw.com
aljones@swlaw.com
bfuller@swlaw.com

Grant R. Mainland (*pro hac vice*
forthcoming)
Andrew L. Porter (*pro hac vice*
forthcoming)
Karen Wong (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

*Attorneys for Plaintiff KalshiEX LLC*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KALSHIEX LLC,<br><br>       *Plaintiff*,<br><br>  v.<br><br>SPENCER J. COX, in his official capacity as Governor of Utah; DEREK BROWN, in his official capacity as Attorney General of Utah; DANIEL BURTON, in his official capacity as Chief Deputy Attorney General and General Counsel of Utah; STEWART YOUNG, in his official capacity as Criminal Deputy Attorney General of Utah; and DOUGLAS CRAPO, in his official capacity as Public Protection Attorney General of Utah,<br><br>       *Defendants*. | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br><br>Case No. _____ |

## INTRODUCTION

1.     This action challenges the State of Utah's intrusion into the federal government's exclusive authority to regulate derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC").  7 U.S.C. § 2(a)(1)(A).  Plaintiff KalshiEX LLC ("Kalshi" or "Plaintiff") believes the Governor of Utah (the "Governor") and the Attorney General's Office of Utah (the "Utah AG") will imminently bring an enforcement action against Kalshi with the intent to prevent Kalshi from offering event contracts for trading on its federally regulated exchange.  Defendants have repeatedly represented that they believe Kalshi is operating unlawfully under Utah anti-gambling laws—just last week the Governor said "I think you're going to see 50 states suing these guys in one way or another" and that businesses like Kalshi are "illegal in Utah and will continue to be so."[1]  Yesterday, Attorney General Brown published an op-ed, which referenced Kalshi by name, made clear that Attorney General Brown considers trading event contracts to be illegal in Utah, and stated he has a plan to address prediction markets operating in the state.[2]  And when Kalshi's counsel made multiple attempts to contact the Utah AG to inquire as to whether Utah was preparing to take action against Kalshi, it was met with silence, even though the Utah AG had previously been willing to communicate with counsel.

2.     Utah's stated intent to prohibit Kalshi from operating is a form of regulation that intrudes upon the federal regulatory framework that Congress established for regulating derivatives on designated exchanges.  The state's efforts to regulate Kalshi are preempted under

---

[1] Raga Justin, *Connecticut Gov. Lamont Pushes for Limits on Prediction Markets*, Bloomberg Law (Feb. 20, 2026, 3:10 PM EST), https://news.bloombergtax.com/daily-tax-report-state/connecticut-gov-lamont-pushes-for-limits-on-prediction-markets.
[2] Derek Brown, *Opinion: Utah's attorney general takes a stand against gambling and prediction markets*, Deseret News (Feb. 22, 2026), https://www.deseret.com/opinion/2026/02/22/utah-gambling-apps-prediciton-markets-harmful-dangerous/.

principles of express preemption, field preemption, and conflict preemption.  This Court should therefore issue both a preliminary and a permanent injunction, as well as grant declaratory relief.

3.    Kalshi is a federally designated derivatives exchange, subject to the CFTC's exclusive jurisdiction.  It offers consumers the chance to trade in many types of event contracts. These contracts are subject to exclusive federal oversight, and—critically—they are *lawful* under federal law.  Thus, they are also lawful under Utah's own anti-gambling laws which provide a carveout for "lawful business transaction[s]."  Utah Code § 76-9-1401(8)(c)(i).

4.    Commodity futures regulation has long been under the exclusive purview of the federal government.  In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives.  In 1974, Congress established a federal agency called the CFTC to oversee it.

5.    The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of derivatives on exchanges overseen by the CFTC, known as "designated contract markets" or "DCMs."  The text of the statute gives the CFTC "exclusive jurisdiction" over trading on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A). During the drafting of the 1974 amendments to the CEA, Congress deleted a provision that would have granted states concurrent jurisdiction over futures trading.  *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).  One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 50 different—and potentially conflicting—state laws.  *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark).  As the conference report to the 1974 amendments explained, they were designed to "preempt the field

insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject certain categories of event contracts as against the public interest.

6.    For that reason, courts have easily found that the CEA preempts state laws in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563–64 (6th Cir. 1998). The CFTC itself agrees. It recently informed the U.S. Court of Appeals for the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583 (emphasis added).[3]

7.    Last week, the CFTC affirmed that it has exclusive jurisdiction to regulate derivatives markets like Kalshi, and the CFTC committed to defending that authority against improper attacks from state regulators such as Utah's. Amicus Brief of CFTC at 1, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2, at 1 ("CFTC Amicus Br.") ("Congress vested the CFTC with exclusive jurisdiction to protect that national interest by overseeing the regulation of futures, options, and swaps traded on federally regulated exchanges…[t]he *CFTC's jurisdiction supersedes State as well as Federal agencies* because commodity derivatives markets require nationally uniform rules governing the listing,

---

[3] Commentators have likewise concluded with no difficulty that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vand. L. Rev. 1, 2 (1976). And commentators have specifically recognized that "the CEA preempts state bucket-shop laws and other anti-gambling legislation." Kevin T. Van Wart, Preemption and the Commodity Exchange Act, 58 Chi.-Kent L. Rev. 657, 721 (1982).

trading, clearing, settlement, surveillance, and enforcement of financial instruments traded in these markets to prevent the type of fragmented oversight" that would result from state enforcement) (citation modified) (emphasis added).

8.    Also last week, a federal court in the Middle District of Tennessee granted Kalshi a preliminary injunction barring officials in that state from taking action against Kalshi's exchange, based on a finding that Kalshi's contracts—specifically Kalshi's sports event contracts—are swaps subject to the CFTC's exclusive jurisdiction. *KalshiEX v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("The court finds that Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies.").

9.    The Tennessee court was also persuaded that Kalshi would suffer irreparable harm because its constitutional rights were threatened and because "[a]bsent an injunction, Kalshi could either continue its operations in Tennessee and face potential civil and criminal liability" or attempt to comply and risk its position as a national exchange. *Id.* at *10.  The court further noted that Kalshi would be irreparably injured from the "substantial expenses and reputational harm" it would incur from attempting to comply with Tennessee's unconstitutional demands. *Id.* at *11.

10.    A federal court in the District of New Jersey likewise granted Kalshi's preliminary injunction in April 2025 to prevent similar state overreach.  The court enjoined state officials from attempting to prohibit Kalshi's event contracts, explaining that it was "persuaded [] Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi. *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025).  Moreover, the court recognized that even the "express preemption provisions" of 7 U.S.C. § 16 "do[] not foreclose implied preemption elsewhere within the CEA." *Id.* at *5.  *But see KalshiEX LLC v.*

*Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282 (D. Nev. Nov. 24, 2025).

11.     The New Jersey District Court also found that Kalshi faced irreparable harm because:

> [T]he prospect of facing civil or criminal enforcement or complying and compromising the integrity of its contracts imperils the reputation Kalshi has cultivated over several years . . . at minimum—Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial.

*Flaherty*, 2025 WL 1218313, at *7 (describing the circumstances as a "Hobson's choice" for Kalshi where "leaving it subject to state enforcement or obligating it to shift its business practices [are] consequences that are not cleanly undone").

12.     In ruling for Kalshi, the New Jersey District Court emphasized that even if Kalshi's contracts were "unlawful" under federal law "that would subject Kalshi to the review of the CFTC—not state regulators." *Flaherty*, 2025 WL 1218313, at *5.

13.     An enforcement action by the Utah AG designed to prohibit Kalshi from offering contracts that federal law permits would intrude on the comprehensive federal scheme for regulating designated exchanges.  Kalshi is a federally designated and approved derivatives exchange, subject to the CFTC's exclusive jurisdiction.  Kalshi offers consumers the chance to trade many types of event contracts, all of which are subject to extensive oversight by the CFTC, and are *lawful* under federal law.  The CFTC has the authority to initiate the review of, and under certain circumstances, prohibit the trading of, contracts listed on Kalshi's federally regulated exchange.  But the CFTC has since made clear that it views Kalshi's offerings as legal and within its purview.

14.     Even though Kalshi's contracts are subject to the CFTC's exclusive jurisdiction, Defendants have made clear that they (mistakenly) believe that each of Kalshi's contracts are

instead subject to—and unlawful under—Utah law. In addition to his statement that "you're going to see 50 states suing these guys in one way or another" last week, the Governor made two social media posts on his official X account suggesting legal action was forthcoming. In the first post, which was a response to a video of CFTC Chairman Mike Selig stating that the CFTC will "defend its exclusive jurisdiction over [] derivatives markets," the Utah Governor wrote that he will use "every resource within [his] disposal as governor of the sovereign state of Utah" to challenge the CFTC's position. Ex. 1.

15.    The second post shared an article titled "Gov. Cox vows fight to keep prediction markets out of Utah," and the Utah Governor added that "We're ready to defend our laws in court." Ex. 2. And then yesterday, Defendant Brown published the above-referenced op-ed.

16.    Defendant Brown has targeted Kalshi's contracts elsewhere too. In his official capacity as Utah's Attorney General and on behalf of the State of Utah, Defendant Brown signed multiple amicus briefs that claim Kalshi is violating comparable state laws by offering sports event contracts. *See generally* Brief of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29 ("June Amicus"); Brief of Amici Curiae, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41-1 ("December Amicus"); Brief of Amici Curiae, *KalshiEX LLC v. Hendrick*, No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1 ("January Amicus"). Those amicus briefs argue that states, not the CFTC, have the sole power to regulate Kalshi's sports event contracts. *Id.* And although those cases were focused particularly on Kalshi's sports event contracts, the positions advanced by the amicus briefs (as well as Defendants' public statements) could apply to *all* of Kalshi's contracts. CFTC Amicus Br. at 2-3. 17–18, 28–29 (explaining arguments advanced by states in attempts to regulate sports event contracts apply beyond sports events, and this conduct improperly usurps the CFTC's exclusive authority given to

them while causing "market fragmentation [that] erode[s] the nationally uniform framework Congress established to reduce risk, promote transparency, and safeguard market integrity within the financial system."); *Orgel*, 2026 WL 474869, at *7–10 (agreeing Kalshi's sports event contracts satisfy the statute's "broad" requirement that an event have a "*potential* financial, economic, or commercial consequence.").

17.     Utah state laws contemplate criminal charges for unlawful gaming transactions, and Defendants' recent statements make abundantly clear that they think Kalshi's event contracts fall within that category.  Since those statements, Defendants have not engaged with Kalshi to provide any assurances about whether they will enforce those laws against it.

18.     Defendants' statements and conduct leaves little doubt that Defendants intend to bring an enforcement against Kalshi unless Kalshi stops offering contracts entirely—which, again, are offered for trade on its federally regulated exchange without objection from the CFTC—in Utah.  In doing so, Defendants would seek to subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and Defendants would interfere with the CFTC's exclusive authority to regulate derivatives trading on the exchanges it oversees.

19.     Defendants' anticipated actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has expressly and impliedly occupied the field of regulating trading on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal law.  Kalshi is entitled to declaratory and injunctive relief to prevent Utah authorities from enforcing their preempted state laws against Kalshi.

20.     Moreover, Defendants' threatened conduct contravenes Utah's own anti-gambling laws which exempt "lawful business transactions," such as federally regulated transactions, from prosecution.  Utah Code § 76-9-1401(8)(c)(i).

21.     Accordingly, Defendants' anticipated actions threaten impending and irreparable harm, not just to Kalshi, but to its customers and commercial counterparties. Shutting down Kalshi's ability to offer event contracts in Utah would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear. It would also impair Kalshi's existing contracts with consumers and business partners, subject Kalshi's users to uncertainty and loss, undermine confidence in the integrity of Kalshi's platform, threaten its prospective business relationships, and jeopardize Kalshi's status as a CFTC-approved exchange. For that reason, Kalshi intends to imminently seek an emergency temporary restraining order and preliminary injunction to avoid the immediate and irreparable harm that would result from Defendants' unlawful acts.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether Utah law is preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

23.     The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. Under the Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123, 159-160 (1908), "a private party may sue a state officer for prospective injunctive or declaratory relief from an ongoing violation of the Constitution or federal laws." *MCI Telecommunications Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 935 (10th Cir. 2000).

24.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). Defendants perform their duties in and thus reside in this District. A substantial part of the events giving rise to the claim occurred in this District.

**PARTIES**

25.     Plaintiff Kalshi is a financial services company with its principal place of business in New York.  Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts.  Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

26.     Defendant Spencer J. Cox is sued in his official capacity as Governor of Utah.

27.     Defendant Derek Brown is sued in his official capacity as the Attorney General of Utah.

28.     Defendant Daniel Burton is sued in his official capacity as Chief Deputy Attorney General and General Counsel of Utah.

29.     Defendant Stewart Young is sued in his official capacity as Criminal Deputy Attorney General of Utah.

30.     Defendant Douglas Crapo is sued in his official capacity as Public Protection Attorney General of Utah.

31.     Together, defendants Spencer J. Cox, Derek Brown, Stewart Young, and Douglas Crapo would be responsible for enforcing any demand for Kalshi to comply with Utah state law that is preempted by federal law.

**FACTUAL ALLEGATIONS**

**A.     An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.**

32.     Derivatives contracts are financial tools used to mitigate risk.  Event contracts are a quintessential example of a derivatives contract—they are a type of option.  This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date.  Most commonly, event contracts involve a binary

question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2026. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

33. Event contracts are traded on an exchange. Traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place."). Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

34. The value of an event contract is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

35. Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus

11

reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

36.    Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other widely available financial instrument with this unique capability to capture the risks of an event with potential economic consequences, which is a benefit not only to those that wish to hedge risk or seek return, but also to market observers and other economic actors.

37.    To give just some of many examples, last week, researchers at the Federal Reserve published a paper for which the "results suggest that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is valuable to both researchers and policymakers."[4]  Findings in that paper included that "Kalshi markets are well-behaved and broadly consistent with those from more established financial instruments," and that "in several episodes, they allocate probability mass in ways that may reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."[5] Further, Kalshi's "median and mode have a perfect forecast record on the day before the [Fed Open Market Committee] meeting, which represents a statistically significant improvement over

---

[4] Anthony M. Diercks, Jared Dean Katz & Jonathan H. Wright, *Kalshi and the Rise of Macro Markets*, Finance and Economics Discussion Series Paper 2026-010, Board of Governors of the Federal Reserve System, at 1 (Feb. 18, 2026), https://www.federalreserve.gov/econres/feds/kalshi-and-the-rise-of-macro-markets.htm
[5] *Id.* at 2-3.

the fed funds futures forecast,"[6] and, for headline consumer price index forecasts, "Kalshi provides a statistically significant improvement over the Bloomberg consensus forecast."[7]  And, "Kalshi provides real-time, distributional forecasts for macroeconomic variables such as GDP, core CPI, and unemployment—markets for which options data have historically been unavailable."[8]

38.    As another example, Kalshi recently announced a partnership with Tradeweb, a leading global operator of electronic marketplaces for rates, credit, equities, and money markets, which facilitates more than $2.6 trillion in notional value of instruments traded per day.[9]  The partnership is designed to expand institutional access to data from Kalshi's market and to facilitate trading by those same institutional investors on Kalshi's platform.[10]

39.    And late last year, the real estate investment firm Arrived announced its plans to utilize Kalshi's event contracts to hedge the risk of a government shutdown impacting its business.[11]

40.    Though Defendants have attacked prediction markets broadly,[12] some states have focused in particular on Kalshi's sports event contracts.  But these too are swaps that fall under the

---

[6] *Id.* at 3.

[7] *Id.*

[8] *Id.*

[9] Tradeweb and Kalshi Announce Strategic Partnership to Expand Institutional Access to Prediction Markets, Tradeweb (Feb. 19, 2026), https://www.tradeweb.com/newsroom/media-center/news-releases/tradeweb-and-kalshi-announce-strategic-partnership-to-expand-institutional-access-to-prediction-markets/.

[10] *See* Katherine Doherty and Sridhar Natarajan, *Wall Street Bond-Trading Hub Tradework Strikes Deal with Kalshi*, Bloomberg (Feb. 19, 2026), https://www.bloomberg.com/news/articles/2026-02-19/bond-trading-hub-tradeweb-strikes-prediction-markets-deal-with-kalshi.

[11] *See* Ryan Frazier, LɪɴᴋᴇᴅIɴ, https://www.linkedin.com/posts/activity-7386091007588749312-rhxN/ [https://perma.cc/CQN6-JK3M]; *see also* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises $1 Billion in a New Round*, N.Y. Tɪᴍᴇs (Dec. 2, 2025),https://www.nytimes.com/2025/12/02/business/dealbook/kalshi-prediction-market-billion.html [https://perma.cc/VUY8-HCDT]

[12] Brown, *supra* note 2; Minty Buckwalter, *Gov. Spencer Cox vows fight to keep prediction markets out of Utah*, Desert News (Feb. 17, 2026), https://www.deseret.com/utah/2026/02/17/governor-cox-vows-legal-battle-over-prediction-markets/.

CFTC's exclusive jurisdiction.  That is because, as both courts and the CFTC have recognized, sporting events can have significant economic consequences for a broad ecosystem of stakeholders.  *Orgel*, 2026 WL 474869, at *7–10; *Flaherty*, 2025 WL 1218313, at *6; CFTC Amicus Br. at 19-20.  Advertisers, sponsors, television networks, local communities, sportsbooks, and others all stand to gain or lose substantial sums depending on the outcomes of sports events.  Sports event contracts thus offer these entities opportunities to hedge their exposure.  And that is happening in the market right now.

41.    Take, for example, Game Point Capital, a sports-focused insurance firm that works with college athletic departments, pro teams, and sponsors to insure risk related to performance bonuses, coach salary buyouts, postseason and ticket revenue, and other areas of economic exposure.[13]  Game Point Capital uses Kalshi to hedge, and it intends to do so for $30 million in risk annually.[14]

42.    Likewise, Underdog Sports, a fantasy sports company, uses Kalshi as a tool to "hedge against volatility" on its own platform.[15]  And others can as well:  sponsors of a particular team or athlete can use event contracts to hedge against the risk that the team or athlete underperforms.  Hotel operators can hedge against the revenue earned from a local team making a playoff run, and TV networks can hedge against the risk that star players who draw viewers may not play in certain games.

---

[13] Game Point Capital, *Services*, https://www.gamepointcapital.com/services; *see also* Paul Steinbach, *UConn Insured Basketball Coach Bonuses and Saved Nearly $3M*, Athletic Bus. (Apr. 23, 2024) https://www.athleticbusiness.com/operations/budgeting/article/15669200/uconn-insured-basketball-coach-bonuses-and-saved-nearly-3m (Game Point Capital wrote insurance contract that saved university nearly $3 million in bonus payments to coaches related to NCAA tournament performance.)

[14] Andrew Ross Sorkin, et al., *New Epstein Details Rattle Washington, Hollywood and Beyond*, N.Y. Times (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.html.

[15] *See* Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 20, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/.

43.     Event contracts are also a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions.  Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions.  This is not theoretical.  Kalshi has recently announced partnerships with CNN and CNBC, which make use of its market data in their reporting.[16]

44.     Kalshi has recently launched a platform, Kalshi Research, to share market data with academics and promote research derived from the same.[17]  Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event.  *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B.     Congress Delegated the Power to Regulate Event Contracts That Are Offered by a Regulated Exchange to the CFTC.**

45.     Futures contracts have long been regulated by the federal government.  In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures

---

[16] *See* James Faris, *Prediction giant Kalshi strikes a new media partnership with CNBC, days after its CNN deal*, Business Insider, (Dec. 4, 2025) https://www.businessinsider.com/kalshi-cnbc-deal-cnn-data-integration-partnership-2025-12; R.T. Watson, *Kalshi inks exclusive CNBC deal as prediction markets surge into mainstream media*, The Block, (Dec. 4, 2025) https://www.theblock.co/post/381415/kalshi-exclusive-cnbc-deal-prediction-markets-surge-mainstream-media.

[17] *See Kalshi launches new research arm*, Kalshi News, (Dec. 22, 2025) https://news.kalshi.com/p/kalshi-launches-research-arm-prediction-markets.

trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

46.    In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA.  Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves," thus subjecting futures exchanges to "conflicting regulatory demands."  *Am. Agric. Movement*, 977 F.2d at 1156.  One Senator remarked that "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).  As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974).  The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading.  *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).

47.    The public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM.  7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a).  An entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA.  17 C.F.R. § 38.3(a)(2).  Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation.  17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.  Proposed exchanges must

provide detailed information demonstrating their capacity to abide by the CEA. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. 17 C.F.R. § 38.3(a)(1).

48.     Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives traded on the market. Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event" contracts. *See id.* § 1a(47)(A)(ii), (iv), (vi).

49.     Once the CEA designates a board of trade as a DCM, the market is subject to an extensive framework for CFTC oversight. Part 38 of Title 17, Chapter 1 of the Code of Federal Regulations comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain their designations as DCMs. 17 C.F.R. pt. 38. Among other things, DCMs must abide by recordkeeping requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. DCMs must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Part 38 also imposes specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more.

50.     The CEA allows DCMs to list contracts on its exchange without pre-approval from the CFTC. To do so, a DCM self-certifies that a given contract complies with the CEA and CFTC regulations by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-

2(c)(1); 17 C.F.R. § 40.2(a).  The CFTC may initiate review of any contract under its purview.
*See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).  The CFTC also may require a DCM to submit a
"written demonstration" that it is "in compliance" with one or more Core Principles at any time.
17 C.F.R. § 38.5(b).

51.     Alternatively, exchanges have the option of submitting contracts to the CFTC for
approval prior to listing.  7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c).  The CFTC
"shall approve a new contract" unless the CFTC finds that it would violate the CEA.  7 U.S.C.
§ 7a-2(c)(5)(B).  Substantially all contracts listed by DCMs for trading are self-certified by the
listing DCMs; it is extremely rare for a DCM to seek CFTC approval of individual contracts.

52.     The CEA's enforcement process rounds out the comprehensive federal framework
that regulates futures derivatives sold on DCMs.  The CEA gives the CFTC discretion as to how
to police and enforce violations of the CEA for DCMs.  The CFTC includes an Enforcement
Division, which may initiate investigations and, with the approval of a majority of the CFTC,
pursue enforcement actions in federal court or administrative proceedings.  If the Division
concludes that there has been a violation of the CEA, it may recommend to the Commission that
it seek a wide range of enforcement measures, including (1) civil monetary penalties, (2)
restitution, (3) disgorgement, (4) suspension, denial, revocation, or restriction of registration and
trading privileges, and (5) injunctions or cease-and-desist orders.  *See* CFTC Division of
Enforcement, Enforcement Manual (May 20, 2020), https://www.cftc.gov/media/1966, at § 3.3.
If the Division suspects that an entity has engaged in criminal violations, the Division may also
refer the matter to the Department of Justice or the appropriate state authority for prosecution.  *Id.*

53.     The CFTC regulates derivatives that reference physical commodities like "wheat,
cotton, rice, corn, oats."  7 U.S.C. § 1a(9).  The CFTC also regulates derivatives on "excluded

commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9).

54.     In 2010, Congress amended the CEA to add "swaps" to the CFTC's exclusive jurisdiction and to define event contracts as a type of swap. *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i).

55.     The CFTC has also recognized that "event contracts," including contracts on "the outcome of particular entertainment events," "can be designed to exhibit the attributes of either options or futures contracts." *Concept Release*, 73 Fed. Reg. 25,669, 25,669–70 (May 7, 2008). An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence—for example, the occurrence or severity of a hurricane. Where event contracts pay out based on financially significant occurrences, they are "of the character of" futures and options, as understood by derivatives markets. *See id.* § 1a(36) (defining "option").

56.     Also, in 2010, Congress amended the CEA to add a "Special Rule" governing event contracts. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

**C.    After an Extensive Regulatory Process, the CFTC Registered Kalshi as a Contract Market That Operates Under Federal Law.**

57.    Kalshi is a CFTC-regulated exchange and prediction market where users can trade on the outcome of real-world events.  In 2020, the CFTC designated Kalshi as a contract market, affirming that its platform complied with the CEA.  Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

58.    Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

59.    Kalshi offers many kinds of event contracts related to an array of substantive areas like economics, finance, climate, technology, health, crypto, popular culture, and sports.  For example, Kalshi's platform currently allows users to trade on the level of US GDP growth in Q1 2026, the closing price of the S&P 500 at the end of 2026, whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030.  Kalshi also offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

60.    Prior to making a contract available for trade on its platform, Kalshi self-certifies to the CFTC, pursuant to section 7a-2(c)(1) of the CEA, that the offering complies with the CEA and CFTC regulations.  Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review.

61.    The CFTC also has the ability to require Kalshi to submit a "Demonstration of Compliance," which is "a written demonstration, containing supporting data, information and

documents" that a DCM is required to file upon request from the CFTC to explain how the DCM "is in compliance with one or more core principles as specified in the request." 17 C.F.R. § 38.5(b). The CFTC did just that with respect to Kalshi's first sports event contracts, and Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports event contracts traded on DCMs.

62.     The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed, with no hint that the agency views these contracts as falling outside of its jurisdiction. Had the CFTC deemed Kalshi's sports event contracts (or any other of its contracts) impermissible, it would have had the responsibility to "object[]" to the contracts. 7 U.S.C. § 7a-2(c)(3)(B)(ii). But it did not. Unless and until the CFTC takes action on a self-certified Kalshi contract—and they all have been self-certified—the contracts are authorized under federal law. 7 U.S.C. § 7a-2(c)(5).

**D.     Utah Governor Spencer Cox's and Utah Attorney General Derek Brown's Statements Concerning Event Contracts.**

63.     On June 17, 2025, December 22, 2025, and January 30, 2026, Defendant Brown signed amicus briefs in the United States Court of Appeals for the Third Circuit, the Fourth Circuit, and the Ninth Circuit, respectively. In the June 2025 amicus brief, Defendant Brown, on behalf of the State of Utah, assumed "absent preemption" that Kalshi's sports event contracts would constitute illegal sports gambling under Utah's laws. June Amicus at 3. In the December 2025 amicus brief, Defendant Brown, also on behalf of the State of Utah, similarly argued that Kalshi's event contracts constituted "sports betting" that is subject to Utah's anti-gambling laws, among other states' gambling laws. December Amicus at 1. In the January 2026 amicus brief, Defendant Brown again argued on behalf of the State of Utah that Kalshi's event contracts are "sports betting" and thus prohibited under the laws of Utah and other states. January Amicus at 1, 6.

64.    On February 17, 2026, the Governor responded to CFTC Chairman Selig's announcement on X (formerly Twitter) that the CFTC intends to defend its "exclusive jurisdiction over [] derivative markets" stating that he will use "every resource within [his] disposal as governor of the sovereign state of Utah" to challenge the CFTC's position.  Ex. 1.

65.    Then, on February 19, 2026, the Governor shared a news article on X titled "Gov. Cox vows fight to keep prediction markets out of Utah."  He also wrote that "Rebranding betting as a financial product doesn't reduce the harm it causes" and "We're ready to defend our laws in court."  Ex. 2.

66.    The Governor was also quoted in a February 20, 2026 news article in which he said "I think you're going to see 50 states suing these guys in one way or another.  It's illegal in Utah and will continue to be so."[18]  The Utah Governor also criticized CFTC Chairman Selig, and he suggested that enforcement against entities like Kalshi was imminent.  *See* Ex. 1.

67.    And then, following the Governor's threats, Defendant Brown made clear his intent to bring an action against Kalshi.[19]

68.    Violations of Utah's anti-gambling laws constitute felonies and misdemeanors. *E.g.*, Utah Code §§ 76-9-1404 ("Online gambling promotion" is a third degree felony); *id.* § 76-9-1405 ("General gambling promotion" is a class A misdemeanor or a third degree felony, depending on criminal history).  Significantly, Utah law exempts "lawful business transaction[s]"—such as transactions executed on a federally registered DCM—from its definition of gambling.

---

[18] Raga Justin, *Connecticut Gov. Lamont Pushes for Limits on Prediction Markets*, Bloomberg Law (Feb. 20, 2026, 3:10 PM EST), https://news.bloombergtax.com/daily-tax-report-state/connecticut-gov-lamont-pushes-for-limits-on-prediction-markets.

[19] Derek Brown, *Opinion: Utah's attorney general takes a stand against gambling and prediction markets*, Desert News (Feb. 22, 2026), https://www.deseret.com/opinion/2026/02/22/utah-gambling-apps-prediciton-markets-harmful-dangerous

Utah Code § 76-9-1401(8)(c)(i).   But this is a fact the Governor and state officials appear to disregard in their statements.

69.    The CFTC has, in an exercise of its exclusive jurisdiction, permitted Kalshi to offer event contracts for trade on its exchange, including its sports-event contracts, which the CFTC views as falling "comfortably within" the CEA and under its own regulatory authority.   CFTC Amicus Br at 19.   As a result, Kalshi now understands that Defendants, consistent with the Governor's recent statements, intend to take action against Kalshi, which the Governor incorrectly views as "illegal in Utah."

**E.    Defendants Have Not Provided Assurances of Non-Enforcement.**

70.    Kalshi has made good-faith efforts to engage Utah in dialogue.   It previously communicated with the Utah AG, and, following the Utah Governor's social media post on February 17, 2026, Kalshi's counsel attempted to contact the Utah AG and the Chief Deputy AG to receive assurances of non-enforcement.

71.    Despite previously having a positive working relationship with Kalshi's counsel, the Utah AG and Deputy AG did not reply to those inquiries.   The lack of response, combined with the clear threat included in the Governor's multiple public statements, has led Kalshi to believe that an enforcement action in Utah is imminent.

72.    Kalshi therefore has no option but to seek judicial relief.   The Utah Governor's statements, Defendant Brown's op-ed, and the multiple amicus briefs submitted in courts across the country suggest that Defendants believe Kalshi's event contracts in Utah violate Utah law and that Kalshi may be immediately subjected to action by the State.   Absent any assurances of non-enforcement Kalshi (and its users) face a threat of irreparable harm, leaving Kalshi with no choice to protect its commercial interests and those of its users except to bring this suit.

73.    Immediately following the filing of this complaint, Kalshi intends to inform the Utah AG of its filing, and Kalshi's intent to seek preliminary injunctive relief.  Kalshi will also inform the Utah AG that, unless Defendants assure Kalshi it will not begin an enforcement proceeding while Kalshi's motion for a preliminary injunction is pending, Kalshi will additionally seek a temporary restraining order barring such an action.[20]

## REQUISITES FOR RELIEF

74.    As a result of Defendants' threatened conduct described above, there is a strong likelihood that Defendants will take action, including, but not limited to, the enforcement of preempted state law threatened by Defendants' statements, which will violate the Supremacy Clause of the U.S. Constitution, and will subject Kalshi and its customers to irreparable harm.

75.    An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties.  Defendants' conduct alleged herein, including online threats to Kalshi, has already resulted in, and will continue to result in, irreparable injury to Plaintiff, including but not limited to economic hardship and impairment of existing contractual relationships.

76.    Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein.  Plaintiff therefore seeks declaratory and injunctive relief restraining Defendants from enforcing Utah law that interferes with the operation and function of Plaintiff's futures market described herein.

---

[20] Kalshi sought the same relief in Tennessee after the Tennessee Attorney General failed to provide any assurance that they would defer enforcement until the court reached a decision on Kalshi's motion for preliminary injunction, and the Tennessee court granted the temporary restraining order.  *Orgel*, 2026 WL 474869, at *1–2.

## COUNT I
**(Declaratory Judgment—Supremacy Clause—Preemption by Commodity Exchange Act)**

77.    Plaintiff incorporates all prior paragraphs by reference.

78.    The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

79.    The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

80.    Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos."  Senate Hearings, at 685 (statement of Sen. Clark).  Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges.  *See, e.g.*, *Am. Agric. Movement*, 977 F.2d at 1156; *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

81.    In threatening to enforce Utah's anti-gambling laws against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges.  Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the

same putative subject matter.  Because federal law occupies the entire field of regulating trading on designated contract markets, Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause.

82.     In addition, Defendants' threatened actions conflict with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized (and to subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges.  In addition, complying with Defendants' implicit demand to immediately cease offering event contracts in Utah or face criminal charges could conflict with the federal law governing DCMs, and would thus imperil Kalshi's CFTC approval.  For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

83.     Defendants may not enforce Utah's anti-gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1.     Enter a judgment declaring that Utah Code §§ 76-9-1401 *et seq.* and any other Utah law that is used in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2.     Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them

who receive actual notice of the injunction, from enforcing Utah Code §§ 76-9-1401 *et seq.* or any

other Utah law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff;

   3.      Any other relief within this Court's discretion that it deems just and proper.


DATED: February 23, 2026.

                                     Respectfully submitted,

                              **SNELL & WILMER L.L.P.**


                              */s/ Matthew L. Lalli*                            
                              Matthew L. Lalli
                              Annika L. Jones
                              Brandon S. Fuller

                              and

                              Neal Katyal (*pro hac vice* forthcoming)
                              Joshua B. Sterling (*pro hac vice* forthcoming)
                              William E. Havemann (*pro hac vice* forthcoming)
                              **MILBANK LLP**
                              1101 New York Avenue NW
                              Washington D.C. 20005
                              Telephone: 202-835-7500
                              Facsimile: 202-263-7586


                              Grant R. Mainland (*pro hac vice* forthcoming)
                              Andrew L. Porter (*pro hac vice* forthcoming)
                              Karen Wong (*pro hac vice* forthcoming)
                              **MILBANK LLP**
                              55 Hudson Yards
                              New York, NY 10001
                              Telephone: 212-530-5000
                              Facsimile: 212-530-5219

                              *Attorneys for Plaintiff KalshiEX LLC*