Matthew L. Lalli (6105)
Annika L. Jones (16483)
Brandon S. Fuller (17215)
**SNELL & WILMER L.L.P.**
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
mlalli@swlaw.com
aljones@swlaw.com
bfuller@swlaw.com

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice*)
William E. Havemann (*pro hac vice*)
**MILBANK LLP**
1101 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice*)
Andrew L. Porter (*pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KALSHIEX LLC,<br><br>    *Plaintiff*,<br><br>    v.<br><br>SPENCER J. COX, in his official capacity as Governor of Utah; DEREK BROWN, in his official capacity as Attorney General of Utah; DANIEL BURTON, in his official capacity as Chief Deputy Attorney General and General Counsel of Utah; STEWART YOUNG, in his official capacity as Criminal Deputy Attorney General of Utah; and DOUGLAS CRAPO, in his official capacity as Public Protection Attorney General of Utah,<br><br>    *Defendants*. | **PLAINTIFF'S RENEWED MOTION AND MEMORANDUM OF LAW IN SUPPORT OF A PRELIMINARY INJUNCTION**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Case No.: 2:26-cv-00151-RJS |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 2

BACKGROUND ................................................................................................................. 3

    A.    The Exclusive Federal Scheme for Regulating Derivatives on DCMs.................. 3

    B.    Kalshi's Registration as a CFTC-Designated Contract Market Under Federal Law. ......................................................................................................... 7

    C.    The Utah Regulatory Scheme for Gaming............................................................ 8

    D.    Defendants' Statements Concerning Event Contracts. ......................................... 8

    E.    Defendants Confirm Their Intention to Bring an Enforcement Action. ................ 9

ARGUMENT .................................................................................................................... 10

    A.    Kalshi Is Likely to Succeed Because Utah's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations. ...................... 10

          1.    Utah's Gambling Laws Are Expressly and Impliedly Field Preempted as Applied to Kalshi's Event Contracts. ............................... 11

          2.    Utah Laws Are Conflict-Preempted as Applied to Kalshi...................... 17

    B.    Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction. ............ 20

    C.    The Balance of the Equities and Public Interest Favor a Preliminary Injunction ............................................................................................................. 23

CONCLUSION................................................................................................................. 24

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ........................................................................4, 7, 17

*Arizona v. United States*,
567 U.S. 387 (2012)........................................................................................11, 19, 23

*Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*,
543 F.3d 275 (6th Cir. 2008) ........................................................................23

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ...................................................................20, 23

*Blue Lake Rancheria v. Kalshi Inc.*,
No. 25-cv-06162, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ....................................15, 16

*BNSF Ry. Co. v. Hiett*,
22 F.4th 1190 (10th Cir. 2022) ......................................................................12

*Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390 (9th Cir. 2002) .....................18

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ........................................................................22

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) ........................................................................22

*Chamber of Com. of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ......................................................................22, 23

*Collins v. Daniels*,
916 F.3d 1302 (10th Cir. 2019) ....................................................................21

*Colonial Ford, Inc. v. Ford Motor Co.*,
No. C 75-190, 1975 WL 929 (D. Utah Aug. 18, 1975) ...........................................23

*Commonwealth of Mass. v. KalshiEX LLC*,
No. 2584-cv-02525 (Mass. Sup. Ct.) ...............................................................21

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)..................................................................10, 11, 17, 20

ii

*Denver Homeless Out Loud v. Denver,*
　　32 F.4th 1259, 1278 (10th Cir. 2022) ...................................................................23

*Evans v. Utah,*
　　21 F. Supp. 3d 1192 (D. Utah 2014)......................................................................20

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
　　458 U.S. 141 (1982)...............................................................................................10

*FTC v. Ken Roberts Co.,*
　　276 F.3d 583 (D.C. Cir. 2001) ...............................................................................12

*Hines v. Davidowitz,*
　　312 U.S. 52 (1941)......................................................................................10, 11, 18

*Hughes v. Talen Energy Mktg., LLC,*
　　578 U.S. 150 (2016).................................................................................................11

*Husky Ventures, Inc. v. B55 Investments, Ltd.,*
　　911 F.3d 1000 (10th Cir. 2018) ..............................................................................23

*Ingersoll-Rand Co. v. McClendon,*
　　498 U.S. 133 (1990).................................................................................................18

*INS v. Cardoza-Fonseca,*
　　480 U.S. 421 (1987).................................................................................................14

*Int'l Trading, Ltd. v. Bell,*
　　556 S.W.2d 420 (Ark. 1977) (en banc)...................................................................13

*KalshiEX LLC v. Orgel,*
　　2026 WL 474869 (M.D. Tenn. Feb. 19, 2026).............................................17, 19, 20

*KalshiEX LLC v. CFTC,*
　　119 F.4th 58 (D.C. Cir. 2024)..............................................................................2, 14

*KalshiEX LLC v. CFTC,*
　　No. 23-3257, 2024 WL 4164694 (D.D.C. Sep. 12, 2024)...............................3, 4, 7

*KalshiEX LLC v. Flaherty,*
　　No. 25-1922, --- F.4th ---, 2026 WL 924004 (3d Cir. Apr. 6, 2026).............. *passim*

*KalshiEX LLC v. Johnson,*
　　2026 WL 976055 (D. Ariz. Apr. 10, 2026) ..............................................................3

*KalshiEX LLC v. Martin*,
　　793 F. Supp. 3d 667 (D. Md. 2025) ......................................................................... 12

*KalshiEX, LLC v. Hendrick*,
　　No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025) ............................ 12

*KalshiEX, LLC v. Hendrick*,
　　No. 25-7516 (9th Cir. Nov. 28, 2025) ..................................................................... 12

*La. Pub. Serv. Comm'n v. FCC*,
　　476 U.S. 355 (1986) ................................................................................................. 14

*Leist v. Simplot*,
　　638 F.2d 283 (2d Cir. 1980) .......................................................................... 2, 13, 17

*Merrill Lynch, Pierce, Fenner and Smith, Inc. v. Curran*,
　　456 U.S. 353 (1982) ................................................................................................. 14

*Metro. Life Ins. Co. v. Pettit*,
　　164 F.3d 857 (4th Cir. 1998) .................................................................................... 18

*Mississippi v. Louisiana*,
　　506 U.S. 73 (1992) ................................................................................................... 11

*Morales v. Trans World Airlines, Inc.*,
　　504 U.S. 374 (1992) ................................................................................................. 20

*N. Am. Derivatives Exch., Inc. v. Nevada*,
　　No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ..................................14, 15, 18, 23

*State of Nevada ex rel. Nevada Gaming Control Bd. v. KalshiEX LLC*,
　　No. 26 OC 00050-1B (Nev. Dist. Ct.) ..................................................................... 21

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach*,
　　738 F.3d 192 (9th Cir. 2013) .................................................................................... 12

*Ortega v. Grisham*,
　　148 F.4th 1134 (10th Cir. 2025) .............................................................................. 23

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
　　461 U.S. 190 (1983) ................................................................................................. 11

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
　　515 F. Supp. 202 (N.D. Ala. 1981) .......................................................................... 16

*Rice v. Bd. of Trade of Chi.*,
    331 U.S. 247 (1947)....................................................................................................13

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ................................................................................24

*Slaney v. Int'l Amateur Athletic Fed'n*,
    244 F.3d 580 (7th Cir. 2001) ....................................................................................12

*Szymakowski v. Utah High Sch. Activities Ass'n, Inc.*,
    756 F. Supp. 3d 1238 (D. Utah 2024).......................................................................10

*UBS Bank USA v. Hussein*,
    No. 2:14-CV-106, 2014 WL 1600375 (D. Utah Apr. 21, 2014)...............................24

*United States v. New York*,
    708 F.2d 92 (2d Cir. 1983).......................................................................................22

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ..................................................................................20

*Winnebago Tribe of Neb. v. Stovall*,
    341 F.3d 1202 (10th Cir. 2003) ................................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................................10

*Ex parte Young*,
    209 U.S. 123 (1908)..................................................................................................21

**Statutes**

7 U.S.C. § 1a(9) ................................................................................................................6

7 U.S.C. § 1a(19)(iv)........................................................................................................6

7 U.S.C. § 1a(47)(A)(ii)....................................................................................................6

7 U.S.C. § 2(a)(1)(A) ................................................................................................. *passim*

7 U.S.C. § 2(e) ...........................................................................................................5, 15

7 U.S.C. § 7(a) ...........................................................................................................5, 15

7 U.S.C. § 7a-2(c)(1).................................................................................................6, 15

7 U.S.C. § 7a-2(c)(2)....................................................................................................15

7 U.S.C. § 7a-2(c)(5)(B) .................................................................................................6

7 U.S.C. § 7a-2(c)(5)(C)(i) ...............................................................................6, 7, 15, 19

7 U.S.C. § 7a-2(c)(5)(C)(ii) .............................................................................................7

7 U.S.C. § 13a-2(1) .......................................................................................................16

7 U.S.C. § 13a-2(7) .......................................................................................................16

7 U.S.C. § 16(e)(1)(C) ...................................................................................................16

7 U.S.C. § 38.3(a)(1).......................................................................................................5

31 U.S.C. § 5362(1)(E) ..................................................................................................16

31 U.S.C. § 5362(10)(A) ................................................................................................16

Utah Code § 70A-9a-102(15) .........................................................................................17

Utah Code § 76-3-203 ......................................................................................................8

Utah Code § 76-3-204 ......................................................................................................8

Utah Code § 76-9-1401(8)(a)...........................................................................................8

Utah Code § 76-9-1401(8)(c)(i)....................................................................................8, 17

Utah Code §§ 76-9-1401 *et seq.* ....................................................................................1

Utah Code § 76-9-1404 *et seq.* ......................................................................................8

Utah Code § 76-9-1405....................................................................................................8

**Other Authorities**

17 C.F.R. § 1.31 .............................................................................................................15

17 C.F.R. § 38.3(a)...........................................................................................................5

17 C.F.R. § 38.3(a)(2).......................................................................................................5

17 C.F.R. § 38.5(b) ...........................................................................................................7

17 C.F.R. § 38.100 .........................................................................................................15

17 C.F.R. § 38.150 .........................................................................................................18

17 C.F.R. § 38.151(b) ...........................................................................................................18, 23

17 C.F.R. § 38.152 .......................................................................................................................4

17 C.F.R. § 38.250 .......................................................................................................................4

17 C.F.R. § 38.255 ................................................................................................................19, 23

17 C.F.R. § 38.450, pt. 16 ..........................................................................................................15

17 C.F.R. § 38.950 .....................................................................................................................15

17 C.F.R. § 38.1101(a)(2) ...........................................................................................................15

17 C.F.R. § 38.1101(a)(2), pt. 38 ...............................................................................................15

17 C.F.R. § 40.2(a) ......................................................................................................................6

17 C.F.R. § 40.2(a)(2) .................................................................................................................15

17 C.F.R. § 40.2(c) ......................................................................................................................15

17 C.F.R. § 40.11 ........................................................................................................................15

17 C.F.R. § 40.11(a) .....................................................................................................................7

17 C.F.R. § 40.11(c) .....................................................................................................................6

120 Cong. Rec. 30464 (1974) .....................................................................................................13

7 U.S.C. § 1a(47)(A)(iv) ..............................................................................................................6

7 U.S.C. § 1a(47)(A)(vi) ..............................................................................................................6

CFTC. S. Rep. No. 93-1131 (1974) .........................................................................................5, 13

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837 and H.R. 13113*, 93d Cong., 2d Sess. 848 (1974) ....................................................................................................5, 12

Derek Brown, *Opinion: Utah's attorney general takes a stand against gambling and prediction markets*, Deseret News (Feb. 22, 2026, 11:00 AM MST) ..........................9, 21

Diercks, Anthony M., Jared Dean Katz, and Jonathan H. Wright (Feb. 18, 2026), "Kalshi and the Rise of Macro Markets," Finance and Economics Discussion Series 2026-010, Washington: Board of Governors of the Federal Reserve System ....................................................................................................................4

*Exclusive,* American Heritage Dictionary (2d ed. 1980) ...............................................11

Fed. R. Civ. P. 65.................................................................................................1, 10

H.R. 13113*, 93d Cong., 2d Sess. 848 (1974)........................................................5, 13

H.R. Conf. Rep. No. 93-1383 ........................................................................................5

H.R. Rep. No. 93-975 (1974).................................................................................13, 15

H.R. Rep. No. 93-1383 (1974).................................................................................2, 13

H.R. Rep. No. 97-565, pt. 1 (1982)..............................................................................16

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
    L. Rev. 657, 721 (1982) ........................................................................................3

Order, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715-MTL (D. Ariz. Apr. 23,
    2026), ECF No. 84 .................................................................................................3

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption
    as Public Policy*, 29 Vand. L. Rev. 1 (1976) .......................................................10

Public Statements & Remarks, CFTC, Remarks of Chairman Michael S. Selig at
    CFTC-SEC Event on Harmonization (Jan. 29, 2026)......................................14, 19

Raga Justin, *Connecticut Gov. Lamont Pushes for Limits on Prediction Markets*,
    Bloomberg Law (Feb. 20, 2026, 1:10 PM MST).....................................................9

*Review of Commodity Exchange Act and Discussion of Possible Changes:
    Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. 128 (1973).......5, 16

## SPECIFIC RELIEF SOUGHT AND THE GROUNDS THEREFOR

Plaintiff KalshiEX LLC ("Plaintiff" or "Kalshi") moves the Court under Rule 65 of the Federal Rules of Civil Procedure for the entry of a preliminary injunction prohibiting Defendants Spencer J. Cox, in his official capacity as Governor of Utah; Derek Brown, in his official capacity as Attorney General of Utah; Daniel Burton, in his official capacity as Chief Deputy Attorney General and General Counsel of Utah; Stewart Young, in his official capacity as Criminal Deputy Attorney General of Utah; Douglas Crapo, in his official capacity as Public Protection Attorney General of Utah (together, "Defendants"); and Defendants' officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Utah Code §§ 76-9-1401 *et seq.* or any other Utah law that attempts to regulate Kalshi's exchange. This motion for a preliminary injunction (the "Motion") is made on the following grounds.

Defendants are unconstitutionally threatening to enforce Utah's anti-gambling laws against Kalshi, even though Kalshi's conduct is governed by the Commodity Exchange Act ("CEA") and subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC"). The Supremacy Clause of the United States Constitution prohibits Defendants from enforcing preempted state law against Kalshi. Defendants have nonetheless threatened Kalshi with imminent enforcement and a preliminary injunction is required to uphold federal law and the CFTC's exclusive jurisdiction to regulate Kalshi and other prediction markets.

Kalshi faces myriad imminent harms from Defendants' unconstitutional threats to enforce state laws. Kalshi is likely to prevail on the merits, because federal law preempts the application of Utah law against Kalshi. The balance of harms and public interest likewise favor Kalshi. Kalshi respectfully requests that the Court grant the Motion and issue a preliminary injunction.

1

## **INTRODUCTION**

Defendants are unconstitutionally threatening to prohibit trading on Kalshi's federally designated contract market ("DCM"), even though Kalshi's contracts are federally authorized; Congress preempted state law by granting the CFTC "exclusive jurisdiction" to regulate trading on DCMs; and Utah law exempts "lawful business transactions" from its definition of gambling. Defendants have repeatedly stated that Kalshi is operating unlawfully in Utah and have threatened to take imminent action to force Kalshi to cease offering event contracts in the state. These threats to enforce preempted state laws subject Kalshi to irreparable harm and require preliminary relief.

Every marker of congressional intent confirms that Congress intended to preempt state regulation of trading on DCMs like Kalshi. The CEA's text grants the CFTC "exclusive jurisdiction" and thereby "supersede[s]" state law. 7 U.S.C. § 2(a)(1)(A). Congress sought to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974). Courts have easily held for 50 years that "the CEA preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982). The CFTC itself recognizes that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583. For that reason, multiple federal courts have recently granted Kalshi preliminary relief against the sort of state enforcement Defendants threaten here. Earlier this month, the Third Circuit affirmed a preliminary injunction barring New Jersey officials from enforcing state laws similar to those invoked by Utah, finding that because "Congress gave the CFTC exclusive jurisdiction over trades on DCMs, [and] provided for continued state regulation of trades conducted off DCMs," it was "reasonable for the District Court to conclude that Kalshi was likely to succeed in showing that the [CEA] preempts [state] law from reaching into Kalshi's CFTC-licensed DCM." *KalshiEX LLC v. Flaherty*, No. 25-1922, --- F.4th ---, 2026 WL 924004, at *6 (3d Cir. Apr. 6, 2026). Two weeks ago, a federal district court temporarily enjoined Arizona state regulators from enforcing state gaming laws against

DCMs, and intends to convert that TRO to a preliminary injunction. *KalshiEX LLC v. Johnson*, 2026 WL 976055, at *1 (D. Ariz. Apr. 10, 2026); Order, *KalshiEX LLC v. Johnson*, No. 2:26-cv-01715-MTL (D. Ariz. Apr. 23, 2026), ECF No. 84. And the CFTC and the U.S. Department of Justice have initiated litigation against Arizona, Connecticut, Illinois, and New York to prevent them from applying state gambling laws to event contracts traded on CFTC-regulated DCMs, confirming the CFTC's view that trading of Kalshi's event contracts is subject to its exclusive jurisdiction. *See generally* Complaint, *United States v. Arizona*, 2:26-cv-02246 (D. Ariz. Apr. 2, 2026); Complaint, *United States v. Connecticut*, 3:26-cv-00498 (D. Conn. Apr. 2, 2026); Complaint, *United States v. Illinois*, 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026); Complaint, *United States v. New York*, 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026). These recent decisions adhere to a longstanding consensus that "the CEA preempts state bucket-shop laws and other anti-gambling legislation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 721 (1982).

Kalshi has no option but to seek preliminary relief. After filing suit on February 23, the parties agreed to seek a stay of deadlines from the Court pending discussions of the issues raised in Kalshi's Complaint. *See* ECF No. 17; ECF No. 25 (entering stay). On April 22, 2026, counsel for Defendants informed Kalshi that Utah intends to commence enforcement proceedings following a 30-day notice period. Defendants have not agreed to stay enforcement beyond that period. Kalshi therefore respectfully requests that this Court issue a preliminary injunction.

## BACKGROUND

### A. The Exclusive Federal Scheme for Regulating Derivatives on DCMs

Derivative contracts are financial tools that traders use to mitigate risk. *See KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *1–2 (D.D.C. Sep. 12, 2024). Event contracts are a type of derivative contract—they identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. *See id.* at *2. The event contracts at issue here

3

are traded on an exchange, so their prices are determined by market forces.  Kalshi does not set the price of any of the contracts traded on its exchange, and unlike a sportsbook there is no "house" that stacks the odds in its own favor.  Declaration of Xavier Sottile ("Sottile Decl.") ¶¶ 33–34.[1] This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a uniquely sensitive financial instrument that tracks real-world market perceptions.[2] *Id.*  During the contract period, individuals can buy and sell the contract at its changing prices.  No user is locked into a contract, and users may trade contracts in accordance with their desire to hedge risk.  Compl. ¶¶ 33–34, ECF No. 1.  The ultimate value of a contract is determined at its expiration date—most commonly, the event's occurrence or a date upon which the contract terminates.  *See KalshiEX*, 2024 WL 4164694, at *2.  For example, a property owner on the Gulf Coast may place a position on whether a hurricane will strike the area around his property in 2026.  *Id.*  If a hurricane strikes, the property owner will receive payment on the contract, which mitigates financial losses associated with the hurricane.  *Id.*

Congress passed the CEA in 1936 to regulate derivatives exchanges, but it initially chose not to preempt state regulation of those exchanges.  In 1974, Congress amended the CEA to establish the CFTC as the federal agency empowered to oversee and regulate exchanges under the

---

[1] For this reason, federal law as enforced by the CFTC focuses on preventing market manipulation and disruption and ensuring market efficiency nationwide.  *See* 17 C.F.R. §§ 38.250, 38.152; *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995).

[2] Researchers at the Federal Reserve published a paper last week, indicating "that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is valuable to both researchers and policymakers," and finding that "in several episodes, they allocate probability mass in ways that may reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."  Diercks, Anthony M., Jared Dean Katz, and Jonathan H. Wright (Feb. 18, 2026), "Kalshi and the Rise of Macro Markets," Finance and Economics Discussion Series 2026-010, Washington: Board of Governors of the Federal Reserve System, https://doi.org/10.17016/FEDS.2026.010.

CEA and to grant the CFTC "exclusive jurisdiction" to regulate trading on the exchanges it oversees. These amendments were designed to "[b]ring[] all futures trading under federal regulation." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong., 2d Sess. 848 (1974) (hereinafter "Senate Hearings"). Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. 128 (1973). Subjecting exchanges to "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark).

Congress also deliberately reinforced the CFTC's exclusive jurisdiction. After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "where the jurisdiction of the [CFTC] is applicable, it supersedes State as well as Federal agencies." *Id.* at 23. The Senate also "struck" the existing CEA provision that preserved states' authority to regulate derivatives transactions. H.R. Conf. Rep. No. 93-1383, at 35. As the conference report explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.*

The CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The exchange's application must detail its capacity to comply with all CFTC rules and regulations through a series of written submissions and exhibits. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the exchange's designation. *Id.* § 38.3(a)(1).

Once the CFTC designates an entity as a contract market—known as a "DCM"—the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts,

5

agreements … and transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).  This exclusive jurisdiction extends to event contracts.  *See id.* §§ 1a(47)(A)(ii), (iv), (vi).  The CFTC also regulates derivatives on "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences.  *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9).

DCMs are subject to the CFTC's extensive regulatory framework as set out in the CEA and CFTC regulations.  Together, these provisions establish a comprehensive scheme for regulating DCMs.  The CEA prescribes a specific method by which the CFTC may approve new contracts on DCMs.  A DCM that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).  The contracts are effective on the first day after the Commission receives the certification unless and until the CFTC initiates review of any contract.  *See* 17 C.F.R. § 40.11(c).  The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  If a DCM offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including but not limited to revocation of licensing, civil penalties, and criminal enforcement.

In 2010, Congress amended the CEA to add a "Special Rule" specifically addressing event contracts, which are "agreements, contracts, transactions, or swaps in excluded commodities."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity

6

that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.*; *see also* 17 C.F.R. § 40.11(a) (implementing Special Rule). The decision to prohibit an event contract that falls within any of these categories is subject to the CFTC's evaluation of the "public interest." *See KalshiEX*, 2024 WL 4164694, at *3 ("[T]he CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves" one of the enumerated categories). The Special Rule further provides that no contract "determined by the Commission to be contrary to the public interest . . . may be listed or made available for clearing or trading on or through a registered entity." 7 U.S.C. § 7a-2(c)(5)(C)(ii).

**B. Kalshi's Registration as a CFTC-Designated Contract Market Under Federal Law**

In 2020, the CFTC certified Kalshi as a DCM, affirming that its platform complies with the CEA's regulatory requirements. *KalshiEX*, 2024 WL 4164694, at *4. Because Kalshi is a DCM, its event contracts are subject to the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A). Federal law requires Kalshi to comply with a host of federal requirements designed to ensure market integrity. An exchange's status as a DCM "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement*, 977 F.2d at 1150–51.

Kalshi offers event contracts related to economics, finance, health, cryptocurrencies, popular culture, and sports. Compl. ¶ 59. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, whether the market share for electric vehicles will be above 50% in 2030, and who will win the Masters Golf Tournament. *Id.* Shortly after Kalshi self-certified its first sports event contract in January 2025, the CFTC requested that Kalshi submit a demonstration of compliance with the CEA for those contracts, pursuant to 17 C.F.R. § 38.5(b). Compl. ¶ 61. Kalshi responded with lengthy memoranda detailing its listings'

compliance with applicable rules and regulations and the CFTC's jurisdiction over sports event contracts traded on DCMs. *Id.* The CFTC took no further action, and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed. *Id.* These contracts, like all of Kalshi's contracts, are lawful under federal law, and they fall under the CFTC's exclusive jurisdiction. *Id.* ¶¶ 3, 13.

### C. The Utah Regulatory Scheme for Gaming

Utah regulates gambling through its criminal code. *See* Utah Code §§ 76-9-1404 *et seq.* The definition of gambling includes risking anything of value on the outcome of a contest, game, or gaming scheme based on chance, or "agreement or understanding that someone will receive anything of value in the event of a certain outcome." *See* Utah Code § 76-9-1401(8)(a). But "lawful business transaction[s]" are exempt from that definition. Utah Code § 76-9-1401(8)(c)(i). Violations of Utah's anti-gambling laws constitute felonies and misdemeanors. Utah Code §§ 76-9-1404 ("Online gambling promotion" is a third-degree felony), *id.* § 76-9-1405 ("General gambling promotion" is a class A misdemeanor or a third-degree felony, depending on criminal history). A third-degree felony conviction permits imprisonment for up to five years, while a class A misdemeanor conviction warrants a prison term up to 364 days. *Id.* §§ 76-3-203, 204.

### D. Defendants' Statements Concerning Event Contracts

On February 17, CFTC Chairman Selig announced on X that the CFTC intends to defend its "exclusive jurisdiction over [] derivative markets." Ex. 4. In response, the Governor stated that he will use "every resource within [his] disposal as governor of the sovereign state of Utah, and under the Constitution of the United States" to challenge the CFTC's position "in court." Ex. 1. Two days later, on February 19, the Governor shared an article titled "Gov. Cox Vows Fight to Keep Prediction Markets Out of Utah" via X. Ex. 2. In this post, he stated that "[r]ebranding betting as a financial product doesn't reduce the harm it causes" and that Defendants are "ready to

8

defend" Utah's "laws in court." *Id.* The Governor has also said "I think you're going to see 50 states suing these guys in one way or another," and that prediction markets are "illegal in Utah."[3]

On February 22, 2026, Defendant Brown published an op-ed, which referenced Kalshi by name, made clear that he considers trading event contracts to be illegal in Utah, and stated he has a plan to address prediction markets operating in the state.[4] These statements echoed amicus briefs Defendant Brown signed in pending litigation claiming that Kalshi is violating comparable state laws by offering sports event contracts. And on April 22, 2026, Defendants informed Kalshi they intend to initiate an enforcement proceeding against it.

Defendants' public statements were not limited to sports event contracts, and instead suggested that Defendants believe that *all* event contracts constitute illegal gambling. These statements are an assault on the CFTC's authority to regulate *all* event contracts, and if Defendants carry out these threats, they would devastate Kalshi's business.

### E. Defendants Confirm Their Intention to Bring an Enforcement Action

On April 22, 2026, Defendants' counsel notified Kalshi of their intent to proceed with an enforcement action against Kalshi no sooner than 30 days from that date (May 22, 2026). *See* ECF No. 28 at 2. The parties then met-and-conferred, and Defendants agreed to refrain from initiating an enforcement proceeding against Kalshi during the 30-day period. *Id*. The parties further agreed to request an expedited briefing schedule for this motion. *Id*. In light of Defendants' commitment, Kalshi is not seeking a temporary restraining order at this time, but has reserved the right to do so should the Court require time beyond May 22, 2026 to resolve this motion. *Id*. at 3.

---

[3] Raga Justin, *Connecticut Gov. Lamont Pushes for Limits on Prediction Markets*, Bloomberg Law (Feb. 20, 2026, 1:10 PM MST), https://news.bgov.com/crypto/connecticut-gov-lamont-pushes-for-limits-on-prediction-markets.

[4] Derek Brown, *Opinion: Utah's attorney general takes a stand against gambling and prediction markets*, Deseret News (Feb. 22, 2026, 11:00 AM MST), https://www.deseret.com/opinion/2026/02/22/utah-gambling-apps-prediciton-markets-harmful-dangerous/.

## ARGUMENT

Federal Rule of Civil Procedure 65 governs preliminary injunctions. *Szymakowski v. Utah High Sch. Activities Ass'n, Inc.*, 756 F. Supp. 3d 1238, 1246 (D. Utah 2024). To obtain such relief, the moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Kalshi satisfies each element of the inquiry, which is why the Third Circuit affirmed a decision granting Kalshi a preliminary injunction, and a district court in Tennessee provided the same relief. And a district court in Arizona will soon convert a TRO it granted to the CFTC into a preliminary injunction after making similar findings.

**A. Kalshi Is Likely to Succeed Because Utah's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations**

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law either expressly or impliedly. One manner of preemption is known as field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Alternatively, federal law can preempt state law where compliance with both is impossible or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976), https://scholarship.law.vanderbilt.edu/vlr/vol29/iss1/1/. Utah's gambling laws are no exception.

10

1. <u>Utah's Gambling Laws Are Expressly and Impliedly Field Preempted as Applied to Kalshi's Event Contracts</u>

Field preemption can be either express or implied.  *See Crosby*, 530 U.S. at 372 n.6 (the preemption "categories" "are not 'rigidly distinct,'" and "'field' preemption may fall into any of the categories of express, implied, or conflict preemption").  Congress's intent to occupy a field can be apparent in the statutory text and history.  *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–13 (1983).  Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards" designed to function "as a 'harmonious whole.'"  *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines*, 312 U.S. at 72).  "Where Congress occupies an entire field," "even *complementary* state regulation is impermissible." *Id.* (emphasis added).  Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation.  Every marker of congressional intent confirms that Congress has preempted the field.

*Statutory Text*:  The text of the 1974 amendments to the CEA could hardly be clearer.  Congress established the CFTC and granted it "*exclusive jurisdiction*" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.

The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities not named in that provision. *Mississippi v. Louisiana,* 506 U.S. 73, 77–78 (1992), *see also Exclusive*, American Heritage Dictionary (2d ed. 1980) ("Not divided or shared with others"; "separate, incompatible").  Thus, the Supreme Court has repeatedly instructed that state law is preempted where a federal agency's jurisdiction is "exclusive." *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).  And courts have easily found that statutes containing similar language

11

preempt parallel state law regulation.  *See BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1194 (10th Cir. 2022) (statutory grant of "exclusive jurisdiction" to federal agency preempted state law "by its plain language"); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001) (statutory grant of "exclusive jurisdiction" to committee preempted state law).

Other features of Section 2(a)'s text confirm its preemptive effect.  Section 2(a) contains a savings clause providing that it does not "supersede" the jurisdiction of "other regulatory authorities" under the laws of any State.  7 U.S.C. § 2(a)(1)(A).  Crucially, the clause applies *"[e]xcept as hereinabove provided"* by the grant of exclusive jurisdiction to the CFTC over trading on DCMs.  *Id.* (emphasis added).  That proviso enables a "logical inference" of preemption as to matters within the CFTC's exclusive jurisdiction.  *See Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 194–196 (9th Cir. 2013).  Because the savings clause clarifies that state law is not "supersede[d]" as *to off-DCM* transactions, it confirms that state law is superseded as *to on-DCM* transactions.  Indeed, Congress added the proviso specifically to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6.[5]

*Statutory Purpose*:  Congress in the 1974 Act sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ by jurisdiction.  One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation." *FTC v. Ken Roberts*

---

[5] A Maryland district court ruled differently, but Kalshi has appealed to the Fourth Circuit, and the defendants agreed not to enforce any action against it during the appeal.  *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025), *appeal filed*, No. 25-1892 (4th Cir. Aug. 6, 2025). A district court in Nevada recently dissolved a preliminary injunction it had previously granted to Kalshi.  The Nevada court did not dispute that the CEA preempts state gaming law as applied to trading swaps and futures contracts on DCMs but instead concluded that Kalshi's sports event contracts do not qualify as swaps or futures subject to CFTC jurisdiction.  *See KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 3286282, at *11–12 (D. Nev. Nov. 24, 2025).  That conclusion was mistaken and conflicts with the CFTC's clear jurisdiction over Kalshi's contracts. Kalshi has appealed to the Ninth Circuit, which has not yet ruled on its motion for a stay pending appeal.  *See KalshiEX, LLC v. Hendrick*, No. 25-7516 (9th Cir. Nov. 28, 2025).

*Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  As one sponsor of the 1974 Act explained, "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).

Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 82 (1974).  The Conference Report confirmed Congress's intent to preempt the field: "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned*."  H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.) (emphasis added).

Courts agree that Congress intended to prevent states from exercising parallel authority over commodity futures trading on exchanges designated by the CFTC.  Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges.  *Leist*, 638 F.2d at 322; *see also Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (en banc) (exclusive jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act").  Defendants' effort to regulate Kalshi's event contracts cannot be reconciled with that clear congressional purpose.

*Drafting History*:  The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi.  To "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading.  120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis); *see also Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947).  And after House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC.  S. Rep. No. 93-1131, at 31 (1974).  The language ensured that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies."  *Id.* at 6.  These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court

13

had previously relied on "to hold that the CEA did not preempt state regulation." Van Wart, *supra*, at 692–93. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987). The Senate's decision to omit provisions allowing concurrent state jurisdiction over trading on DCMs is yet further proof of Congress's intent to preempt parallel state regulation.

*The CFTC's Position*: The CFTC clearly views prediction markets as subject to its exclusive jurisdiction, and has consistently maintained this position in court. In 2024, the CFTC informed the D.C. Circuit that "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583 (emphases added). Just last week, the CFTC stated that its "*jurisdiction supersedes State as well as Federal agencies*," and that "commodity derivatives markets require nationally uniform rules . . . to prevent the type of fragmented oversight" that would result from state enforcement. Amicus Brief of CFTC at 1, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2, at 1 ("CFTC Amicus Br."). Additionally, Chairman Selig directed the CFTC to draft an event contracts rulemaking, reflecting the CFTC's continuing interest in "provid[ing] certainty to market participants." Public Statements & Remarks, CFTC, Remarks of Chairman Michael S. Selig at CFTC-SEC Event on Harmonization (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1 ("Selig Remarks").

*Comprehensive Regulatory Scheme*: The comprehensive nature of the regulatory scheme Congress created for DCMs is further evidence that Congress intended to foreclose concurrent state jurisdiction. *See La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368–69 (1986).

As the Supreme Court has found, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce*

14

*Fenner and Smith, Inc. v. Curran*, 456 U.S. 353 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)).  An exchange may only offer derivatives after undergoing an extensive review process and receiving the CFTC's designation as a DCM.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100.  Once an exchange is designated as a DCM, the CFTC enjoys "exclusive jurisdiction" over the derivatives traded on the market.  7 U.S.C. § 2(a)(1)(A). DCMs are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* § 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties, *id.* pt. 38.  Congress elected to allow DCMs to list contracts by self-certifying that they comply with the CEA's requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2).  Congress then gave the CFTC the back-end authority to conduct a review of a contract if it believes the contract may run afoul of any statute or regulation.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).  Violations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the Special Rule specifically authorizes the CFTC to bar certain event contracts deemed to be "contrary to the public interest" *and* "involv[ing]" certain categories of activities.  7 U.S.C. § 7a-2(c)(5)(C)(i); *see generally* 17 C.F.R. § 40.11.  The Special Rule is not mandatory—the CFTC "may" prohibit a contract involving a listed activity *or* it may determine that such a contract would not be contrary to the public interest.  *Id.*  Congress thus left the decision to one federal authority—not 50 separate states and the District of Columbia.  *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025) (because the CFTC has "exclusive jurisdiction," "the only enforcement mechanism belongs to the [CFTC]"); CFTC Amicus Br. at 21 (the CEA's "exclusive jurisdiction" provision "preempts application of state gambling laws to event contracts trading on DCMs.").

Congress granted an enforcement role to states—but that role expressly *excludes* the right to enforce state laws against DCMs.  The CEA authorizes appropriate officials "of any State" to bring suit regarding "any act or practice constituting a violation" of the CEA—but a proviso to

15

this provision allows states to enforce the CEA against parties "*other than a [designated] contract market.*"  7 U.S.C. § 13a-2(1) (emphasis added).  Congress added this proviso because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC." Van Wart, *supra*, at 708.  The CEA also allows states to enforce general "antifraud" laws, but not antigambling or other laws.  7 U.S.C. § 13a-2(7); *see Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981) *disagreed with on other grounds by Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 676 (11th Cir. 1988) ("this specific allowance of antifraud proceedings must be deemed to preclude antigambling proceedings.")  Congress further made clear that the CEA does not "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so.  7 U.S.C. § 16(e)(1)(C).  In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees but permitted federal and state agencies to police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (emphasis added).  Thus, the CEA does not call into question the state's authority to regulate casinos or entities that are not DCMs.  But the CEA's comprehensive regulatory scheme for regulating trading on licensed exchanges evinces a strong congressional intent to preempt the field.

Other federal laws reinforce this intent.  The Unlawful Internet Gaming Enforcement Act of 2006 ("UIGEA") generally prohibits use of the internet to transmit wagers between states "where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), but provides that the term "bet or wager" "*does not include*" transactions conducted on "a registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E) (emphasis added).  UIGEA underscores Congress's understanding that, under the CEA, state gambling laws do not reach trading on DCMs.  *See Blue Lake Rancheria*, 2025 WL 3141202, at *6 (Kalshi's "internet contracts are not bets or wagers

16

under the UIGEA and therefore do not constitute 'unlawful internet gambling' even if the contracts are received, placed or transmitted from persons" where gambling is unlawful under local law).

Utah's own laws reinforce CEA preemption. Utah exempts "lawful business transactions" from its prohibition on gambling. Utah Code § 76-9-1401(8)(c)(i). And one type of lawful business transaction recognized under state law is "a commodity futures contract … or another contract if the contract or option is traded on or subject to the rules of a board of trade that has been designated as a contract market for such a contract pursuant to federal commodities laws." Utah Code § 70A-9a-102(15). That is Kalshi's business, plain and simple. This state law itself reinforces that the CEA preempts the field.

2. <u>Utah Laws Are Conflict-Preempted as Applied to Kalshi.</u>

As another court recently held regarding similar state laws, *see KalshiEX LLC v. Orgel*, 2026 WL 474869, at *9-10 (M.D. Tenn. Feb. 19, 2026), Utah gambling laws are conflict-preempted as applied to Kalshi. It would be "impossible" for Kalshi "to comply with both state and federal law," and Utah's laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby*, 530 U.S. at 372–73. In at least three respects, subjecting Kalshi's event contracts to Utah law would conflict with the CEA.

*First*, Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement*, 977 F.2d at 1156; *see also Leist*, 638 F.2d at 295–96. "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Am. Agric. Movement,* 977 F.2d at 1156. The Seventh Circuit found that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156–57 (citation modified).

17

Courts commonly find conflict preemption where, as here, a statute provides for a uniform federal scheme. The Supreme Court has found state law to conflict with federal law where permitting state regulation was "at odds with the goal of uniformity that Congress sought to implement." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990); *see Metro. Life Ins. Co. v. Pettit*, 164 F.3d 857, 862 (4th Cir. 1998) (finding conflict preemption where Congress sought to apply "one body of national, uniform law") (citations omitted); *Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 393–95 (9th Cir. 2002) (finding conflict preemption where "[t]he application of different state standards would disrupt the nationally uniform administration" provided by federal statute).

Subjecting Kalshi to Utah's gambling laws would conflict with Congress's goal of subjecting DCMs to a uniform federal scheme. Defendants intend to deploy state laws to regulate Kalshi's DCM. Piecemeal application of state laws is precisely what Congress sought to avoid in 1974, and the conflict is made even clearer when considering the possibility that 49 other states might equally attempt to subject Kalshi to their own state laws (as several have). That state-by-state regulation would erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67; *see Flaherty*, 2026 WL 924004, at *5 (state regulation would "directly conflict[] with the full purposes and objectives of the [CEA]").

*Second,* compliance with Utah law would be flatly impossible for Kalshi. Defendants have demanded that Kalshi cease offering event contracts in Utah. To do so, Kalshi would need to block the exchange solely from persons located in Utah. But this would violate Kalshi's obligation to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. § 38.151(b) (emphasis added); *see also id.* § 38.150; CFTC Amicus Br. at 25–26 (noting that "a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide," and that a DCM "cannot fulfill its federal

18

mandate" if it imposes geographical restrictions).[6]  If Utah could subject Kalshi to its state laws, 49 other states could do the same, resulting in precisely the state-by-state patchwork that Congress in 1974 recognized would make operating a DCM functionally impossible.  Again, the Tennessee district court recently agreed that compliance with state law would "violate" Kalshi's impartial-access obligation, making it "impossib[le]" to comply with both state and federal law.  *Orgel*, 2026 WL 474869, at *9–10.

*Third*, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law hampers "the careful balance struck by Congress."  *Arizona*, 567 U.S. at 406.  Where Congress "entrust[s]" the federal government with "discretion" to permit particular conduct, a state regime that allows for state prosecutions of the same actions is "preempted by federal law."  *Id.* at 407–10.  Otherwise, a state could bring charges "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies."  *Id.* at 402.

That is exactly the risk posed by state enforcement here.  Under federal law, once Kalshi was approved as a DCM, Kalshi was authorized to list its event contracts by the CEA's self-certification process.  Congress then authorized the CFTC to review Kalshi's contracts if it were to determine they involve "gaming" and to bar them if it were to determine they are "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).  Exercising discretion delegated by Congress, the CFTC has declined to initiate a public-interest review of Kalshi's contracts.  Compl. ¶ 62.  Instead, the CFTC has indicated its intention to initiate a rulemaking clarifying the federal rules governing prediction markets.  *See supra*, Selig Remarks.

---

[6] Even if Kalshi could somehow exclude Utah residents from participating in its exchange, CFTC's Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of *price distortions and market disruptions*."  17 C.F.R. § 38.255 (emphasis added).  Abruptly closing Kalshi's event contracts to anyone located in Utah as a result of the Defendants' threats of criminal liability would constitute exactly that sort of market disruption.

19

Allowing states to interpose their own state-law judgments for the CFTC's public-interest judgment would conflict with this federal scheme. The discretion Congress accorded to the CFTC to determine whether particular contracts are "contrary to the public interest" would be utterly meaningless if any state—let alone every state—could subject DCMs to criminal penalties under state law even when the CFTC permits those contracts. Subjecting Kalshi to state criminal laws would not just disrupt "the congressional calibration of force," *Crosby*, 530 U.S. at 380—it would nullify the CFTC's exclusive right to engage in public-interest review.

## B. Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction

The Defendants' actions threaten Kalshi with a "Hobson's choice" giving rise to irreparable harm—either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). As the Third Circuit recently held, Kalshi suffers irreparable harm in several respects. *See Flaherty*, 2026 WL 924004, at *6; *see also Orgel*, 2026 WL 474869 at *10–11.

*First*, if Kalshi chooses not to comply with the Defendants' unconstitutional threats, Kalshi and its officers face the extraordinary harms associated with the threat of criminal prosecution. A party facing the threat of imminent enforcement under a preempted state statute suffers "irreparable injury." *Morales*, 504 U.S. at 381. "The Tenth Circuit recognizes that 'when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" *Evans v. Utah*, 21 F. Supp. 3d 1192, 1210 (D. Utah 2014) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("credible threat of prosecution" under a preempted state statute amounts to irreparable harm). Defendants' repeated statements that Kalshi is operating illegally

20

under Utah law and that the Utah AG has a "plan" to deal with it amount to just such a threat.[7] Two other states recently commenced enforcement proceedings against Kalshi under state gaming laws, confirming that there is a real threat of enforcement. *See Commonwealth of Mass. v. KalshiEX LLC*, No. 2584-cv-02525 (Mass. Sup. Ct.); *State of Nevada ex rel. Nevada Gaming Control Bd. v. KalshiEX LLC*, No. 26 OC 00050-1B (Nev. Dist. Ct.). Defendants' threats not only subject Kalshi's officers to the prospect of criminal liability, but also generate uncertainty that will harm Kalshi. One of Kalshi's partners, for example, declined to roll out a partnership with Kalshi in Nevada as a direct response to the threat of enforcement actions by Nevada authorities. Sottile Decl. ¶ 61. If Defendants act on their threats and harm Kalshi's business relationships, that alone amounts to irreparable harm.

*Second*, attempting to comply with the Defendants' unconstitutional threats would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation. Kalshi has over 32,000 users in Utah, with millions of dollars in open contracts on the platform. Sottile Decl. ¶ 31. If Kalshi complied with Defendants' unconstitutional threats during the pendency of this litigation, it would forgo business in this market, with no prospect of recouping its losses even if it ultimately prevails. Moreover, any attempt to force Kalshi to cease operating in Utah would subject Kalshi to extraordinary technological challenges and costs. Kalshi has no current obligation to geolocate its users on a real-time, state-by-state basis. *Id.* ¶ 25. Attempting to implement geolocation capabilities would take months and cost tens of millions of dollars annually. *Id.* ¶¶ 28–29. And because the Eleventh Amendment permits only *injunctive relief* against state officials enforcing unconstitutional state law, *see Ex parte Young*, 209 U.S. 123, 155 (1908); *Collins v. Daniels*, 916 F.3d 1302, 1315–16 (10th Cir. 2019), Kalshi would have no

---

[7] Derek Brown, *Opinion: Utah's attorney general takes a stand against gambling and prediction markets*, Deseret News (Feb. 22, 2026, 11:00 AM MST), https://www.deseret.com/opinion/2026/02/22/utah-gambling-apps-prediciton-markets-harmful-dangerous/.

clear way of seeking damages if it ultimately prevailed, creating further irreparable harm. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) (citations omitted); *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (holding irreparable harm established where an action to recover damages would be barred by the Eleventh Amendment); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (concluding that monetary harm "is irreparable here because [plaintiffs] will not be able to recover monetary damages" due to damages immunity).

*Third*, a preliminary injunction is needed to protect not only Kalshi but also its users. Immediately shuttering access to contracts for Utah users could require Kalshi unilaterally to terminate contracts and liquidate users' positions, or to pause trading on these contracts pending the outcome of litigation months or more in the future. Sottile Decl. ¶¶ 42, 49. Under either scenario, this would be an extraordinary and disruptive act, harming users not just in Utah but nationwide, because cutting off access to users in one state would substantially distort the markets and contract prices for users in other states. As described above, Kalshi is not a party to any event contract traded on its exchange. Compl. ¶ 33; Sottile Decl. ¶¶ 34, 47. Therefore, people "located in Utah" are inevitably transacting with persons located in other states, which means that the harms flowing from Defendants' threats would be suffered not only in Utah, but in all other states— including New Jersey and Tennessee, where federal courts have preliminarily enjoined enforcement of state laws against Kalshi. Sottile Decl. ¶¶ 43, 47. This constitutes irreparable harm. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ("[L]ikely interference with customer relationships" resulting from breach of contract constitutes irreparable harm).

*Fourth*, Kalshi will face irreparable reputational harm if no injunction is granted. If Kalshi chooses not to comply on the ground that Utah law is preempted, the threat of prosecution undermines the reputation that Kalshi has cultivated over many years as a lawfully licensed DCM.

22

But bowing to Defendants' threats by abruptly ending its business in Utah would undermine users' confidence in Kalshi's exchange and make them fear their positions are at risk. *See* Sottile Decl. ¶¶ 59-62. This loss of "goodwill" could not easily be regained even if Kalshi ultimately prevails, and constitutes a distinct form of irreparable harm. *Husky Ventures, Inc. v. B55 Investments, Ltd.*, 911 F.3d 1000, 1012 (10th Cir. 2018). Moreover, abruptly terminating its event-based contracts in Utah would risk violating the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255. *See* CFTC Amicus Br. at 25–26 (noting a DCM "cannot fulfill its federal mandate" if it complies with state-by-state regulation). A preliminary injunction is needed to prevent Kalshi from suffering irreparable harm during the pendency of this litigation.

### C. The Balance of the Equities and Public Interest Favor a Preliminary Injunction[8]

The balance of equities and public interest weigh in favor of a preliminary injunction because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Ortega v. Grisham*, 148 F.4th 1134, 1154 n.13 (10th Cir. 2025); *Flaherty*, 2026 WL 924004, at *7; *Awad*, 670 F.3d at 1132. Utah, by contrast, lacks any interest in enforcing a law that, by its terms, excludes lawful contracts like Kalshi's event contracts. *See Edmondson*, 594 F.3d at 771; *Arizona*, 567 U.S. at 401.

Further, the failure to issue an injunction here would "reach beyond the parties involved directly in the suit and impact . . . the public's right[s]." *Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*, 543 F.3d 275, 278 (6th Cir. 2008) (citation omitted); *Colonial Ford, Inc. v. Ford Motor Co.*, No. C 75-190, 1975 WL 929, at *5 (D. Utah Aug. 18, 1975) (weighing the impact of denial of injunctive relief on third parties). Ceasing operations in

---

[8] If the government opposes the preliminary injunction, the last two factors merge. *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1278 (10th Cir. 2022).

Utah to avoid penalties will harm Kalshi's users in Utah and impose intractable technological difficulties on a very short timeframe.  Sottile Decl. ¶¶ 18-63.  Abrupt cessation would make it difficult to inform users in Utah of their rights and obligations regarding ongoing event contracts and cut off users' access to their positions on Kalshi's exchange.  *Id*. ¶ 46.  And the harms occasioned by Defendants' threats would be suffered by counterparties nationwide (including Tennessee and New Jersey, where similar enforcement actions have been enjoined).  *Id*. ¶ 47.  Because Utah's laws are preempted as applied to Kalshi, the balance of the equities and public interest firmly favor preliminary relief.[9]

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction.

---

[9] In the Tenth Circuit, "trial courts have 'wide discretion under Rule 65(c) in determining whether to require security'" when entering a preliminary injunction.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (quoting *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)).  Defendants will suffer no nonspeculative damage by halting enforcement against Kalshi during the pendency of this litigation.  *Cf. UBS Bank USA v. Hussein*, No. 2:14-CV-106, 2014 WL 1600375, at *4 (D. Utah Apr. 21, 2014).  Accordingly, Kalshi respectfully requests the Court grant a preliminary injunction without requiring a bond.  In the alternative, only a de minimis bond is warranted.

DATED: April 24, 2026

Respectfully submitted,

**SNELL & WILMER L.L.P.**

*/s/ Annika L. Jones*
Matthew L. Lalli
Annika L. Jones
Brandon S. Fuller

and

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice*)
William E. Havemann (*pro hac vice*)
**MILBANK LLP**
1101 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice*)
Andrew L. Porter (*pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*