Derek Brown
Utah Attorney General
Joshua B. Cutler (16434)
Mark C. Gillespie (19265)
Assistant Solicitors General
Office of the Utah Attorney General
P.O. Box 140858
Salt Lake City, Utah 84114-0858
Telephone: (801) 366-0533
jbcutler@agutah.gov
markgillespie@agutah.gov

*Counsel for Defendants*

---

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| KALSHIEX LLC;<br><br>*Plaintiff,*<br><br>v.<br><br>SPENCER J. COX, in his official capacity as Governor of Utah; DEREK BROWN, in his official capacity as Attorney General of Utah; DANIEL BURTON, in his official capacity as Chief Deputy Attorney General and General Counsel of Utah; STEWART YOUNG in his official capacity as Criminal Deputy Attorney General of Utah; and DOUGLAS CRAPO in his official capacity as Public Protection Attorney General of Utah.<br><br>*Defendants.* | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF A PRELIMINARY INJUNCTION**<br><br>Case No. 2:26-cv-00151-RJS-CMR<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

## Table of Contents

Requested Resolution and Grounds ................................................................................ 1

Background ...................................................................................................................... 2

Statements of Material Facts ......................................................................................... 4

Argument ........................................................................................................................ 6

    I.    Kalshi Will Not Suffer Irreparable Harm in the Absence of an
Injunction. ...................................................................................................... 6

    II.  Kalshi's Claim Fails on the Merits. ................................................................ 11

        A.  Utah is Not Preempted From Enforcing Generally Applicable State
Law Against Kalshi. .................................................................................. 11

           1.  The CEA Does Not Expressly Preempt Relevant State Law. ............. 12

           2.  The CEA Does Not Impliedly Preempt Relevant State Law .............. 12

              a.  Field preemption .................................................................... 12

                  i.    Kalshi's proposed preemption field is impermissibly
broad. ...................................................................... 13

                  ii.   Utah's general gambling and criminal laws do not
impermissibly occupy any preempted fields, if any
exist, associated with the CEA. ............................. 15

              b.  Conflict preemption ............................................................... 18

                  i.    Impossibility preemption ...................................... 19

                  ii.   Obstacle preemption .............................................. 20

        B.  All or Most Bets Offered on Kalshi Are Not Within the Jurisdiction
of the CFTC. .............................................................................................. 21

           1.  Kalshi's Bets are Not Sufficiently Tied to Financial, Economic,
or Commercial Consequences. .......................................................... 22

           2.  Kalshi's Bets Do Not Depend on the Occurrence of an "Event"
or "Contingency." .............................................................................. 23

    III. The Balance of the Equities and the Public Interest Weight Against
an Injunction. ............................................................................................... 25

Conclusion .................................................................................................................... 28

## Table of Authorities

**Cases**

*Aid for Women v. Foulston,*
441 F.3d 1101 (10th Cir. 2006) ........................................................................ 25, 27

*Arizona v. United States,*
567 U.S. 387 (2012) ........................................................................ 13, 14, 15, 16

*Citizens Against Ruining Our Env't v. Jewell,*
839 F.3d 1276 (10th Cir. 2016) ........................................................................ 6

*Crutcher v. Commonwealth,*
141 U.S. 47 (1891) ........................................................................ 26

*D.T. v. Sumner Cnty. Schs.,*
942 F.3d 324 (6th Cir. 2019) ........................................................................ 9

*Denver Homeless Out Loud v. Denver, Colorado,*
32 F.4th 1259 (10th Cir. 2022) ........................................................................ 6, 25

*Dickson v. Uhlmann Grain Co.,*
288 U.S. 188 (1933) ........................................................................ 2, 14, 18

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
356 F.3d 1256 (10th Cir. 2004) ........................................................................ 7

*English v. General Electric Co.,*
496 U.S. 72 (1990) ........................................................................ 16, 17

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ........................................................................ 10

*First W. Cap. Mgmt. Co. v. Malamed,*
874 F.3d 1136 (10th Cir. 2017) ........................................................................ 7

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963) ........................................................................ 19

*Fort Halifax Packing Co. v. Coyne,*
482 U.S. 1 (1987) ........................................................................ 17

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
505 U.S. 88 (1992) ........................................................................ 15, 16, 17

*Gobeille v. Liberty Mut. Ins. Co.,*
  577 U.S. 312 (2016) .................................................................................. 16

*Heideman v. S. Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) ........................................................... 7, 11

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) ..................................................................................... 16

*Huron Portland Cement Co. v. City of Detroit, Mich.,*
  362 U.S. 440 (1960) .................................................................................... 17

*KalshiEX LLC v. Orgel,*
  No. 26-cv-00034, 2025 U.S. Dist. LEXIS 33927 (M.D. Tenn. Feb. 19, 2026) .......... 4

*KalshiEx, LLC v. Hendrick,*
  2025 WL 3286282 (D. Nev. Nov. 24, 2025) ............................................... 3

*KalshiEx, LLC v. Martin,*
  793 F. Supp. 3d 667 (D. Md. 2025) .................................................... 3, 20

*KalshiEX, LLC v. Schuler,*
  2026 WL 657004 (S.D. Ohio Mar. 9, 2026) ............................................... 3

*Kansas v. Garcia,*
  589 U.S. 191 (2020) ....................................................................... 13, 14, 17

*Kentucky Gambling Recovery LLC v. Kalshi Inc.,*
  2026 WL 596107 (E.D. Ky. Mar. 4, 2026) ................................................ 4

*Maryland v. King,*
  567 U.S. 1301 (2012) .................................................................................. 25

*Massachusetts v. KalshiEX, LLC,*
  2026 WL 188019 (Super. Ct. Suffolk Cnty., Mass. Jan. 20, 2026) ........................ 3

*May v. Harper,*
  306 F. Supp. 1222 (N.D. Fla. 1969) ........................................................... 8

*Medtronic, Inc. v. Lohr,*
  518 U.S. 470 (1996) .................................................................................... 13

*Meese v. Keene,*
  481 U.S. 465 (1987) ...................................................................................... 8

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
  456 U.S. 353 (1982) ...................................................................................... 2

*Murphy v. NCAA,*
   584 U.S. 453 (2018) ..................................................................................... 26

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ....................................................................................... 27

*Napier v. Atl. Coast Line R. Co.,*
   272 U.S. 605 (1926) ..................................................................................... 16

*Nken v. Holder,*
   556 U.S. 418 (2009) ..................................................................................... 25

*North American Derivatives Ex., Inc. v. Nev. Gaming Control Bd.,*
   815 F. Supp. 3d 1169 (D. Nev. 2025) ........................................... 3, 23, 24

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
   342 F.3d 1170 (10th Cir. 2003) ................................................................. 25

*Oneok, Inc. v. Learjet, Inc.,*
   575 U.S. 373 (2015) ............................................................ 12, 13, 17, 19

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
   461 U.S. 190 (1983) ..................................................................................... 15

*PLIVA, Inc. v. Mensing,*
   564 U.S. 604 (2011) ..................................................................................... 19

*Ray v. Atl. Richfield Co.,*
   435 U.S. 151 (1978) ..................................................................................... 16

*Rice v. Santa Fe Elevator Corp.,*
   331 U.S. 218 (1947) ............................................................................. 14, 16

*Rivera-Corraliza v. Morales,*
   794 F.3d 208 (1st Cir. 2015).................................................................... 26

*Schrier v. Univ. Of Co.,*
   427 F.3d 1253 (10th Cir. 2005) ................................................................ 7

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ..................................................................................... 25

*Williams v. Taylor,*
   529 U.S. 362 (2000) ..................................................................................... 22

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..................................................................................... 6, 9

*Wis. Gas Co. v. Fed. Energy Regul. Com.,*
   758 F.2d 669 (D.C. Cir. 1985)...............................................................................9

**Statutes**

7 U.S.C. § 1.................................................................................................... 21, 22, 23

7 U.S.C. § 2.............................................................................................................. 15

7 U.S.C. § 7........................................................................................................ 3, 4, 20

15 U.S.C. § 3001..................................................................................................... 20

18 U.S.C. § 1955......................................................................................... 2, 7, 10, 20

Utah Code § 76-9-1401 .......................................................................................... 10

**Rules**

Fed. R. Civ. P. 65 ................................................................................................ 1, 6

**Regulations**

17 C.F.R. § 38.151................................................................................................. 19

17 C.F.R. § 40.11..................................................................................................... 3

89 Fed. Reg. 48968.................................................................................................. 3

91 Fed. Reg. 5386.................................................................................................... 3

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Defendants identified in the above caption file this Opposition to Plaintiff's Renewed Motion for Preliminary Injunction. Dkt. 29.

### Requested Resolution and Grounds

Through its Motion, Kalshi seeks an injunction prohibiting Utah from enforcing its generally applicable gambling laws and "any other law" against Kalshi. Dkt. 29 at 1. This preemption claim would stretch the preemption doctrine beyond recognition. In a typical preemption case, a party alleges that a *specific* State statute is preempted. In addressing these claims, courts are governed by the relevant federal text (ignoring "freewheeling" inquiries into vague Congressional purposes that supposedly motivated the statute) and presume that State law is not preempted unless Congress clearly manifested an intent to preempt. Kalshi's argument ignores this and seeks a blanket declaration that Kalshi is immune from all Utah's generally applicable laws. As explained in Defendants Motion to Dismiss or, alternatively, Motion for Summary Judgment, this request is unsupported by statute and Supreme Court case law. *See* Defendants' Motion, filed concurrently herewith at dkt. 34.

In addition to its failure on the merits, Kalshi's Motion should be denied because Kalshi cannot show a threat of imminent, irreparable harm or that the balance of equities and public interest favors an injunction.[1]

---

[1] Kalshi notes that Utah's gambling statute exempts "lawful business transactions" from its definition of gambling. Dkt. 29 at 2. This exemption is irrelevant to Kalshi's

1

## Background

Congressional regulation of commodity derivatives has a long history—a history that reflects a policy of deference to State law. *See* Defendants' Motion at 1-5; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357 (1982). Indeed, in 1933, the Supreme Court analyzed the Grain Futures Act—the predecessor to the CEA—and concluded that it did not preempt State gambling laws. *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). Although Congress subsequently changed the name of the Grain Futures Act to the CEA and amended it to include other commodity derivatives and increase penalties, *Merrill Lynch*, 456 U.S. at 362, the overarching purpose and scope of the CEA has remained the same. This is true even after Congress amended the CEA, in 2010, to add "swaps" as a commodity derivative. *See* Defendants' Motion at 4-6.

Significantly, in amending the CEA in 2010, Congress did not intend the changes to authorize sports betting on contract markets designated under the CEA (DCMs). *See, e.g.*, 156 Cong. Rec. S5906-07 (July 15, 2010) (colloquy between Senators Feinstein and Lincoln explaining that sports bets should not be on DCMs because they "would not serve any real commercial purpose" and "would be used solely for gambling"). To that end, Congress enacted the "Special Rule," which authorizes the CFTC to disallow contracts that involve "activity that is unlawful under any Federal

---

preemption claim (its only claim in this case). It also ignores the fact that Kalshi is an "illegal gambling business" under *Federal* law. 18 U.S.C. § 1955. And if Kalshi wishes to raise it as an affirmative defense in a future criminal prosecution, its application would need to be interpreted by a Utah state court.

or *State law*," "terrorism," "assassination," "war," or "*gaming*." 7 U.S.C. § 7a-2(c)(5) (emphases added). The CFTC subsequently did just that. *See* 17 C.F.R. § 40.11(a).

Consistent with this, the CFTC has long recognized that it is not a gaming regulator and that gaming should not occur on DCMs. The CFTC previously explained that it "does not believe that it has the statutory mandate nor specialized experience appropriate to oversee" gaming. Event Contracts, 89 Fed. Reg. 48968, 48976 (proposed June 10, 2024), *withdrawn,* 91 Fed. Reg. 5386 (Feb. 6, 2026). Although the CFTC now claims the authority to regulate sports betting, Dkt. 1 at ¶ 7, that is an abrupt about-face, and its regulation prohibiting gaming on DCMs remains on the books.

Despite the history and text of the CEA, Kalshi (and the CFTC) now claim that all State laws are preempted by the CEA. However, a majority of courts across the country have rejected this argument. *See KalshiEx, LLC v. Schuler*, No. 26-3196 (6*th* Cir. April 24, 2026) ("Kalshi has not met the likelihood-of-success standard" on preemption issue); *KalshiEx, LLC v. Hendrick,* 2025 WL 3286282 (D. Nev. Nov. 24, 2025)*; North American Derivatives Ex., Inc. v. Nev. Gaming Control Bd.,* 815 F. Supp. 3d 1169 (D. Nev. 2025) (contracts based on outcome of sporting events are not "swaps" under CEA subject to CFTC's exclusive jurisdiction); *KalshiEx, LLC v. Martin,* 793 F. Supp. 3d 667 (D. Md. 2025) (holding CEA did not preempt state regulation of event contracts); *Massachusetts v. KalshiEX, LLC,* 2026 WL 188019 (Super. Ct. Suffolk Cnty., Mass. Jan. 20, 2026) (same); *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *1 (S.D. Ohio Mar. 9, 2026) (Kalshi's bets are not "swaps" and, alternatively, CEA

3

does not preempt State regulation); *see also Kentucky Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 596107, at *3 (E.D. Ky. Mar. 4, 2026) ("[C]ourts across the country recognize that the [CEA] does not completely preempt state law claims."); *but see KalshiEx, LLC v. Flaherty,* No. 25-1922, (3d Cir. Apr. 6, 2026) (holding, in a divided panel decision, state law preempted by Commodity Exchange Act as applied to sports-related event contracts); *KalshiEX LLC v. Orgel,* No. 26-cv-00034, 2025 U.S. Dist. LEXIS 33927 (M.D. Tenn. Feb. 19, 2026) (state law likely conflict preempted by the Commodity Exchange Act as. applied to sports-related event contracts).

## Statements of Material Facts

1.      Kalshi is a contract market designated by the CFTC under Section 7 of the CEA. 7 U.S.C. § 7; November 3, 2020 Order of Designation, attached as Exhibit A; January 17, 2025 Order of Designation, attached as Exhibit B; Dkt. 1 at ¶ 57 (Complaint).

2.      Kalshi offers its users a chance to participate in "event contracts," which are contracts in which users agree to pay a fixed amount with the hope that they will receive a greater amount in return depending on potential "outcomes" of specified events. Dkt. 1 at ¶¶ 57-59.

3.      Kalshi has marketed itself as a platform where its users can "trade on anything." Kalshi (@Kalshi), Twitter profile, https://x.com/Kalshi (last visited April 1, 2026) ("Trade on anything: politics, sports, entertainment, crypto, weather, and so much more.").

4

4.      Indeed, Kalshi offers many kinds of event contracts related to an array of areas, including politics, popular culture, and sports. Dkt. 1 at ¶ 59; *see also* Sample of Kalshi self-certification contract filings, attached as Exhibit C.

5.      Beginning in January 2025, Kalshi began self-certifying a series of event contracts related to sports pursuant to Section 7a-2(c)(1) of the CEA. Dkt. 1 at ¶ 60; *see*, *e.g.*, Ex. C at 92.

6.      Kalshi began offering these contracts to its users soon after. Dkt. 1 at ¶¶ 60, 62.

7.      For example, related solely to this year's Superbowl, Kalshi encouraged users to participate in "event contracts" related to the following: which song Bad Bunny would open his halftime show with, whether an announcer would say "tush push" during the broadcast, whether the band Green Day would say "MAGA" or "Make America Great Again" during the game's opening ceremonies, whether Bill Gates would attend the game, and whether Sydney Sweeney would show up in a Superbowl commercial. *Super weird: 5 of the Strangest 'Big Game' markets on Kalshi*, https://news.kalshi.com/p/strangest-big-game-football-markets-kalshi (last accessed April 1, 2026).

8.      Kalshi often offers a variety of bets for a single event. For example, Kalshi recently offered contracts on whether the Los Angeles Lakers would beat the Oklahoma City Thunder on April 2, 2026, whether the Thunder would win by over 9.5 points, whether the Thunder would score over 105.5 points in the game, and whether Lebron James would score more than 10 points in the game (to name only a

few of the bets offered related to this event). *See Los Angeles L at Oklahoma City*, https://kalshi.com/markets/kxnbagame/professional-basketball-game/kxnbagame-26apr02lalokc (last accessed on April 2, 2026).

9.      Kalshi did not offer a bet on whether the game would actually occur. *Id.*

## Argument

The Court should deny Kalshi's Motion for Preliminary Injunction under Rule 65. Injunctive relief is "'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To obtain a preliminary injunction, Kalshi "must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. No factor is optional; "a movant must show all four factors before a preliminary injunction can issue." *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1279 (10th Cir. 2022).

Kalshi fails to establish any of these factors, let alone all four.

## I.      Kalshi Will Not Suffer Irreparable Harm in the Absence of an Injunction.

First and foremost, Kalshi has made no "clear showing" that it will suffer irreparable harm without an injunction. *Winter*, 555 U.S. at 22. The Tenth Circuit has repeatedly held that "'because a showing of probable irreparable harm is the

6

single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements' will be considered." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)). To demonstrate irreparable harm, a movant must "show[] actual or significant risk of loss" that "cannot be remedied by money damages." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005). That showing is "not an easy burden to fulfill," *First W. Cap.*, 874 F.3d at 1141 (internal quotation marks omitted). In short, "[t]o constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks omitted).

Kalshi argues that it could suffer four potential harms in the absence of an injunction. But even if any of those alleged injuries were to materialize, none of them can satisfy Kalshi's burden to show irreparable harm—largely because, as Kalshi openly admits, all of them are conditioned upon future decisions by Kalshi to violate Utah and Federal[2] law. Such "speculative harm does not amount to irreparable injury," *Schrier*, 427 F.3d at 1267 (internal quotation marks omitted).

---

[2] 18 USC § 1955 makes it illegal to conduct, finance, manage, supervise, direct, or own all or part of an "illegal gambling business." And it defines an "illegal gambling business" as a business that (1) "is a violation of the law of a State or political subdivision in which it is conducted"; (2) "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business"; and (3) "has been or remains in substantially continuous operation for a period in excess of thirty days." So by operating a business in violation of Utah's gambling laws, Kalshi also violates Federal law and is an "illegal gambling business."

*First*, Kalshi argues that "if [it] chooses not to comply" with Utah law, Kalshi and its officers face harms "associated with the threat of criminal prosecution." Dkt. 29 at 20–21. Right out of the gate, Kalshi gives the game away by acknowledging that this harm is conditional on its own free decision "not to comply" with statutes duly enacted by the Utah Legislature (and Congress). This is not a situation in which Kalshi must "take affirmative steps" to "avoid the risk of harm" by the operation of State law. *Meese v. Keene*, 481 U.S. 465, 475 (1987). Though Kalshi attempts to frame potential criminal enforcement as an encroachment upon its constitutional rights, it does not explain which rights Utah would violate by enforcing its own valid, generally applicable laws. Nor can it, for "[t]he possibility of criminal prosecution for law violation is always present; that it, standing alone, serves as some deterrent to law violation obviously violates no constitutional rights." *May v. Harper*, 306 F. Supp. 1222, 1224 (N.D. Fla. 1969). Whether or not an injunction is in place, Kalshi faces no risk of criminal penalties unless and until it consciously decides to violate the laws of the State. That does not satisfy the heavy "burden" required for a showing of irreparable harm.

*Second*, Kalshi argues that "attempting to comply with" Utah (and Federal) laws—laws that existed long before Kalshi ever sought to enter the market—would subject Kalshi to monetary losses and "extraordinary technological challenges," specifically an obligation to "geolocate its users." Dkt. 29 at 21. Once again, these harms are speculative and conditional, not the type of "loss [that] threatens the very

8

existence of [Kalshi]'s business." *Wis. Gas Co. v. Fed. Energy Regul. Com.*, 758 F.2d 669, 674 (D.C. Cir. 1985).

What's more, Kalshi already engages in the very geolocation that it now claims would constitute irreparable injury. Kalshi itself explains that it "screen[s]" new customers "against prohibited lists *and geographies*" and that its "surveillance team tracks their trading behavior." Frequently Asked Questions, *Kalshi*, available at https://kalshi.com/faq (emphasis added). And two courts have already ordered Kalshi to use geolocation to prevent violation of State laws. *See* [Massachusetts order dated Jan. 20, 2026]; [Nevada TRO dated Mar. 20, 2026]. Enforcement of Utah law would impose no unprecedented obligations on Kalshi.

*Third*, Kalshi argues that enforcing Utah law would impair its ability to honor existing contractual obligations among its users. Dkt. 29 at 22. This alleged harm is just as speculative as the others Kalshi identifies. But more importantly, it is not a harm to Kalshi itself. "A plaintiff seeking a preliminary injunction must show that *he* is likely to succeed on the merits, [and] that *he* is likely to suffer irreparable harm in the absence of preliminary relief"—not that someone else is likely to do so. *Winter*, 555 U.S. at 20. Accordingly, "[i]f *the plaintiff* isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (first emphasis added). Potential harm to third parties is thus not relevant to the irreparable-harm analysis as to Kalshi. And even if it were, there is no record evidence showing that Kalshi is incapable of "giv[ing] its users reasonable notice to allow them to exit their positions

voluntarily if they so choose," a practice that Kalshi represents it "want[s]" to engage in. Dkt. 29-1 ¶ 40.

Additionally, both Kalshi and its Utah users had notice that the gambling bets they participated in were illegal under Utah and Federal laws. *See* Utah Code §§ 76-9-1401 *et. seq.*; 18 U.S.C. § 1955. A potential disruption to illegal contracts and an illegal market does not justify an injunction prohibiting Utah from enforcing its laws.

*Fourth* and finally, Kalshi speculates that it will suffer reputational injuries if it "chooses not to comply" with Utah law. Dkt. 29 at 22–23. To the extent this alleged harm does not simply rehash Kalshi's previously expressed concerns about "the threat of prosecution" and "users' . . . positions," Dkt. 29 at 20-22, it fails for the same reasons. Once again, Kalshi's alleged harms depend entirely on Kalshi's own future conduct. And once again, those harms may never emerge at all—because they depend on the independent decisions of third parties. The "links in the chain of causation" projected by Kalshi here are supported only by conjecture, making them "too speculative" and "too attenuated" to form an actionable injury. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (internal quotation marks omitted). And Kalshi's concern that it may violate the CFTC's "Core Principles" if some of its event contracts are terminated is particularly unfounded; the CFTC's own guidance expressly instructs organizations like Kalshi to "account[] for" and manage risks arising from "State regulatory actions and pending and potential litigation, including enforcement actions." CFTC Advisory No. 25-36 (Sept. 30, 2025).

Kalshi cannot receive an injunction without showing harm that is "certain, great, actual and not theoretical." *Heideman*, 348 F.3d at 1189. The harms Kalshi has purported to show are none of those things. Kalshi's motion for preliminary relief can be denied on that basis alone.

## II.   Kalshi's Claim Fails on the Merits.[3]

Next, Kalshi's claim fails on the merits. The only cause of action Kalshi raises in its Complaint is a claim for a judicial declaration that Utah's laws are preempted by the CEA. Dkt. 1 ¶¶ 77-83. Specifically, Kalshi alleges that the CEA preempts Utah law because the transactions it offers fall within the "exclusive jurisdiction" of the CEA. As explained in Defendants' Motion, Kalshi's claim fails because (A) the CEA does not preempt Utah from enforcing generally applicable criminal laws and (B) most, if not all, of the "trades" Kalshi offers do not fall within the CEA's exclusive-jurisdiction provision.

### A.   Utah is Not Preempted from Enforcing Generally Applicable State Law Against Kalshi.

First, Kalshi's claim fails because, as explained in Defendants' Motion, the CEA does not preempt Utah from enforcing generally applicable state law against Kalshi under any recognized preemption theory. *See* Defendants' Motion at 11-41.

---

[3] In Defendants' Motion to Dismiss, Defendants have provided more comprehensive argument as to the lack of merit of Kalshi's claim. Defendants incorporate those arguments as part of this Opposition and have not included any arguments here that are not included, in greater detail, in Defendants' Motion.

1.      **The CEA Does Not Expressly Preempt Relevant State Law.**

Congress did not expressly preempt States from enforcing generally applicable state gambling or other criminal laws when it enacted or amended the CEA. *See* Defendants' Motion at 13-24. As explained in Defendants' Motion, the CEA's text does not expressly preempt generally applicable State law. The CEA contains two express-preemption provisions that do not apply in this case (thereby creating a reasonable inference that Congress did not intend to preempt the generally applicable State law at issue). And although Section 2(a)(1)(A) of the CEA confers exclusive jurisdiction over certain contracts to the CFTC, the scope and effect of this exclusive-jurisdiction is necessarily limited to the CFTC's statutorily authorized functions—functions that are limited in scope and effect by the text and structure of the CEA. *See* Defendants' Motion at 13-24.

2.      **The CEA Does Not Impliedly Preempt Relevant State Law.**

The Court should also conclude that the CEA does not impliedly preempt Utah from enforcing generally applicable state laws. *See* Defendants' Motion at 25-41. "Congress may implicitly pre-empt" state law "either through 'field' pre-emption or 'conflict' pre-emption." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377-78 (2015). Neither type of implied-preemption applies here. *See* Defendants' Motion at 25-41.

a.      **Field preemption**

First, Utah's laws are not preempted from any field in which Utah is attempting to regulate. The Supreme Court recently stressed that field preemption

12

has only been found in "rare cases." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). This case does not qualify as one of those rare cases. See Defendants' Motion at 26-37

As to its field-preemption argument, Kalshi asserts that "Congress has . . . impliedly occupied *the field of regulating trading on CFTC-approved exchanges*." Dkt. 1 at ¶ 19 (emphasis added). And, based on this proposed field, Kalshi contends that "event contracts *never violate state law* when they are traded on a DCM." *Id*. at ¶ 6 (emphasis in original). The Court should reject this incredibly broad field-preemption argument for two reasons: (1) Kalshi's proposed preemption field—a field that must be construed narrowly—is indefensibly broad; and (2) the alleged State laws at issue—generally applicable State laws—do not fall within Kalshi's proposed field.

### i. Kalshi's proposed preemption field is impermissibly broad.

First, Kalshi's proposed preemption field is impermissibly broad. *See* Defendants' Motion at 26-29. Consistent with the Supreme Court's directive to "proceed cautiously" when analyzing a field-preemption claim, *Oneok*, 575 U.S. at 385, the Supreme Court has repeatedly stressed that courts should construe the field of potential preemption as *narrowly* as possible. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (presumption against preemption "support[s] a narrow interpretation" of federal law).

For example, despite an "extensive and complex" federal scheme to regulate immigration, in *Arizona v. United States*, the Supreme Court declined to bar States from the general field of immigration. 567 U.S. 387 (2012). Instead, the Court construed narrower fields within the immigration arena for each of the four State

13

immigration laws at issue before concluding that one State law was field-preempted, two were conflict preempted, and the fourth was not preempted from any field. *Id.* at 406-13.

Similarly, in *Rice v. Santa Fe Elevator Corp.*, the Court considered whether the United States Warehouse Act preempted Illinois laws that also regulated warehouses. 331 U.S. 218 (1947). In so doing, the Court identified nine subcategories regulated within the federal act and concluded that "[i]in these *fields*" Congress had acted "so unequivocally as to make clear that it intends no regulation except its own." *Id.* at 235-36. However, the Court also identified three additional matters or fields that were not covered by the federal act and concluded that Illinois's warehouse regulations were not preempted in those fields. *Id.* at 237. Thus the Court did not identify the relevant field generally as "warehouse regulation." Instead, the Court identified a total of twelve narrow fields (based on specific federal provisions) before determining whether specific state regulations were preempted by each field. *See also Kansas v. Garcia*, 589 U.S. 191, 208-10 (2020) (rejecting a field-preemption claim in which the challenger had construed the field too broadly).

As these cases show, the Supreme Court has consistently construed alleged preemption fields narrowly based on specific provisions of federal law.

Kalshi, in contrast, proposes a field of preemption that would encompass any State law when applied to activity involving event contracts. This proposed field is impermissibly broad under the field-preemption case law above, the Supreme Court's decision in *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 197 (1933) (declining to

14

preempt a Missouri gambling law under predecessor to CEA), and the case law from other circuits that Kalshi cites in its Complaint. *See* Defendants' Motion at 26-28.

Kalshi's proposed preemption field is also at odds with the text and structure of the CEA, including the "exclusive jurisdiction" provision upon which Kalshi relies. Dkt. 1 at ¶ 5 (relying on 7 U.S.C. § 2(a)(1)(A)). *See* Defendants' Motion at 28-29. Accordingly, the Court should deny Kalshi's field-preemption claim as impermissibly broad.

### ii. Utah's general gambling and criminal laws do not impermissibly occupy any preempted fields, if any exist, associated with the CEA.

Additionally, the Court should reject Kalshi's field-preemption claim because Kalshi has not sufficiently identified any State laws that would be preempted by any potential preemption field under the CEA. Kalshi does not allege that Utah enacted its criminal gambling laws to specifically target activity regulated under the CEA. *See* dkt. 1 at ¶ 17 ("Utah state laws contemplate criminal charges for unlawful gaming transactions."). Instead, Kalshi alleges that "event contracts *never violate [any] state law* when they are traded on a DCM." *Id.* at ¶ 6 (emphasis in original). But this argument is inconsistent with field-preemption principles. *See* Defendants' Motion at 29-37.

Field preemption applies where there is an allegedly *supplementary* state law or, in other words, state laws that regulate "on the same subject," *Arizona*, 567 U.S. at 399, or in the same "specific area." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983); *see also Gade v. Nat'l Solid*

15

*Wastes Mgmt. Ass'n*, 505 U.S. 88, 105 (1992) ("[P]art of the pre-empted field is defined by reference to the purpose of the state law in question" and "another part of the field is defined by the state law's actual effect." (*quoting English v. General Electric Co.*, 496 U.S. 72, 84 (1990)).

In the cases in which the Supreme Court has concluded federal law preempts State law from a field, the challenged State law was directly aimed (either as its express purpose or as the law's actual effect) at regulating the same subject matter comprehensively regulated by federal law. *See Arizona v. United States*, 567 U.S. 387, 400-03 (2012) (federal and State immigration laws); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236 (1947) (federal and state warehouse regulations); *Napier v. Atl. Coast Line R. Co.*, 272 U.S. 605, 612 (1926) (federal and State locomotive equipment regulations).

Significantly, in many cases in which the Supreme Court has found that State and federal laws targeted the same subject for field-preemption, the Court specifically clarifies that the same analysis would not apply to generally applicable laws. *See Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 324–25 (2016) (explaining that although some state laws, "such as a tax on hospitals," may not be preempted, a Vermont reporting law constituted a "direct regulation of a fundamental ERISA function" and was, therefore, preempted); *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 164 (1978) (although federal law would not "prevent a State or city from enforcing local laws *having other purposes*," a local law regulating tankers was preempted by a "federal scheme" that "*aim[ed] precisely at the same ends*" (emphases added)); *Hines*

16

*v. Davidowitz*, 312 U.S. 52, 61 (1941) ("The basic subject of the state and federal laws is identical—registration of aliens as a distinct group.").

This principle is clearly seen in the Supreme Court's opinion in *Gade v. National Solid Wastes Management Association*, 505 U.S. 88 (1992). As explained in Defendants' Motion, in that case, the Court concluded that the Occupational Safety and Health Administration Act (OSHA) preempted "state laws *regulating the same issue* as federal laws . . . even if they merely supplement the federal standard," but expressly concluded that "state laws of general applicability (such as laws regarding traffic safety or fire safety)" would not be field-preempted even where they "have a 'direct and substantial' effect on worker safety" because "they regulate workers simply as members of the general public." *Id.* at 107-110 (emphasis added).

Consistent with the reasoning in *Gade*, the Supreme Court has regularly rejected field-preemption arguments where the challenged State law was generally applicable or targeted a subject other than the subject of federal regulation, even where the State law affected the objects of federal regulation. *See English v. Gen Elec. Co.*, 496 U.S. 72, 85 (1990); *Kansas v. Garcia*, 589 U.S. 191 (2020) (generally applicable laws prohibiting fraud, forgeries, and identity theft not preempted by federal immigration laws); *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20 (1987) (National Labor Relations Act did not preempt State employment laws that applied to all employees generally); *Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440 (1960) (generally applicable pollution laws not preempted by "comprehensive" federal regulations

17

regarding boilers on sea vessels); *Dickson v. Uhlman Grain Co.*, 288 US 188 (1933) (predecessor to CEA did not preempt application of Missouri gambling prohibition as to grain futures contracts).

As these cases illustrate, federal statutes do not impliedly preempt generally applicable State laws (or State laws targeted at a different "subject matter" or area) absent a specific conflict with the text of a federal statute (*i.e.* under theories of impossibility or obstacle preemption). *See* Defendants' Motion at 29-37.

The Court should rule similarly in this case. Utah's generally applicable criminal laws are not aimed at the target of price manipulation or fraud on commodity derivative markets. Nor are they aimed at regulating who can or cannot be designated as a contract market. In short, they are not aimed at any of the purposes identified within the CEA and thus there is no "overlap" between Utah's laws and the CEA. Accordingly, the laws are not the type of law that any preemptive field within the CEA would supersede.

In sum, Kalshi's field-preemption claim should be rejected because Kalshi's proposed preemptive field is impermissibly broad and because Kalshi challenges laws (generally applicable laws) that are not properly excluded under a field-preemption theory.

### b.   Conflict preemption

The Court should also reject Kalshi's conflict-preemption theory. Conflict preemption exists in two situations: (1) "where compliance with both state and federal law is impossible," or (2) "where 'the state law stands as an obstacle to the

18

accomplishment and execution of the full purposes and objectives of Congress.'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015). The Court should reject Kalshi's conflict-preemption claim under both branches. *See* Defendants' Motion at 37-41.

### i. Impossibility preemption

First, the Court should reject Kalshi's impossibility preemption claim. "The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963) (conflict occurs where there is a "physical impossibility" of compliance with state and federal law). Kalshi cannot satisfy this standard. *See* Defendants' Motion at 37-38.

Kalshi argues that "compliance with Utah law would be flatly impossible for Kalshi" because a CFTC regulation requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." Dtk. 9 at 20-21 (citing 17 C.F.R. § 38.151(b) (emphasis added)). But this argument misconstrues the impartial-access requirement.

The impartial access requirement prevents DCMs from discriminating based on wealth or exclusivity; it does not require contract markets to offer identical products in every State. *See* Defendants' Motion at 37-38; *see also* Dan Bernstein, *A Frequent Kalshi Claim is Being Undermined by Nevada, CFTC,* Sportico (Nov. 12, 2025), perma.cc/DE6H-B4PF. Accordingly, Kalshi's impossibility-preemption argument fails.

19

### ii. Obstacle preemption

The Court should also reject Kalshi's obstacle-preemption claim. Kalshi raises two obstacle-preemption arguments. First, Kalshi relies on comments from a few legislators to argue that "[s]ubjecting Kalshi to Utah's gambling laws would conflict with Congress's goal of subjecting DCMs to a uniform federal scheme." Dkt. 29 at 18. The Court should reject this argument as unsupported by the CEA. *See* Defendants' Motion at 38-39. Additionally, this uniformity argument is undermined by the fact that Congress also made it illegal under *Federal* law to operate a business within a State in a manner that violates State gambling laws. *See* 18 U.S.C. § 1955; *see also* 15 U.S.C. § 3001(a)(1) ("The Congress finds that . . . the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders."). So the CEA was enacted under a Federal framework that recognizes that gambling laws would differ from State to State.

Kalshi's second obstacle-preemption argument similarly fails. Kalshi argues that enforcement of Utah's criminal laws would conflict with the "federal scheme" in which the CFTC was given authority to prohibit event contracts in certain situations, including where they violate State laws. Dkt 29 at 18-19 (citing 7 U.S.C. § 7a-2(c)(5)(C)). But Kalshi misunderstands the purpose and effect of Section 7a-2(c). *See* Defendants' Motion at 39-41. As one district court already found in ruling against Kalshi last year, Section 7a-2 "clearly reflects an affirmative intent to preserve state laws governing whether particular conduct is lawful or unlawful." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 680 (D. Md. 2025). Indeed, by authorizing the CFTC to prohibit transactions on any nationwide exchange if the "event contracts" are

20

unlawful under the laws of one State, Congress contemplated that there would be situations in which States treated the underlying legality of an event contract differently. Instead of expressly preempting these State laws, Congress merely provided the CFTC with the discretion to prohibit them nationwide if the CFTC determined that doing so would be in the public interest. This authority over nationwide markets is not meaningless.

In sum, Kalshi cannot meet its burden of showing a conflict between Utah's generally applicable criminal laws and the CEA. Kalshi has not identified any provision of the CEA in conflict with any specific Utah statute. Accordingly, the Court should reject Kalshi's conflict-preemption claim.

## B.      All or Most Bets Offered on Kalshi Are Not Within the Jurisdiction of the CFTC.

Alternatively, the Court should dismiss Kalshi's Complaint because all or most of Kalshi's offered bets do not fall within the exclusive jurisdiction of the CFTC. Kalshi alleges that its bets are regulated by the CFTC because they qualify as "swaps" under the CEA. Dkt. 1 at ¶¶ 8, 40, 48, 54. This is incorrect. *See* Defendants' Motion at 41-47.

As discussed in Defendants' Motion, to qualify as a swap under the CEA, Kalshi's contracts must (1) depend on the occurrence, nonoccurrence, or extent of an event or contingency and (2) the event or contingency must be "*associated with* a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). Most of Kalshi's bets fail both tests.

21

### 1. Kalshi's Bets are Not Sufficiently Tied to Financial, Economic, or Commercial Consequences.

First, Kalshi's bets are not sufficiently tied to financial, economic, or commercial consequences to qualify as a swap. *See* Defendants' Motion at 42-45. Inclusion of the term "associated" means that, to qualify as a swap under Section 1a(47)(A)(ii), the event at issue must be commonly linked or connected to an existing economic risk that a person would seek to hedge. *See id.* This stems from the dictionary definition of the term "associated,"[4] and the "cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor,* 529 U.S. 362, 404 (2000).

Kalshi's interpretation would include any event that has potential economic consequences, even when those consequences are indirect and downstream. This essentially deletes the term "associated" from part (ii) so that part (ii) would read as follows: "event or contingency ~~associated~~ with . . . financial, economic, or commercial consequences." This loose interpretation deprives the clause of any limiting principle and, thereby, deprives it of any function in Section 1a(47)(A)(ii). *See* ("It is . . . a (internal quotation marks omitted)). *See* Defendants' Motion at 42-45.

For the foregoing reasons (which are more fully explained in Defendants' Motion), the Court should interpret the phrase "associated with a potential financial, economic, or commercial consequence" to mean events that are inherently or commonly joined or connected with those consequences—a definition that would

---

[4] Defendants' Motion at 42 (quoting dictionaries to show that "associated" things are connected in idea or often discussed in combination).

22

exclude many, if not all, of the bets Kalshi is currently offering to Utah residents. Accordingly, the blanket relief Kalshi seeks in this case—a declaration that all betting occurring on Kalshi falls within the CEA and outside Utah's jurisdiction—should be denied.

### 2. Kalshi's Bets Do Not Depend on the Occurrence of an "Event" or "Contingency."

Second, Kalshi's bets do not depend on the occurrence, nonoccurrence, or extent of an "event" or "contingency," as required by Section 1a(47)(A)(ii). 7 U.S.C. § 1a(47)(A)(ii) (". . . that provides for any purchase, sale, payment, or delivery . . . that *is dependent* on the occurrence, nonoccurrence, or the extent of the occurrence of an *event or contingency . . . .*" (emphases added)). Instead, Kalshi's bets depend on the *outcome* of an event. *See* Defendants' Motion at 45-48.

The "ordinary meaning of the word[s] occurrence . . . nonoccurrence and extent of occurrence," as used in the statute, is that "something happened, did not happen or happened to an extent." *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *8 (D. Nev. Oct. 14, 2025). As an example "in the context of sports," "a boxing match could either take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of occurrence)." *Id.*

Additionally, an ordinary meaning of event is "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time." *N. Am. Derivatives Exch., Inc.*, 2025 WL 2916151, at *8. Putting this definition in the context of sports, as an example, "the ordinary meaning of event

. . . would be the sporting event itself, not who wins it." *Id.* Indeed, an "ordinary American interpreting the word 'event' would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself." *Id.*

With these definitions in mind, it is clear that most of the bets Kalshi offers depend on the *outcome* of an event, not the *occurrence* of the event. For example, although Kalshi offered bets on whether the Los Angeles Lakers would beat the Oklahoma City Thunder on April 2, 2026, whether the Thunder would win by over 9.5 points, whether the Thunder would score over 105.5 points in the game, and whether Lebron James would score more than 10 points in the game (to name only a few of the bets offered related to this event), Kalshi did not offer a bet on whether the game (or event) would actually occur. *See Los Angeles L at Oklahoma City*, https://kalshi.com/markets/kxnbagame/professional-basketball-game/kxnbagame-26apr02lalokc (last accessed on April 2, 2026). Ordinary English speakers call who wins the game an outcome, not an event. Similarly, they do not call the number of points scored by an NBA team or player, or the margin of victory, events. These are outcomes and, therefore, not within the CEA's definition of the term swap.

In sum, even if the Court were to conclude that Utah is preempted by the CEA's exclusive-jurisdiction provision from enforcing its generally applicable laws against Kalshi (the Court should not do so), the relief Kalshi seeks in this case would nevertheless be inappropriate because most (if not all) the bets Kalshi offers do not qualify as swaps under the CEA's definition of the term and, therefore, are not within

24

the scope of the CEA's exclusive jurisdiction provision. *See* Defendants' Motion at 41-48.

### III.    The Balance of the Equities and the Public Interest Weight Against an Injunction.

Because Kalshi seeks an injunction against a State government, the final two preliminary injunction factors—the balance of equities and the public interest—"merge" together and are considered as one. *Denver Homeless*, 32 F.4th at 1278 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, that combined factor heavily favors the State.

A grant of preliminary relief would inflict serious harm on both the State and the public. As the Supreme Court has recognized, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). And the Tenth Circuit has repeatedly made clear that a State "government has a strong interest generally in the enforcement of its criminal laws." *Aid for Women v. Foulston*, 441 F.3d 1101, 1119 (10th Cir. 2006) (collecting cases); *see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1187 (10th Cir. 2003), *on reh'g en banc*, 389 F.3d 973 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (when considering the "balance of the harms and adversity to the public interest," courts must "recognize the importance of enforcement of criminal laws").

What's more, the gambling restrictions at issue "lie[] at the heart of the state's police power to further important goals like protecting the health, welfare, safety, and morals of its citizens." *Rivera-Corraliza v. Morales*, 794 F.3d 208, 220 & nn. 17–18 (1st Cir. 2015) (internal quotation marks omitted) (collecting cases). Studies have long shown that gambling can "inflict substantial harm on individuals, families, and communities," including "loss of employment, broken relationships, health effects, and crime-related impacts," higher "risk of suicidality and domestic violence," and "the obvious danger of financial losses and financial ruin." H. Wardle *et al.*, *The Lancet Public Health Commission on Gambling*, 9 The Lancet Public Health e950, e951 (Nov. 2024). And these problems become more severe over time, since "[l]ike additions to alcohol and drugs, gambling addictions are characterized by an increasing tolerance that requires more gambling as time goes on to feel satisfied." Emily Sohn, *How Gambling Affects the Brain and Who is Most Vulnerable to Addiction*, Am. Psych. Ass'n, 54 Monitor on Psych. 62 (July 2023). States enacting laws that limit gambling have recognized its tendency to prey upon the vulnerable by "encourag[ing] people of modest means to squander their savings and earnings." *Murphy v. NCAA*, 584 U.S. 453, 486 (2018); *see also id.* at 460 (citing sources supporting the claim that certain types of gambling, including sports betting, are "particularly addictive and especially attractive to young people"). Unsurprisingly, courts have thus always emphasized that "the police power of the state extends to . . . gambling." *Crutcher v. Commonwealth*, 141 U.S. 47, 61 (1891); *see also Murphy*, 584 U.S. at 486 (holding that State gambling laws were not preempted and that "each

State is free to act on its own" regarding the "important policy choice" of gambling legalization). Both the State and its residents will suffer significant harm from an injunction that prevents Utah from enforcing its duly enacted laws designed to avoid the well established harms of gambling.

On the other side of the balance, Kalshi faces no harm if the status quo remains in place. As explained above, any potential harms to Kalshi are just that—potential, and conditioned upon Kalshi's decision to violate preexisting law that is not preempted. Although Kalshi complains at length about "intractable technological difficulties" and potential obstacles making it "difficult to inform users" in the absence of an injunction, Dkt. 29 at 24, any such difficulties would be of Kalshi's own making. Plaintiffs seeking preliminary relief cannot prevail "merely by inflicting harm on themselves," let alone by complaining that they intend to do so. *Murthy v. Missouri*, 603 U.S. 43, 73 (2024). And even "large implications" due to anticipated future enforcement are "not equivalent to harm" for the purposes of this factor. *Aid for Women*, 441 F.3d at 1121.

Additionally, as explained above, Kalshi is already required to overcome these "technological difficulties" in two other States (Nevada and Massachusetts). And there is no indication that applying that technology to Utah will impose an additional burden on Kalshi.

In short, Kalshi's self-inflicted potential future alleged harms do not outweigh the State's interests in exercising its police power and enforcing generally applicable

27

laws enacted by its people's representatives. The balance of equities and public interest thus both favor the State.

## Conclusion

For the foregoing reasons, the Court should deny the Renewed Motion for Preliminary Injunction.

Respectfully submitted on May 1, 2026

Derek Brown
Utah Attorney General

  _/s/ Joshua Cutler_
Joshua Cutler
Mark Gillespie
Assistant Solicitors General
*Counsel for Defendants*

## Certificate of Compliance

I, Joshua B. Cutler, certify that this **OPPOSITION TO PLAINTIFFS'**

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF A**

**PRELIMINARY INJUNCTION** contains 7,180 words and complies with DUCivR

7-1(a)(4).


  */s/ Joshua B. Cutler*
Joshua Cutler
Assistant Solicitor General
*Counsel for Defendants*

29

## Certificate Of Service

I hereby certify that on May 1, 2026, I caused a true and correct copy of the foregoing **OPPOSITION TO PLAINTIFFS' RENEWED MOTION AND MEMORANDUM OF LAW IN SUPPORT OF A PRELIMINARY INJUNCTION** to be filed using the Court's electronic filing system, which effectuated service of such filing upon all counsel who have entered an appearance.

_/s/ Joshua Cutler_
Joshua Cutler
Assistant Solicitor General
*Counsel for Defendants*

# Exhibit A

**UNITED STATES OF AMERICA**
**Before the**
**COMMODITY FUTURES TRADING COMMISSION**

---

In the Matter of the Application
of KalshiEX LLC for
Designation as a Contract Market

---

**ORDER OF DESIGNATION**

KalshiEX LLC ("Kalshi") has submitted to the Commodity Futures Trading Commission ("Commission"), pursuant to Section 5(a) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 7(a), and Commission Regulation 38.3(a), 17 C.F.R. § 38.3(a), an application for designation as a contract market, which includes submissions dated December 30, 2019 through September 17, 2020.  Having reviewed Kalshi's application, the Commission makes the following findings and rulings:

WHEREAS Commission staff reviewed Kalshi's application for designation as a contract market, including Kalshi's rules, and conducted a technical evaluation of Kalshi's operational capabilities to evaluate whether Kalshi was in compliance with the core principles and corresponding regulations in accordance with Section 5(d) of the Act, 7 U.S.C 7(d)(1).

WHEREAS based on its review, staff concludes that Kalshi's application, including all amendments thereto and representations made by Kalshi, demonstrates compliance with the applicable requirements of the Act and the Commission's regulations for designation as a contract market.

The Commission FINDS that Kalshi has demonstrated, as required by Section 6(a) of the Act, 7 U.S.C. § 8(a), and Regulation 38.3(a), 17 C.F.R. § 38.3(a), that Kalshi complies with the provisions set forth in the Act and the Commission's regulations thereunder applicable to designation as a contract market and provides a sufficient assurance that it will continue to comply with the requirements of the Act and the Commission's regulations.

Therefore:

IT IS HEREBY ORDERED, pursuant to Sections 5 and 6(a) of the Act, that the application of Kalshi for designation as a contract market is approved, subject to the terms and conditions specified herein:

(1)     Kalshi shall comply with all representations and submissions made by Kalshi in support of its application for designation as a contract market, as shown in the application record;

(2)     Kalshi shall comply with all provisions of the Act and all requirements set forth in the Commission's regulations, as may be amended or adopted from time to time, that are applicable to designated contract markets; and

(3)     Kalshi may not permit any futures commission merchant to intermediate any transactions or carry accounts for customers executing trades on, or pursuant to the rules of, the contract market unless the Kalshi Order of Designation has been amended to permit futures commission merchants to carry customer accounts.

Issued in Washington, D.C., this 3rd day of November, 2020.


By the Commission,


_____
Christopher J. Kirkpatrick
Secretary of the Commission

2

# Exhibit B

**UNITED STATES OF AMERICA**
**Before the**
**COMMODITY FUTURES TRADING COMMISSION**

_____

In the Matter of the Request by
KalshiEX LLC to Amend Its Order of
Designation as a Contract Market

_____

**AMENDED ORDER OF DESIGNATION**

WHEREAS, on November 3, 2020, the Commodity Futures Trading Commission (the "Commission") issued an order (the "Original Order") pursuant to Sections 5 and 6(a) of the Commodity Exchange Act ("Act"), 7 U.S.C.§ 7 and 8(a), designating KalshiEX LLC ("Kalshi") as a contract market.

WHEREAS, the Original Order includes a provision stating that Kalshi "may not permit any futures commission merchant to intermediate any transactions or carry accounts for customers executing trades on, or pursuant to the rules of, the contract market unless the Kalshi Order of Designation has been amended to permit futures commission merchants to carry customer accounts" (the "Subject Provision").

WHEREAS, by submissions dated November 27, 2023, through December 9, 2024, Kalshi requested that the Commission amend the Original Order to remove the Subject Provision (such request, including the documentation and representations submitted by Kalshi in support thereof, the "Request").

IT IS HEREBY ORDERED, pursuant to Section 5 of the Act, 7 U.S.C.§ 7, that the Original Order is superseded by this Order of Designation (from which the Subject Provision has

been removed), and Kalshi is designated as a contract market subject to the following terms and conditions:

(1) Kalshi shall comply with all representations and submissions made by Kalshi in the Request and in support of its application for the Original Order, subject to its continuing obligation to promptly update information contained in Form DCM, or any supplement or amendment thereto, if such information becomes inaccurate for any reason; and

(2)  Kalshi shall comply with all provisions of the Act, including the DCM Core Principles thereunder, and all requirements set forth in the Commission's regulations, as may be amended or adopted from time to time, that are applicable to designated contract markets.

This Order of Designation is based upon the representations made and supporting material provided to the Commission by Kalshi.  Any changes to or omissions in the material facts or circumstances pursuant to which this Order of Designation is issued may require a new or amended order.  The Commission may condition, modify, suspend, terminate, or otherwise restrict the terms of this Order of Designation, as appropriate and as permitted by law, on its own motion.

Issued in Washington, D.C., this 17th day of January, 2025.


By the Commission

Robert N. Sidman
Deputy Secretary of the Commission

# Exhibit C

*KalshiEX LLC*

March 6, 2026

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will the greatest seeding upset margin in <time period> of <event> be <above/below/exactly/at least/between> <value>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will the greatest seeding upset margin in <time period> of <event> be <above/below/exactly/at least/between> <value>?" contract (Contract). The Contract will initially be listed after close-of-business on **March 6, 2026**; it is listed as the day after because of limitations of the Commission's online submission portal. The Exchange intends to list the contract on a custom ▾ basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<event>**
- **<above/below/exactly/at least/between>**
- **<value>**
- **<time period>**
- **<sporting entity>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC

*KalshiEX LLC*

KalshiEX LLC

KalshiEX LLC

xsottile@kalshi.com

KalshiEX LLC

**KalshiEX LLC**
**Official Product Name: "Will the greatest seeding upset margin in <time period> of <event> be <above/below/exactly/at least/between> <value>?"**
**Rulebook: SEEDUPSET**
**Summary: Upset margin in sporting events**
**Kalshi Contract Category:  Sports**
**Kalshi Internal Category:  Sports**
**March 6, 2026**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will the greatest seeding upset margin in <time period> of <event> be <above/below/exactly/at least/between> <value>?" Contract is a contract relating to Sports.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.16 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.13 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new

Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

- ❏ The Contract complies with the Act and Commission regulations thereunder.
- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: March 6, 2026

*KalshiEX LLC*

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B - Trading Prohibitions

Appendix C (Confidential) - Further Considerations

Appendix D (Confidential) - Source Agency

Appendix E (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

*KalshiEX LLC*

**APPENDIX A – CONTRACT TERMS AND CONDITIONS**

**Official Product Name: "Will the greatest seeding upset margin in \<time period\> of \<event\> be \<above/below/exactly/at least/between\> \<value\>?"**
**Rulebook: SEEDUPSET**

*KalshiEX LLC*

*KalshiEX LLC*

# SEEDUPSET

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the greatest seeding disadvantage overcome by any winner across all matches in <event> during <time period>, as determined by the Source Agency. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agencies are, in hierarchical order, the official organizing body or governing authority of <event> (e.g., NCAA, ATP, FIFA, the IOC, or the relevant national federation), the official website or statistical platform of <event>, ESPN, the Associated Press, Reuters, BBC Sport, Sky Sports, and other major sports news organizations.

**Type:** The type of Contract is an Event Contract.

**Issuance:** After the initial Contract, Contract iterations will be listed on an as-needed basis at the discretion of the Exchange and corresponding to the risk management needs of Members.

**<event>:** <event> refers to a sporting competition, tournament, league, or championship specified by the Exchange. <event> may refer to a singular event, multiple events, an element in a set of events, or by distinguishing characteristics (e.g., any Grand Slam tournament). <event> may additionally encompass the entire duration of a competition or a defined phase thereof, such as a single round, bracket stage, or leg.

**<time period>:** <time period> refers to the specific stage or stages of <event> within which the greatest seeding disadvantage overcome is evaluated, as specified by the Exchange (e.g., "first round," "quarterfinals," "the entire tournament"). If not specified, <time period> shall default to the entire duration of <event>. <time period> may refer to a single stage, multiple stages (consecutive or non-consecutive), or all stages of <event>.

**<above/below/exactly/at least/between>:** <above/below/exactly/at least/between> refers to comparison operators. "Above" means greater than (>), "below" means less than (<), "exactly" means equal to (=) when rounded to the nearest whole number, "at least" means greater than or equal to (≥), and "between" means within an inclusive range (≥ lower bound and ≤ upper bound).

**<value>:** <value> refers to a specific numeric seeding difference specified by the Exchange, expressed as a non-negative whole number representing the absolute difference between the official seed numbers of the winner and the loser in a single match or fixture. Rounding to the nearest whole number shall be assumed unless otherwise specified.

**<sporting entity>:** <sporting entity> refers to an individual athlete, team, pair, or group competing in <event>, as seeded and identified by the organizing body of <event>. A <sporting

entity> may be identified by name, seed number, nationality, bracket position, or other distinguishing characteristic as specified by the Exchange.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that the greatest seeding disadvantage overcome by any winner in <time period> of <event> is <above/below/exactly/at least/between> <value>.

For the purposes of this Contract:

- "Seeding disadvantage overcome" means, for a given completed match or game within <event> and <time period>, the positive difference obtained by subtracting the loser's official seed number from the winner's official seed number, where the winner holds a numerically higher seed number than the loser (i.e., the winner was ranked lower entering the match). This value is calculated as: winner's seed number minus loser's seed number. A seeding disadvantage overcome is only recorded when this difference is strictly positive; matches won by the lower-numbered (higher-ranked) seed produce no seeding disadvantage overcome and are excluded from the calculation.
- "Greatest seeding disadvantage overcome" means the single largest such value recorded across all qualifying matches within <event> and <time period>. If two or more matches produce an equal seeding disadvantage overcome, each shall be treated as a co-equal greatest value and the Contract shall resolve based on that shared value.

**Additional clarification(s):**

- If no qualifying match within <event> and <time period> produces a seeding disadvantage overcome (i.e., every completed match is won by the lower-numbered seed or by equally-seeded competitors), the greatest seeding disadvantage overcome shall be deemed zero (0) for purposes of resolution, and the Contract shall resolve accordingly against the <value> threshold.
- Matches between two <sporting entity> that carry identical seed numbers shall not produce a seeding disadvantage overcome regardless of the outcome.
- If one or both competing <sporting entity> in a match are officially designated as "unseeded" by the organizing body of <event>, the seed of the unseeded competitors will be one greater than the highest seeded value.
- If official seedings are not published by the organizing body of <event> prior to the commencement of <time period>, the difference in seeding between all <sporting entity> will be zero (0).
- Walkovers and forfeitures in which no active play occurs shall not constitute a qualifying match for the purposes of this Contract. If a match ends due to retirement, injury withdrawal, or disqualification after active play has commenced, such match shall constitute a qualifying match, and the seeding disadvantage overcome shall be calculated using the official seed numbers of the winner and

*KalshiEX LLC*

loser. If the greatest seeding disadvantage overcome across all qualifying matches in <time period> is produced by a match that concluded via retirement, injury withdrawal, or disqualification rather than through completion of regulation play, the Contract shall resolve at the last fair price as determined in the sole discretion of the Exchange.

- In round-robin or league-format stages of <event>, each individual match within <time period> is evaluated independently. The seeding disadvantage overcome for each match is calculated using the same method as for elimination formats, and the greatest value across all qualifying matches in <time period> shall govern.

- Official seedings used for resolution are those published by the organizing body of <event> at the commencement of <time period>. Seeding revisions made after <time period> has begun, including reseedings between rounds, will not be applied retroactively to matches already completed within that <time period>.

- If <event> is cancelled, postponed, or abandoned before the completion of <time period> and no qualifying matches have been completed, the Contract shall resolve to the last fair price determined in the sole discretion of the Exchange. If at least one qualifying match within <time period> has been completed prior to cancellation or abandonment, the greatest seeding disadvantage overcome among completed matches shall serve as the Expiration Value.

- If a <sporting entity> competes under a different name, nationality, or affiliation than listed at the time of seeding (e.g., due to a transfer, rebrand, or administrative reclassification), the seed number assigned at the commencement of <time period> shall govern, and the identity of the <sporting entity> shall remain consistent with their seeded designation for purposes of this Contract.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the Expiration Date. The Last Trading Time will be the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be one week after the conclusion of <event> or <time period>, whichever is later. If the greatest seeding disadvantage overcome can be conclusively determined prior to the conclusion of <event>, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

*KalshiEX LLC*

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 7.1 of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 7.1 in the Rulebook.

*KalshiEX LLC*

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the league, association, or organization(s) governing <event>. For college leagues/associations specifically, or where otherwise appropriate (as identified by the Exchange), this applies to current and former players/coaches/staff of the specific teams in <event> rather than the league/association as a whole.
- Paid employees of the league, tournament organizer, or governing body of <event> and league participants.
- Ultimate beneficial owners of teams, franchises, or clubs competing in <event> and of the league or governing body.
- Officials, referees, umpires, and match officials assigned to <event>.
- Medical and athletic training personnel with access to non-public injury or fitness information regarding competitors in <event>.
- Members of seeding committees, selection committees, draw committees, or any persons involved in determining or assigning official seedings for <event>.
- Immediate family (parents, siblings, spouses, domestic partners) and household members of all above.

These prohibitions apply to the appropriate values of <event>. For example, former players of the ATP Tour are not necessarily prohibited from trading on iterations of the Contract related to the NCAA Tournament, unless they are part of any other group listed for that event.

*KalshiEX LLC - Confidential*

*KalshiEX LLC*

February 19, 2026

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <team> have the longest losing streak in <season> of <league>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <team> have the longest losing streak in <season> of <league>?" contract (Contract). The Contract will initially be listed after close-of-business on **February 19, 2026**; it is listed as the day after because of limitations of the Commission's online submission portal. The Exchange intends to list the contract on a  custom ⌄  basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<team>**
- **<season>**
- **<league>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile

*KalshiEX LLC*

*KalshiEX LLC*

Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: "Will <team> have the longest losing streak in <season> of <league>?"**
**Rulebook: LOSESTREAKTEAM**
**Summary: Team with longest losing streak**
**Kalshi Contract Category:** Sports ˅
**Kalshi Internal Category:** Sports ˅
**February 19, 2026**

### CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will <team> have the longest losing streak in <season> of <league>?" Contract is a contract relating to Sports ˅ .

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.16 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.13 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new

Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

- ❏ The Contract complies with the Act and Commission regulations thereunder.
- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: February 19, 2026

*KalshiEX LLC*

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B - Trading Prohibitions

Appendix C (Confidential) - Further Considerations

Appendix D (Confidential) - Source Agency

Appendix E (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will \<team> have the longest losing streak in \<season> of \<league>?"**
**Rulebook: LOSESTREAKTEAM**

*KalshiEX LLC*

*KalshiEX LLC*

**LOSESTREAKTEAM**

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the official game results for <league> during <season>, as reported by the Source Agencies. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Instructions:** The Underlying can be found at the official website of <league>. These instructions on how to access the Underlying are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time.

**Source Agency:** The Source Agencies are the league or association governing <league>, the Associated Press, ESPN, The Wall Street Journal, Fox Sports, and CBS Sports.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent event. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to the next season of <league>.

**<team>:** <team> refers to one or more entities participating in <league> as specified by the Exchange. The Exchange may specify <team> by name (e.g., "Chicago Bears"), by a list of named franchises connected by AND or OR logic, or by distinguishing characteristics describing a defined group (e.g., "any team from the Midwest," "any expansion team," or "any team that made the playoffs in the prior season"). When <team> is defined by distinguishing characteristics, group membership is determined as of the date or point in time specified by the Exchange; if no date is specified, membership is determined as of the start of <season>. If <team> relocates, rebrands, or changes its name during <season>, the Contract follows the franchise continuity as recognized by <league>. The Exchange may also list an iteration with the value "Any other team" or "Field" to represent all teams for which there is no individually listed strike.

**<league>:** <league> refers to a professional sports league specified by the Exchange. <league> may refer to the National Football League (NFL), the National Basketball Association (NBA), the National Hockey League (NHL), Major League Baseball (MLB), or any other sports league or association specified by the Exchange.

**<season>:** <season> refers to a specific regular season of <league> as specified by the Exchange. <season> is defined by the official regular-season schedule published by <league>. Only regular-season games count toward the Underlying; preseason, exhibition, All-Star, postseason, and playoff games are excluded. If <league> uses a split-season or multi-phase regular-season format, <season> encompasses all phases of the regular season unless otherwise

specified by the Exchange. The Exchange may list iterations of the Contract corresponding to variations of <season>.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that <team> has the longest losing streak in <season> of <league>.

A "losing streak" for purposes of this Contract is the maximum number of consecutive regular-season games in which <team> records a loss during <season>. A game that ends in a tie or draw (such as an NFL game that remains tied after overtime) is not a loss and will end any active losing streak.

- Only games that are completed and have an official result recognized by <league> count toward a losing streak.
- Suspended games count toward the losing streak based on their official final result and the date on which <league> recognizes the result as final.
- Forfeited games count as losses for the forfeiting team and as wins for the non-forfeiting team.
- If <league> retroactively changes the outcome of a game after Expiration, such changes will not be considered.

The "longest losing streak in <season> of <league>" is the greatest number of consecutive regular-season losses recorded by any single team during <season>, as determined at the conclusion of the final regular-season game of <season>. Only losses from regular-season games played during <season> count toward the losing streak calculation. Losses from prior seasons, postseason games, or subsequent seasons are not included, even if they are part of a continuous sequence of losses.

- If two or more teams share the longest losing streak (i.e., they have losing streaks of the same length, and no other team has a longer one), then the markets for each of those tied teams will resolve to $1/(the number of tied teams), rounded down.
- If <season> is cancelled in its entirety before any regular-season games are played, all markets will resolve to the last fair price as determined by Kalshi.
- If <season> is shortened and ended (e.g., due to a lockout, strike, pandemic, or other extraordinary circumstance) but at least one regular-season game is played to completion, the longest losing streak will be determined based on the games actually played, and the Contract will resolve accordingly.
- If <team> is eliminated, dissolved, or ceases to participate in <league> during <season>, the longest losing streak for <team> will be determined based on games played before their departure. Such a streak is still eligible to be the longest in <season>.
- If a game is declared "no contest" by <league> and is not replayed or given an official result, it does not count as a loss; it does not extend OR break a losing streak. It is treated as though the game did not occur.

*KalshiEX LLC*

Examples that would resolve the market to Yes (assuming <team> = "Chicago Bears" and <season> = "2025-26 NFL Season"):

- The Chicago Bears lose 8 consecutive regular-season games during the 2025-26 NFL season, and no other team in the NFL loses more than 7 consecutive regular-season games. The market resolves to Yes.
- The Chicago Bears lose 6 consecutive regular-season games, and the New York Giants also lose exactly 6 consecutive regular-season games, and no team loses more than 6. Both the Bears and Giants markets resolve to $0.50.

Examples that would NOT resolve the market to Yes:

- The Chicago Bears lose 5 consecutive regular-season games, but the Carolina Panthers lose 7 consecutive regular-season games. The Bears market resolves to No.
- The Chicago Bears' longest losing streak during the season is 1 game, but the Detroit Lions lose 4 consecutive regular-season games, which is the longest streak in the league. The Bears market resolves to No.
- The Chicago Bears had a 10-game losing streak that began in the prior season, with 4 of those losses occurring in the prior season and 6 occurring in the current season. The Bears' losing streak for the current <season> is counted as 6, not 10.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be one week after the end of the last regular season game of <season>. If the final regular-season game of <season> concludes and all game results are official, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

*KalshiEX LLC*

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 7.1 of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 7.1 in the Rulebook.

*KalshiEX LLC*

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of <league>;
  - These prohibitions apply to the appropriate values of <league>. A given individual's prohibition is scoped to the specific <league> iteration of the Contract on which they would have a prohibited informational or competitive advantage. For example, a former NFL player is not necessarily prohibited from trading on iterations of the Contract related to the NBA, unless they independently qualify under any other category listed above with respect to that other <league>.
- Paid employees of <league> and participants of <league>;
- Ultimate beneficial owners of <team> and <league>; and
- Household members and immediate family of all of the above.

These prohibitions apply to the appropriate values of <league> and <team>. A given individual's prohibition is scoped to the specific <league> and <team> iteration of the Contract on which they would have a prohibited informational or competitive advantage. For example, a former player within one <league> is not necessarily prohibited from trading on iterations of the Contract related to a different <league>, unless they independently qualify under any other category listed above with respect to that other <league>.

*KalshiEX LLC*

*KalshiEX LLC*

August 18, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <team> win <game> by <above/below/between/exactly/at least> <count> points?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <team> win <game> by <above/below/between/exactly/at least> <count> points?" contract (Contract). The Contract will initially be listed after close-of-business on **August 18, 2025**; it is listed as the day after because of limitations of the Commission's online submission portal. The Exchange intends to list the contract on a  custom  basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<date>**
- **<team>**
- **<game>**
- **<above/below/between/exactly/at least>**
- **<count>**
- **<opponent>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets

*KalshiEX LLC*

*KalshiEX LLC*

KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: "Will <team> win <game> by <above/below/between/exactly/at least> <count> points?"**
**Rulebook: FOOTBALLSPREAD**
**Summary: Whether team wins game by specified point margin**
**Kalshi Contract Category: Sports**
**Kalshi Internal Category: Sports**
**August 18, 2025**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will <team> win <game> by <above/below/between/exactly/at least> <count> points?" Contract is a contract relating to Sports.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access

the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.

❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: August 18, 2025

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Trading Prohibitions

Appendix C (Confidential) - Further Considerations

Appendix D (Confidential) - Source Agency

Appendix E (Confidential) - Compliance with Core Principles

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will \<team\> win \<game\> by \<above/below/between/exactly/at least\> \<count\> points?"**
**Rulebook: FOOTBALLSPREAD**

*KalshiEX LLC*

# FOOTBALLSPREAD

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the final point differential in <game> between <team> and <opponent>. The point differential is calculated as <team>'s final score minus <opponent>'s final score, including any overtime periods played. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agency is the league governing <game>.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent data release. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to games throughout the season.

**<team>:** <team> refers to a specific team designated by the Exchange using official team names or standard abbreviations. <team> is tracked through name changes.

**<opponent>:** <opponent> refers to the team playing against <team> in the specified game.

**<above/below/between/exactly/at least>:** Refers to comparison operators. "Above X" means winning by more than X points, "below X" means winning by less than X points (or losing), "exactly X" means winning by exactly X points, "at least X" means winning by X or more points, "between X and Y" means winning by at least X but no more than Y points. Negative values indicate losing margins.

**<count>:** <count> refers to a numerical point value specified by the Exchange. May include half-points and negative points (e.g., 3.5, 7.5).

**<game>:** <game> refers to a specific contest between <team> and <opponent>, including regular season, playoff, or other official games, identified by date and participating teams. It may also include, e.g. "any game" or other combinations of specific games.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values where <team> wins <game> against <opponent> by <above/below/between/exactly/at least> <count> points.

**For the purposes of this Contract:**

**Overtime Rules**

- All scoring in overtime periods counts toward the final margin

**Game Completion Rules**

- If <game> is suspended or postponed and not resumed or started within the same scheduling week (by Wednesday), all Contracts settle to the last fair market price prior to suspension
- If <game> is abandoned after 55 minutes of play have been completed, the Contract settles based on statistics accumulated up to the point of abandonment
- If <game> is abandoned before 55 minutes of play (including cancellation before any play), all Contracts settle to the last fair market price unless the outcome was already determined
- If the venue changes but the home/away designation remains the same, all Contracts remain valid

**Venue Change Rules**

- If the venue changes but the home/away designation remains the same, all Contracts remain valid
- If the home/away designation changes, all Contracts settle to the last fair market price

**Statistical Corrections**

- Settlements are based on statistics at game's end
- Any subsequent statistical changes after Expiration will not be taken into consideration

**Special Circumstances**

- If <game> is forfeited, the final score is used for settlement

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be the fifteenth day following <game>. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the National Football League and National Collegiate Athletic Association Football
  - For college leagues/associations specifically, or where otherwise appropriate (as identified by the Exchange), this applies to current and former players/coaches/staff of the specific teams in <game> rather than the league/association as a whole (e.g., if the Division I Gonzaga Men's Basketball Team is playing in <game>, this prohibition will restrict trades by current/former players of that team, rather than all current/former players/coaches/staff in any NCAA sport);
- Paid employees of the league and league participants;
- Ultimate beneficial owners of teams and the league; and
- household members and immediate family of all above.

These prohibitions apply to the appropriate values of <game>. For example, former players of the National Football League are not necessarily prohibited from trading on iterations of the Contract related to the National Basketball Association, unless they are part of any other group listed for that league.[1]

---

[1] The Contract has not been endorsed by any league or association as of self-certification. The use of any names of leagues or associations does not indicate an endorsement of this product.

*KalshiEX LLC*

August 18, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <game> have <over/under> <count> points in <time period> of <game>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <game> have <over/under> <count> points in <time period> of <game>?" contract (Contract). The Contract will initially be listed after close-of-business on **August 18, 2025**; it is listed as the day after because of limitations of the Commission's online submission portal. The Exchange intends to list the contract on a custom ▾ basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<date>**
- **<game>**
- **<over/under>**
- **<count>**
- **<time period>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

KalshiEX LLC

KalshiEX LLC

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: "Will <game> have <over/under> <count> points in <time period> of <game>?"**
**Rulebook: FOOTBALLTOTALS**
**Summary: Team stat over/under in game period**
**Kalshi Contract Category:  Sports**
**Kalshi Internal Category:  Sports**
**August 18, 2025**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will <game> have <over/under> <count> points in <time period> of <game>?" Contract is a contract relating to Sports.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of

the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

- ❏ The Contract complies with the Act and Commission regulations thereunder.
- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: August 18, 2025

*KalshiEX LLC*

**<u>Attachments:</u>**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Trading Prohibitions

Appendix C (Confidential) - Further Considerations

Appendix D (Confidential) - Source Agency

Appendix E (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will &lt;game&gt; have &lt;over/under&gt; &lt;count&gt; points in &lt;time period&gt; of &lt;game&gt;?"**
**Rulebook: FOOTBALLTOTALS**

# FOOTBALLTOTALS

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the number of points scored recorded during <time period> of <game> on <date>. For team-specific markets, only statistics accumulated by the specified team count. For game totals, statistics from both teams are combined. Statistics recorded during regulation time and overtime periods shall count toward the Underlying, unless <time period> specifies otherwise. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agency is the league governing <game>.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent data release. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to games throughout the season.

**<game>:** <game> refers to the combined performance of both teams in a game, as specified by the Exchange.

**<over/under>:** <over/under> refers to whether the final score will be greater than (over) or less than (under) the specified <count>.

**<count>:** <count> refers to a numerical threshold specified by the Exchange. May include whole numbers or half-numbers (e.g., 47.5) or 0.

**<time period>:** <time period> refers to a specific portion of the game specified by the Exchange, which may include: full game (including overtime if played), first half, second half, specific quarter (Q1, Q2, Q3, Q4), overtime period only, or specific time ranges. If not specified, "full game" is assumed. Overtime counts for all markets unless stated otherwise.

**<date>:** <date> refers to the originally scheduled date of <game> in Eastern Time, specified by the Exchange.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values where <game> records <over/under> <count> points during <time period> of <game>.

**For the purposes of this Contract:**

**Statistical Counting Rules**

- All statistics accumulated during regulation and overtime periods count unless <time period> specifies otherwise
- Statistics are considered final at the conclusion of the game. Corrections made afterwards will not affect the value of the Contract.
- For professional football, sacks count against team passing yards only. They do not affect individual quarterback rushing statistics
  - For college, sacks count as rushing attempts with negative yardage for the quarterback and reduce both the quarterback's individual rushing yards and team rushing totals
- Laterals are credited as follows: receiving yards to the point of lateral for the original receiver, additional yards to the player receiving the lateral, all passing yards including post-lateral yards to the quarterback
- Two-point conversion attempts count toward all relevant statistical categories
- Two-point conversion scores do not count as touchdowns
- Defensive two-point conversion returns do not count as defensive touchdowns but do count toward point totals
- Fair-catch free kicks count as field goal attempts
- Turnovers include only fumbles lost and interceptions thrown
- Penalties refer to accepted penalties only
- Hook-and-ladder plays credit receiving yards to each player for their portion, with all passing yards to the quarterback

**Game Completion Rules**

- If <game> is suspended or postponed and not resumed or started within the same scheduling week (by Wednesday), all Contracts settle to the last fair market price prior to suspension
- If <game> is abandoned after 55 minutes of play have been completed, the Contract settles based on statistics accumulated up to the point of abandonment
- If <game> is abandoned before 55 minutes of play (including cancellation before any play), all Contracts settle to the last fair market price unless the outcome was already determined
- If the venue changes but the home/away designation remains the same, all Contracts remain valid

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be the fifteenth day following <game>. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the National Football League and National Collegiate Athletic Association Football
  - For college leagues/associations specifically, or where otherwise appropriate (as identified by the Exchange), this applies to current and former players/coaches/staff of the specific teams in <game> rather than the league/association as a whole (e.g., if the Division I Gonzaga Men's Basketball Team is playing in <game>, this prohibition will restrict trades by current/former players of that team, rather than all current/former players/coaches/staff in any NCAA sport);
- Paid employees of the league and league participants;
- Ultimate beneficial owners of teams and the league; and
- household members and immediate family of all above.

These prohibitions apply to the appropriate values of <game>. For example, former players of the National Football League are not necessarily prohibited from trading on iterations of the Contract related to the National Basketball Association, unless they are part of any other group listed for that league.[1]

---

[1] The Contract has not been endorsed by any league or association as of self-certification. The use of any names of leagues or associations does not indicate an endorsement of this product.

*KalshiEX LLC*

February 13, 2026


**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581


Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing
of the "Will <golfer 1> beat <golfer 2> in <event>?" Contract


Dear Sir or Madam,


Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <golfer 1> beat <golfer 2> in <event>?" contract (Contract). The Contract will initially be listed after close-of-business on **February 13, 2026**; it is listed as the day after because of limitations of the Commission's online submission portal. The Exchange intends to list the contract on a   custom ▾   basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:
- **<golfer 1>**
- **<golfer 2>**
- **<event>**


Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.


If you have any questions, please do not hesitate to contact me.


Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

KalshiEX LLC

KalshiEX LLC

KalshiEX LLC

**KalshiEX LLC**
**Official Product Name: "Will <golfer 1> beat <golfer 2> in <event>?"**
**Rulebook: GOLFH2H**
**Summary: Golfer head-to-head comparison in <event>**
**Kalshi Contract Category:  Sports ˅**
**Kalshi Internal Category:  Sports ˅**
**February 13, 2026**

### CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will <golfer 1> beat <golfer 2> in <event>?" Contract is a contract relating to  Sports ˅ .

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.16 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.13 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of

the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.
❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: February 13, 2026

*KalshiEX LLC*

**<u>Attachments:</u>**

Appendix A - Contract Terms and Conditions

Appendix B - Trading Prohibitions

Appendix C (Confidential) - Further Considerations

Appendix D (Confidential) - Source Agency

Appendix E (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will &lt;golfer 1&gt; beat &lt;golfer 2&gt; in &lt;event&gt;?"**
**Rulebook: GOLFH2H**

*KalshiEX LLC*

*KalshiEX LLC*

# GOLFH2H

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the official total stroke count of <golfer 1> and <golfer 2> over the rounds encompassed by <event>, as recorded by the governing body of <event>. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Instructions:** The Underlying can be found at the official website of the governing body of <event> (e.g., https://www.pgatour.com/ for PGA Tour events). These instructions on how to access the Underlying are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time.

**Source Agency:** The Source Agencies are the governing body of <event> (e.g., the PGA Tour, DP World Tour, LPGA, PGA of America, USGA, The R&A, or LIV Golf, as applicable), the Associated Press, ESPN, The Wall Street Journal, Fox Sports, CBS Sports, NBC Sports, Golf Channel, and the official broadcaster of <event>.

**Type:** The type of Contract is an Event Contract.

**Issuance:** After the initial Contract, Contract iterations will be listed on an as-needed basis at the discretion of the Exchange and corresponding to the risk management needs of Members.

**<golfer 1>:** <golfer 1> refers to an individual professional golfer specified by the Exchange.

**<golfer 2>:** <golfer 2> refers to an individual professional golfer specified by the Exchange, distinct from <golfer 1>.

**<event>:** <event> refers to a specific professional golf tournament, or a specific round within a professional golf tournament, as specified by the Exchange. <event> will identify the tournament name, the tour or governing body, and the year (e.g., "the 2025 Masters Tournament" or "Round 1 of the 2025 U.S. Open"). If <event> specifies only the tournament name without reference to a particular round, then the Contract applies to the full tournament (all scheduled regulation rounds, excluding any playoff). The Exchange may list iterations of the Contract corresponding to variations of <event>.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that <golfer 1> is determined to have won the head-to-head matchup against <golfer 2> in <event>, as defined by the rules below.

*KalshiEX LLC*

*KalshiEX LLC*

"Total stroke count" means the cumulative number of strokes officially recorded by the governing body of <event> over all regulation rounds encompassed by <event>. Playoff holes or strokes are not included in the total stroke count for tournament-scope matchups.

- **Standard case (both golfers complete all regulation rounds):** If both <golfer 1> and <golfer 2> complete all scheduled regulation rounds of <event>, <golfer 1> wins the matchup if and only if <golfer 1>'s total stroke count is strictly lower than <golfer 2>'s total stroke count.

The following additional rules govern specific scenarios:

- **Tie (identical total stroke count):** If both <golfer 1> and <golfer 2> complete the same number of rounds and finish with identical total stroke counts, "Yes" holders shall receive $0.50 per share and "No" holders shall receive $0.50 per share.
- **One golfer withdraws or is disqualified after teeing off:** If exactly one of <golfer 1> or <golfer 2> withdraws, is disqualified, or otherwise fails to complete all regulation rounds of <event> after having teed off in the first round encompassed by <event>, and the other golfer completes at least one more round than the withdrawn/disqualified golfer, then the golfer who completed more rounds is deemed to have the lower score and wins the matchup, with the loser resolving to No and the winner resolving to Yes. If both golfers complete the same number of rounds but one withdraws or is disqualified after having teed off, the golfer with the lower total stroke count over those completed rounds wins. If they have the same number of completed rounds and the same total stroke count, the market resolves 50/50.
    - If both <golfer 1> and <golfer 2> withdraw, are disqualified, or otherwise fail to complete all regulation rounds of <event> after having teed off, then: (a) the golfer who completed more rounds wins; (b) if both completed the same number of rounds, the golfer with the lower total stroke count over those completed rounds wins; (c) if both completed the same number of rounds and have the same total stroke count, the market resolves 50/50.
- **One or both golfers do not tee off:** If either <golfer 1> or <golfer 2> does not tee off in the first round encompassed by <event>, or the governing body of <event> confirms before the start of <event> that either golfer will not participate, the Contract will settle at the last fair price as determined by Kalshi for both golfers.
- **Missed cut (tournament-scope matchups only):** If <event> encompasses the full tournament and <golfer 1> makes the cut while <golfer 2> misses the cut, <golfer 1> wins the matchup regardless of <golfer 1>'s score in subsequent rounds, and vice versa. If both golfers miss the cut, the golfer with the lower total stroke count at the time of the cut wins. If both miss the cut with the same total stroke count, the market resolves 50/50.
- **Tournament shortened:** If the tournament is shortened by the governing body (e.g., due to weather) such that fewer than the originally scheduled number of regulation rounds are

completed, but at least 36 holes (two full rounds) have been completed and an official result is declared, the Contract will resolve based on the official standings after the final completed round. If fewer than 36 holes are completed and no official result is declared, the Contract will settle at the last fair price as determined by Kalshi.

- **Tournament cancelled or postponed:** If <event> is postponed but later resumed within two weeks of its originally scheduled start time (and such rescheduling is announced within one week of the originally scheduled start date), the market will remain open and resolve based on the official final leaderboard once play is completed. If the tournament is postponed later than two weeks (either initially or through continued postponement) and/or the announcement of postponement happens more than one week after the scheduled start date, all markets will resolve at the last fair price determined in the sole discretion of the Exchange.
- **Round-scope matchups:** If <event> refers to a specific round, the Contract resolves based solely on the total stroke count recorded in that round. If play is suspended and later resumed (e.g., suspended due to darkness), meaning that at least one golfer specified is unable to immediately complete the round, the round is deemed complete once the golfer has finished the round (i.e. completed all requisite holes), even if play resumes on a subsequent calendar day. If the round is cancelled entirely and not replayed, the Contract will settle at the last fair price as determined by Kalshi.
- **Data corrections:** If the governing body of <event> corrects a scoring error before Expiration, the corrected score will be used. Corrections or adjustments made after Expiration will not be considered.

Examples that would resolve the market to Yes:

- <golfer 1> = Scottie Scheffler, <golfer 2> = Rory McIlroy, <event> = the 2025 Masters Tournament. Scheffler finishes with a 72-hole total of 272 and McIlroy finishes with 275. The market resolves Yes because Scheffler's total stroke count (272) is strictly lower than McIlroy's (275).
- <golfer 1> = Xander Schauffele, <golfer 2> = Jon Rahm, <event> = Round 1 of the 2025 PGA Championship. Schauffele shoots 66 in Round 1 and Rahm shoots 69. The market resolves Yes because 66 < 69 in that round.
- <golfer 1> = Collin Morikawa, <golfer 2> = Viktor Hovland, <event> = the 2025 U.S. Open. Morikawa makes the cut and Hovland misses the cut. The market resolves Yes regardless of Morikawa's weekend scores.
- <golfer 1> = Brooks Koepka, <golfer 2> = Jordan Spieth, <event> = the 2025 Open Championship. Spieth withdraws after Round 2 due to injury. Koepka completes all four rounds. The market resolves Yes because Koepka completed more rounds.

Examples that would NOT resolve the market to Yes:

- <golfer 1> = Scottie Scheffler, <golfer 2> = Rory McIlroy, <event> = the 2025 Masters Tournament. Both finish with a 72-hole total of 275. The market does not resolve Yes; instead it resolves 50/50 because their total stroke counts are identical. Both markets resolve to $0.50.
- <golfer 1> = Xander Schauffele, <golfer 2> = Jon Rahm, <event> = the 2025 Masters Tournament. Schauffele and Rahm both finish 72 holes; Schauffele at 278 and Rahm at 276. The market resolves No because Schauffele's total (278) is not lower than Rahm's (276).
- <golfer 1> = Collin Morikawa, <golfer 2> = Viktor Hovland, <event> = the 2025 U.S. Open. Both miss the cut with identical scores of 145 after 36 holes. The market resolves 50/50 rather than Yes.
- <golfer 1> = Tiger Woods, <golfer 2> = Justin Thomas, <event> = the 2025 PGA Championship. Woods withdraws before teeing off. The market resolves to the last fair price determined in the sole discretion of the Exchange.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be one week after the end of <event>. If an event described in the Payout Criterion occurs, or both golfers' participation in <event> has concluded (including by withdrawal, disqualification, or missing the cut), expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00, unless otherwise specified in accordance with the Contract's terms and conditions.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 7.1 of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 7.1 in the Rulebook.

KalshiEX LLC

KalshiEX LLC

*KalshiEX LLC - Confidential*

## APPENDIX B - TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, caddies, coaches, and staff of the tour, association, or organization(s) governing <event>.
  - For college tours/associations specifically, or where otherwise appropriate (as identified by the Exchange), this applies to current and former players/caddies/coaches/staff of the specific teams in <event> rather than the tour/association as a whole, (e.g., if a Division I University Golf Team member is playing in <event>, this prohibition will restrict trades by current/former players of that team, rather than all current/former players/coaches/staff in any NCAA sport);
- Paid employees of the tour and tour participants;
- Tournament sponsors, organizers, and tour executives with material decision-making authority; and
- Household members and immediate family of all above.

These prohibitions apply to the appropriate values of <event>. For example, former players of the PGA Tour are not necessarily prohibited from trading on iterations of the Contract related to the LPGA Tour, unless they are part of any other group listed for that tour.[1]

---

[1] The Contract has not been endorsed by any league or association as of self-certification. The use of any names of leagues or associations does not indicate an endorsement of this product.

*KalshiEX LLC*

December 10, 2024

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will Luigi Mangione plead guilty to killing Brian Thompson?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will Luigi Mangione plead guilty to killing Brian Thompson?" contract (Contract). The Contract will initially be listed on **December 11, 2024**. The Exchange intends to list the contract on a  custom ⏷  basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<date>** (the target date)

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: "Will Luigi Mangione plead guilty to killing Brian Thompson?"**
**Rulebook: UCHPLEA**
**Kalshi Contract Category:**  Political Decision  ˅
**UHC plea**
**December 10, 2024**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will Luigi Mangione plead guilty to killing Brian Thompson?" Contract is a contract relating to a criminal trial.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices B, C, and D.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time.

Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

## CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2

Based on the above analysis, the Exchange certifies that:

❑ The Contract complies with the Act and Commission regulations thereunder.

❑ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: December 10, 2024

*KalshiEX LLC*

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Further Considerations

Appendix C (Confidential) - Source Agency

Appendix D (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

*KalshiEX LLC*

**APPENDIX A – CONTRACT TERMS AND CONDITIONS**

**Official Product Name: "Will Luigi Mangione plead guilty to killing Brian Thompson?"**
**Rulebook: UCHPLEA**

*KalshiEX LLC*

# UCHPLEA

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is reporting from *The New York Times* and public records of local, state, and the federal government of the United States. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agency is *The New York Times* and public records of local, state, and the federal government of the United States.

**Type:** The type of Contract is an Event Contract.

**Issuance:** After the initial Contract, Contract iterations will be listed on an as-needed basis at the discretion of the Exchange and corresponding to the risk management needs of Members.

**<date>**: <date> refers to a calendar date specified by the Exchange. The Exchange may list iterations of the Contract corresponding to variations of <date>.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that Luigi Manzione has pled guilty to a criminal charge of a crime encompassing the murder of former UnitedHealthCare CEO Brian Thompson. For purposes of this contract, "murder" includes all criminal offenses that include the word "murder," as well as any other criminal offense encompassing the unlawful and intentional killing of a human being. For purposes of this Contract, the charge must be directly related to the act of killing; for example, possession of fake identification is not sufficient to resolve the market to Yes. This market will resolve based on his first pleas at his first arraignment. Subsequent pleas will not be considered in the Payout Criterion. If the arraignment has not occurred by <date>, then the market resolves to No.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be <date>. If he pleads, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

*KalshiEX LLC*

August 13, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <metric> in <quarter 1> be <above/below/the same as> <metric> in <quarter 2>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <metric> in <quarter 1> be <above/below/the same as> <metric> in <quarter 2>?" contract (Contract). The Contract will initially be listed after close-of-business on **August 14, 2025**; it is listed as the day after because of limitations of the Commission's online submission portal. The Exchange intends to list the contract on a  custom ▾  basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<date>**
- **<metric>**
- **<quarter 1>**
- **<above/below/the same as>**
- **<quarter 2>**
- **<company>**
- ****
- ****
- **<time period 1>**
- **<time period 2>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

*KalshiEX LLC*

*KalshiEX LLC*

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: "Will \<metric\> in \<quarter 1\> be \<above/below/the same as\> \<metric\> in \<quarter 2\>?"**
**Rulebook: QUARTERKPICHANGE**
**Summary: Metric**
**Kalshi Contract Category:  Economic/Demographic Measure - US Govt**
**Kalshi Internal Category:  Companies**
**August 13, 2025**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will \<metric\> in \<quarter 1\> be \<above/below/the same as\> \<metric\> in \<quarter 2\>?" Contract is a contract relating to Companies.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices B, C, and D.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access

the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.

❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: July 1, 2025

*KalshiEX LLC*

**<u>Attachments:</u>**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Further Considerations

Appendix C (Confidential) - Source Agency

Appendix D (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

*KalshiEX LLC*

**APPENDIX A – CONTRACT TERMS AND CONDITIONS**

**Official Product Name: "Will <metric> in <quarter 1> be <above/below/the same as> <metric> in <quarter 2>?"**
**Rulebook: QUARTERKPICHANGE**

*KalshiEX LLC*

# QUARTERKPICHANGE

**Scope**: These rules shall apply to this contract.

**Underlying**: The Underlying for this Contract is <metric> as officially reported by <company> in their quarterly earnings release, earnings call, investor presentation, or government filings for  and . Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency**: The Source Agencies are <company>, the official investor relations website of <company>, federal government financial regulatory authorities with jurisdiction over <company>, The New York Times, the Associated Press, Bloomberg News, Reuters, The Wall Street Journal, Financial Times, CNBC, Fox Business, MarketWatch, Barron's, Yahoo Finance, and Seeking Alpha.

**Type**: The type of Contract is an Event Contract.

**Issuance**: The Contract is based on the outcome of a recurrent data release, which is issued on a quarterly basis. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to the next quarter.

**<company>**: <company> refers to a business entity specified by the Exchange. This includes the company itself and its consolidated subsidiaries as defined in their financial reporting. If <company> undergoes a merger, acquisition, or restructuring after Issuance but before the reporting date, the market will resolve based on the reporting entity that publishes earnings for . <company> is tracked through name changes or rebranding. <company> may also refer to "Any" or "None".

**<metric>**: <metric> refers to a specific key performance indicator or business metric specified by the Exchange. This may include but is not limited to:

- Subscriber counts (total subscribers, net additions, paying subscribers, active members)
- User metrics (monthly active users, daily active users, registered users)
- Transaction metrics (gross merchandise value, payment volume, number of transactions)
- Operational metrics (store count, square footage, utilization rates)

**<time period 1> and <time period 2>**: <time period 1> and <time period 2> refer to specific time periods specified by the Exchange (e.g., "Q1 2025," "2026"). If using the quarter designation, it will follow <company>'s fiscal calendar, which may differ from the calendar year.

**<date>**: <date> refers to a calendar date specified by the Exchange.

**Payout Criterion**: The Payout Criterion for the Contract encompasses the Expiration Values where <metric> for <time period 1> is <above/below/the same as> <metric> for <time period 2> as reported by <company> in their official financial disclosures.

Key clarifications:

- The metric must be explicitly reported by <company> in their earnings materials; calculated or derived metrics by third parties do not qualify
- The first official report of the metric will be used; subsequent restatements or corrections after initial reporting will not affect resolution
- If <company> reports a range instead of a specific number, the midpoint will be used
- If <company> changes their <metric> definition or stops reporting <metric>, the market resolves to the last fair market price as determined by the Exchange
- Metrics must be reported for the full quarter unless otherwise specified (not month-to-date or partial quarter)

Reporting hierarchy (in order of precedence):

1. Earnings press release
2. Prepared remarks in earnings call transcript
3. Investor presentation published concurrent with earnings
4. Q&A portion of earnings call (only if specific number stated by company representative)
5. Government filings

**Minimum Tick**: The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level**: The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date**: The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date**: The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date**: The latest Expiration Date of the Contract shall be <date>. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time**: The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value**: The Settlement Value for this Contract is $1.00.

**Expiration Value**: The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies**: Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

*KalshiEX LLC*

August 18, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <player/team> score <first/last/any/count> touchdown(s) in  of <game>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <player/team> score <first/last/any/count> touchdown(s) in  of <game>?" contract (Contract). The Contract will initially be listed after close-of-business on **August 18, 2025**; it is listed as the day after because of limitations of the Commission's online submission portal. The Exchange intends to list the contract on a [ custom ⏷ ] basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<date>**
- **<player/team>**
- **<first/last/any/count>**
- ****
- **<game>**
- **<time period>**
- **<count>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile

*KalshiEX LLC*

*KalshiEX LLC*

Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: "Will <player/team> score <first/last/any/count> touchdown(s) in  of <game>?"**
**Rulebook: FOOTBALLTOUCHDOWN**
**Summary: Whether player/team scores touchdown in period**
**Kalshi Contract Category:  Sports**
**Kalshi Internal Category:  Sports**
**August 18, 2025**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will <player/team> score <first/last/any/count> touchdown(s) in  of <game>?" Contract is a contract relating to Sports.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access

the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.
❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: August 18, 2025

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Trading Prohibitions

Appendix C (Confidential) - Further Considerations

Appendix D (Confidential) - Source Agency

Appendix E (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

**APPENDIX A – CONTRACT TERMS AND CONDITIONS**

**Official Product Name: "Will <player/team> score <first/last/any/count> touchdown(s) in  of <game>?"**
**Rulebook: FOOTBALLTOUCHDOWN**

*KalshiEX LLC*

*KalshiEX LLC*

# FOOTBALLTOUCHDOWN

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is touchdowns scored in <game> as recorded by the Source Agency. For <player/team> markets, the Underlying is touchdowns scored by <player/team>. For <first/last/any/count> markets, the Underlying is the sequence and number of touchdowns scored. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agency is the league governing <game>.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent data release, which is issued on a weekly basis during the season. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to games throughout the season.

**<player/team>:** <player/team> refers to an individual player or team specified by the Exchange. For individual players, this includes their legal name or commonly used name.

**<game>:** <game> refers to a specific game specified by the Exchange, identified by the two participating teams and the scheduled date.

**<first/last/any/count>:** <first/last/any/count> refers to the timing or quantity of touchdowns. "First" means the initial touchdown scored in <time period>. "Last" means the final touchdown scored in <time period>. "Any" means at least one touchdown during <time period>. <count> refers to a specific number of touchdowns (e.g., "2+", "exactly 3", "between 2 and 4").

**:**  refers to a specific portion of the game specified by the Exchange, which may include: full game (including overtime if played), first half, second half, specific quarter (Q1, Q2, Q3, Q4), overtime period only, or specific time ranges. If not specified, "full game" is assumed. Overtime counts for all markets unless stated otherwise.

**<date>:** <date> refers to the originally scheduled date of <game> in Eastern Time, specified by the Exchange.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values where <player/team> scores <first/last/any/count> touchdown(s) in  of <game>.

For the purposes of this Contract:

**Player Participation Rules**

*KalshiEX LLC*

- A player must take at least one snap (offensive, defensive, or special teams). If a player is active but does not participate in any plays, the Contract settles to the last fair market price before the start of play.
  - If a player plays a single snap but that play is called back due to penalty, that will be counted as participation.
  - If a player lines up for a snap but a penalty is called before the penalty, and then they return to the bench, that is not counted as participation.
- Once a player is active, the Contract will settle based on actual touchdowns scored regardless of playing time, injury, ejection, or other removal from the game

**Touchdown Scoring Rules**

A player "scores" a touchdown when they:

- Possess and control the football while breaking the plane of the opponent's goal line
- This includes rushing, receiving, fumble recovery, interception return, kick/punt return, and blocked kick return touchdowns
- Defensive and special teams touchdowns scored by an individual player DO count for that player's touchdown props

The following explicitly do NOT count as scoring a touchdown:

- Throwing a touchdown pass (quarterbacks who are merely passing are not credited with scoring)
- Two-point conversions (these are not touchdowns)
- Defensive two-point conversion returns (these are not touchdowns)
- Safeties (these are not touchdowns)
- Being awarded a touchdown due to defensive penalty

**Special Circumstances**

- If multiple players possess the ball on the same play (laterals/hook-and-ladder), only the player who crosses the goal line receives credit
- If a touchdown is nullified by penalty, it does not count

**First/Last Touchdown Markets**

- If no touchdowns are scored in <game>, all individual player/team markets for first/last touchdown resolve to "No"
- If multiple touchdowns appear simultaneous, the one credited first in the play-by-play determines the outcome

**Game Completion Rules**

- If <game> is suspended or postponed and not resumed or started within the same scheduling week (by Wednesday), all Contracts settle to the last fair market price prior to suspension
- If <game> is abandoned after 55 minutes of play have been completed, the Contract settles based on statistics accumulated up to the point of abandonment
- If <game> is abandoned before 55 minutes of play (including cancellation before any play), all Contracts settle to the last fair market price unless the outcome was already determined
- If the venue changes but the home/away designation remains the same, all Contracts remain valid

**Settlement Examples**

Examples that would resolve to Yes:

- <player/team> = "Josh Allen", <first/last/any/count> = "any": Josh Allen rushes for a touchdown (Yes)
- <player/team> = "Deebo Samuel", <first/last/any/count> = "first": Deebo Samuel scores the game's first touchdown on a reception (Yes)
- <team> = "Buffalo Bills", <first/last/any/count> = "2+": Bills score 3 total touchdowns including one defensive TD (Yes)

Examples that would settle to last fair market price:

- <player/team> = "Travis Kelce", <first/last/any/count> = "any": Kelce is declared inactive before kickoff (settles to last fair market price)
- Game is postponed to the following week (settles to last fair market price - outside scheduling week)

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be the fifteenth day after <game>. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

*KalshiEX LLC*

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the National Football League and National Collegiate Athletic Association Football
    - For college leagues/associations specifically, or where otherwise appropriate (as identified by the Exchange), this applies to current and former players/coaches/staff of the specific teams in <game> rather than the league/association as a whole (e.g., if the Division I Gonzaga Men's Basketball Team is playing in <game>, this prohibition will restrict trades by current/former players of that team, rather than all current/former players/coaches/staff in any NCAA sport);
- Paid employees of the league and league participants;
- Ultimate beneficial owners of teams and the league; and
- household members and immediate family of all above.

These prohibitions apply to the appropriate values of <game>. For example, former players of the National Football League are not necessarily prohibited from trading on iterations of the Contract related to the National Basketball Association, unless they are part of any other group listed for that league.[1]

---

[1] The Contract has not been endorsed by any league or association as of self-certification. The use of any names of leagues or associations does not indicate an endorsement of this product.

*KalshiEX LLC*

January 10, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <performer> sing <song> at the Super Bowl in <year>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <performer> sing <song> at the Super Bowl in <year>?" contract (Contract). The Contract will initially be listed on **January 11, 2025**. The Exchange intends to list the contract on a  custom ▾  basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<performer>**
- **<song>**
- **<year>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: "Will \<performer\> sing \<song\> at the Super Bowl in \<year\>?"**
**Rulebook: SBSETLISTS**
**Kalshi Contract Category:**  Entertainment/Pop Culture
**January 10, 2025**

### CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will \<performer\> sing \<song\> at the Super Bowl in \<year\>?" Contract is a contract relating to the Super Bowl halftime show.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices B, C, and D.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an

absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.

❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: January 10, 2025

*KalshiEX LLC*

**<u>Attachments:</u>**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Further Considerations

Appendix C (Confidential) - Source Agency

Appendix D (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will &lt;performer&gt; sing &lt;song&gt; at the Super Bowl in &lt;year&gt;?"**
**Rulebook: SBSETLISTS**

*KalshiEX LLC*

# SBSETLISTS

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the content of the Super Bowl halftime show, as shown during the national broadcast of the Super Bowl in <year>. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agency is the national broadcaster of the Super Bowl in <year>.

**Type:** The type of Contract is an Event Contract.

**Issuance:** After the initial Contract, Contract iterations will be listed on an as-needed basis at the discretion of the Exchange and corresponding to the risk management needs of Members.

**<song>**: <song> refers to a musical project specified by the Exchange.

**<year>**: <year> refers to a calendar year specified by the Exchange. The Exchange may list iterations of the Contract corresponding to variations of <year>.

**<performer>**: <performer> refers to a Super Bowl halftime performer. It may also take the form of "any performer".

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that <performer> at the Super Bowl halftime show in <year> sings the lyrics to at least some of <song> during the Super Bowl halftime show in <year>.

The song must be <song> in its context, such as with the relevant music. Merely saying "Yeah" would not qualify as the artist singing "Yeah" by Usher, for example.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be the day after the Super Bowl in <year>. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

*KalshiEX LLC*

December 4, 2024

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will there be a half-trillionaire before <date>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi) hereby notifies the Commission that it is self-certifying the "Will there be a half-trillionaire before <date>?" contract (Contract). The Contract will initially be listed on December 5, 2024. The Exchange intends to list the contract on a custom basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:
- **<date>** (the target date)
- **<person>** (the target wealthiest person)

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: Will there be a half-trillionaire before <date>?**
**Rulebook: HALFTRIL**
**Kalshi Contract Category: Economic/Demographic Measure – non U.S. government**
**First half-trillionaire**
**December 4, 2024**

### CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles, and the Commission's regulations thereunder.

### I.    Introduction

The "Will there be a half-trillionaire before <date>?" Contract is a contract relating to the Forbes Billionaires List.

Forbes Billionaire List is a subject of major press and interest. As of issuance, the wealthiest person in the world is entrepreneur Elon Musk.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices B, C, and D.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new

Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.
❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: December 4, 2024

**<u>Attachments:</u>**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Further Considerations

Appendix C (Confidential) - Source Agency

Appendix D (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will there be a half-trillionaire before <date>?"**
**Rulebook: HALFTRIL**

*KalshiEX LLC*

*KalshiEX LLC*

**HALFTRIL**

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the estimated net worth (reported as "net worth") of persons on the Forbes Real-Time Billionaire List as checked at 10:00 AM ET every day. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Instructions:** The Underlying is available <u>here</u>. These instructions on how to access the Underlying are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time.

**Source Agency:** The Source Agency is Forbes.

**Type:** The type of Contract is an Event Contract.

**Issuance:** After the initial Contract, Contract iterations will be listed on an as-needed basis at the discretion of the Exchange and corresponding to the risk management needs of Members.

**<date>**: <date> refers to a calendar date specified by the Exchange. The Exchange may list iterations of the Contract corresponding to different statistical periods of <date>.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that the estimated net worth of any person (or a person and their family, if reported together) is at least five hundred billion U.S. dollars after Issuance and before <date>.

**Minimum Tick:** The Minimum Tick size for the referred Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be <date>. If an event encompassed by the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be <mark>10:00 AM</mark> ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

*KalshiEX LLC*

January 28, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <word> be said by Donald Trump in <address>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <word> be said by Donald Trump in <address>?" contract (Contract). The Contract will initially be listed on **January 29, 2025**. The Exchange intends to list the contract on a custom ▾ basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<word>**
- **<address>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name:  "Will <word> be said by Donald Trump in <address>?"**
**Rulebook: TRUMPMENTION**
**Kalshi Contract Category:  Political Decision ⌄**
**January 28, 2025**

### CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will <word> be said by Donald Trump in <address>?" Contract is a contract relating to U.S. politics.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices B, C, and D.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

<u>**General Contract Terms and Conditions:**</u> The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an

absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

*KalshiEX LLC*

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

- ❏ The Contract complies with the Act and Commission regulations thereunder.
- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: January 28, 2025

*KalshiEX LLC*

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Further Considerations

Appendix C (Confidential) - Source Agency

Appendix D (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name:  "Will <word> be said by Donald Trump in <address>?"**
**Rulebook: TRUMPMENTION**

*KalshiEX LLC*

# TRUMPMENTION

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is words used in <address> by President Donald Trump. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agency is the President of the United States (and in order in case of priority, in case of contradiction) and: the White House, The New York Times, the Associated Press, Bloomberg News, Reuters, Axios, Politico, Semafor, The Information, The Washington Post, The Wall Street Journal, ABC, CBS, CNN, Fox News, MSNBC, and NBC.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract will be issued in conjunction with Presidential addresses and statements.

**<word>:** <word> refers to the particular word or phrase potentially to be mentioned by the President. It may also refer to a word being said a minimum number of times. It may also refer to one of multiple words/phrases, any of which are acceptable (e.g. "Doge/Dogecoin").

**<address>**: <address> refers to a given statement, speech, briefing, or address given by Donald Trump. It can be given in written or oral form.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that <word>, or a plural or possessive form of <word> is stated by Donald Trump during <address>. Grammatical/tense inflections are otherwise not included. For example, if <word> takes the value of "Immigrant", then "Immigration" will not count but "Immigrants" will count. Hyphenated or compound words used with <word> will not be included.

Similar words and synonyms are also not encompassed by the Payout Criterion.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

*KalshiEX LLC*

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be the day after <address> occurs; if it does not occur, it will expire on <date>. If an event described in the Payout Criterion occurs, or the event is over and a consensus has been reached on all terms, then expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

January 16, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will Trump visit any area affected by the January 2025 Los Angeles wildfires?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will Trump visit any area affected by the January 2025 Los Angeles wildfires?" contract (Contract). The Contract will initially be listed on January 17, 2025. The Exchange intends to list the contract on a custom ▾ basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **\<date\>** (the target date)

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

**KalshiEX LLC**
**Official Product Name: "Will Trump visit any area affected by the January 2025 Los Angeles wildfires?"**
**Rulebook: TRUMPFIRE**
**Kalshi Contract Category:** Commodity ˅
**January 16, 2025**

### CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will Trump visit any area affected by the January 2025 Los Angeles wildfires?" Contract is a contract relating to U.S. politics.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices B, C, and D.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an

absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.

❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: January 16, 2025

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Further Considerations

Appendix C (Confidential) - Source Agency

Appendix D (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will Trump visit any area affected by the January 2025 Los Angeles wildfires?"**
**Rulebook: TRUMPFIRE**

*KalshiEX LLC*

# TRUMPFIRE

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is trips by President (and President-elect) Donald J. Trump. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agencies are the White House and The New York Times, the Associated Press, Bloomberg News, Reuters, Axios, Politico, Semafor, The Information, The Washington Post, The Wall Street Journal, ABC, CBS, CNN, Fox News, MSNBC, and NBC

**Type:** The type of Contract is an Event Contract.

**Issuance:** After the initial Contract, Contract iterations will be listed on an as-needed basis at the discretion of the Exchange and corresponding to the risk management needs of Members.

**<date>**: <date> refers to a calendar date specified by the Exchange. The Exchange may list iterations of the Contract corresponding to variations of <date>.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that after Issuance and before <date>, President Donald J. Trump has visited a part of the Los Angeles metropolitan area directly damaged by the January 2025 Los Angeles area wildfires before <date> in order to inspect the damage. A visit includes Donald J. Trump's deliberate physical presence in the area, including on foot, inside a vehicle, or in a helicopter. A visit to comfort people impacted by the damage, to survey the damage, to plan rebuilding efforts, or another similar purpose, will be considered a visit "to inspect the damage". Conversely, if Donald J. Trump flies over an affected area en route to another destination and is not reported to have journeyed to the affected area  to inspect the damage, that event is not encompassed in the Payout Criterion. .

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

*KalshiEX LLC*

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be <date>. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

*KalshiEX LLC*

Date of Submission

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <competitor> record the fastest lap during <session> at the <event> in <series>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <competitor> record the fastest lap during <session> at the <event> in <series>?" contract (Contract). The Contract will initially be listed after close-of-business on **DATE**; it is listed as the day after because of limitations of the Commission's online submission portal. The Exchange intends to list the contract on a  custom ▾  basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<date>**
- **<competitor>**
- **<session>**
- **<event>**
- **<series>**
- **<governing body>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets

*KalshiEX LLC*

*KalshiEX LLC*

KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: "Will <competitor> record the fastest lap during <session> at the <event> in <series>?"**
**Rulebook: MOTORSPORTFASTLAP**
**Summary: Competitor's fastest lap in specific race session**
**Kalshi Contract Category:  Sports**
**Kalshi Internal Category:  Sports**
**Date of Submission**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will <competitor> record the fastest lap during <session> at the <event> in <series>?" Contract is a contract relating to Sports.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.16 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.13 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access

the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

*KalshiEX LLC*

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.

❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: Date of Submission

*KalshiEX LLC*

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B - Trading Prohibitions

Appendix C (Confidential) - Further Considerations

Appendix D (Confidential) - Source Agency

Appendix E (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

*KalshiEX LLC*

**APPENDIX A – CONTRACT TERMS AND CONDITIONS**

**Official Product Name: "Will <competitor> record the fastest lap during <session> at the <event> in <series>?"**
**Rulebook: MOTORSPORTFASTLAP**

*KalshiEX LLC*

# MOTORSPORTFASTLAP

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the official fastest lap result of the <session> at the <event> in <series>, as determined by <governing body>'s official timing and classification for that session. For race sessions (including the primary race, sprint races, and any other competitive race session), the fastest lap is the single shortest elapsed time for any complete racing lap recorded by any competitor during the session, as measured by <governing body>'s official timing system; laps completed under Safety Car, Full Course Yellow, Neutralization, or equivalent controlled-pace conditions remain eligible unless expressly excluded by <governing body>'s regulations, and warm-up laps, in-laps, and out-laps are excluded. For qualifying sessions (including any knockout, time-trial, group, shootout, or other qualifying format), the fastest lap is the fastest valid timed flying lap recorded by any competitor during the applicable session or segment, as measured by <governing body>'s official timing system; installation laps, in-laps, and out-laps are excluded. If a competitor's lap time is subsequently deleted by <governing body> or its designated stewards (e.g., for exceeding track limits, failing technical inspection, or other infractions), that lap time is excluded and the next-fastest valid lap time determines the Underlying. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agencies are, in hierarchical order, <governing body>, the official website or app of <series>, ESPN, Sky Sports, Motorsport.com, Autosport, the Associated Press, BBC Sport, and Reuters.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent event. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to the next scheduled event within <series>. After the initial Contract, Contract iterations will be listed on an as-needed basis at the discretion of the Exchange and corresponding to the risk management needs of Members.

**<governing body>:** <governing body> refers to the sanctioning authority or authorities with official jurisdiction over <series> for the relevant <event>, as specified by the Exchange. <governing body> may refer to a single sanctioning body, multiple bodies exercising co-sanctioning authority, or the body designated by the Exchange as the primary timing and classification authority for the relevant <session>. Examples include but are not limited to: INDYCAR LLC (for the NTT IndyCar Series), NASCAR LLC (for NASCAR series), Dorna Sports S.L. and the FIM (for MotoGP, Moto2, and Moto3), the FIM independently (for WorldSBK, WorldSSP, WRC, Extreme E, and other FIM-sanctioned series), the FIA independently (for Formula E, FIA WEC, WRC where co-sanctioned, and other FIA-sanctioned

series other than Formula 1), WEC S.A.S. (for the FIA World Endurance Championship), IMSA (for the IMSA SportsCar Championship), V8 Supercars Australia Pty Ltd (for the Supercars Championship), and the DTM Series GmbH (for the DTM). Where <governing body> delegates timing authority or stewards' decisions to a technical committee, protest committee, or similar body, decisions of that delegated authority are encompassed within <governing body> for purposes of this Contract. Where a series operates under dual or co-sanctioning, the body whose published timing and classification is designated as primary by the Exchange shall govern for resolution purposes; if no designation is made, the body whose regulations are listed first in the official supplementary regulations of <event> shall govern. The Exchange may list iterations of the Contract corresponding to variations of <governing body>.

**<series>:** <series> refers to a sanctioned motorsport competition series, championship, or league as specified by the Exchange, excluding the FIA Formula 1 World Championship, which is governed separately. <series> encompasses but is not limited to: the NTT IndyCar Series, NASCAR Cup Series, NASCAR Xfinity Series, NASCAR Craftsman Truck Series, MotoGP World Championship (including Moto2 and Moto3 classes), FIM Superbike World Championship (WorldSBK), FIM Supersport World Championship (WorldSSP), FIA World Endurance Championship (WEC), IMSA SportsCar Championship, Formula E World Championship, DTM, British Touring Car Championship (BTCC), Supercars Championship, Super Formula, Super GT, GT World Challenge, and any other sanctioned series designated by the Exchange. The Exchange may specify <series> by full name, common abbreviation, or distinguishing characteristic. If a <series> is renamed, rebranded, or absorbed into another series but continues substantially in character and under the same or successor <governing body>, the Contract follows the series as identified by its <governing body> regardless of naming changes. Series for which <governing body> does not maintain or publish an official individual lap timing record during competitive sessions are not eligible for listing under this Contract; where uncertainty exists as to whether official individual lap timing is maintained, the Exchange will specify in the Contract listing. The Exchange may list iterations of the Contract corresponding to variations of <series>.

**<competitor>:** <competitor> refers to a single individual, a set of co-drivers or co-riders sharing an entry, or a set of individuals defined by team or manufacturer affiliation or other distinguishing characteristics, entered in the <event> in <series>. The Exchange may list iterations of the Contract corresponding to variations of <competitor>. <competitor> may refer to a specifically named individual or individuals, multiple named individuals using AND/OR logic, any element in a set of competitors, or any competitor satisfying a distinguishing characteristic (e.g., "any competitor entered by Chip Ganassi Racing," "any factory-supported rider from the Honda Racing Corporation"). Where <competitor> is defined by team or manufacturer affiliation, all competitors officially entered by that team or manufacturer for the relevant <event> are encompassed, including any reserve, substitute, or relief competitor formally designated to participate. Where <competitor> is defined by name, if <competitor>

changes teams or manufacturers between Contract issuance and the <event>, the Contract continues to track the named individual regardless of team or manufacturer affiliation at the time of the <event>. Where <competitor> is defined by team or manufacturer affiliation, any officially entered replacement or substitute competitor for that team or manufacturer shall be encompassed within <competitor> for purposes of resolution.

In series that use classes within a single session (including but not limited to WEC, IMSA, and similar multi-class events), <competitor>'s fastest lap shall be interpreted as the fastest lap within the overall session classification unless otherwise specified by the Exchange. The Exchange may specify a class-specific fastest lap (e.g., "GTE-Am class fastest lap") for multi-class events, in which case resolution shall be based on the fastest valid lap recorded within the specified class only. In series where multiple classes participate in the same session under a shared <governing body> and <series> designation (e.g., MotoGP, Moto2, and Moto3 at a single Grand Prix; WorldSBK and WorldSSP at a single round), <competitor>'s fastest lap shall be interpreted as the fastest lap within the class specified by the Exchange. If no class is specified, the Contract defaults to the premier class of <series> as designated by the Exchange.

For race sessions, if <competitor> does not start the <session> (i.e., does not cross the start/finish line under their own power, or in formats using a standing or rolling start, does not take the start of the session after the signal to commence), all Contracts for that <competitor> resolve No. For qualifying sessions, if <competitor> does not participate in the <session> (i.e., does not record at least one timed flying lap during the applicable qualifying session or segment), all Contracts for that <competitor> resolve No. Where <competitor> is defined by team or manufacturer affiliation and no competitor from that team or manufacturer starts or participates in the applicable <session>, the Contract resolves No.

**<event>:** <event> refers to one or more sanctioned motorsport event weekends as designated on the official calendar of <series> by <governing body> (e.g., "the 2026 Indianapolis 500," "the 2026 Daytona 500," "the 2026 Japanese MotoGP Grand Prix," "the 2026 Le Mans 24 Hours"), including a specified year and event name and encompassing all sessions held during that event weekend. <event> may refer to a singular event, multiple events, an element in a set of events, or events defined by distinguishing characteristics, and may also take the values "Any" or "None." If <governing body> renames an event, the Contract follows the event as identified by <governing body> regardless of naming changes. The Exchange may list iterations of the Contract corresponding to variations of <event>.

**<session>:** <session> refers to a specific on-track session within the <event> weekend as specified by the Exchange. Depending on <series>, <session> may include but is not limited to: the "Race" or "Main Event" (the primary scored race of the event weekend), a "Sprint Race," "Heat Race," "Qualifying Race," "Feature Race," "Superpole Race," or any other competitive race session; or a qualifying session such as "Qualifying," "Superpole," "Sprint Qualifying," or a

KalshiEX LLC

specific qualifying segment (e.g., "Q1," "Q2," "Q3"). In rally formats, fastest lap concepts apply only to individual Special Stages where <governing body> maintains official stage-time records; <session> for rally formats may refer to a specific "Special Stage" as designated by <governing body>, and references to a "Power Stage" shall mean the final designated special stage of the rally as officially designated by <governing body>. In endurance formats, <session> refers to the primary endurance race unless otherwise specified. If no <session> is specified, <session> defaults to the Race or Main Event. Not all event weekends include every session type; if a Contract references a session type at an event where that session type is not scheduled by <governing body>, all Contracts for that <session> resolve No.

<session> may refer to a single session, or to multiple sessions using AND/OR logic (e.g., "Qualifying AND Race," meaning the competitor must record the fastest valid lap in both sessions for the Contract to resolve Yes; or "Qualifying OR Race," meaning the competitor must record the fastest valid lap in at least one of the specified sessions). Where <session> references multiple sessions using AND logic, if any referenced session is cancelled or does not take place, all Contracts for that <session> resolve at the last fair market price. Where <session> references multiple sessions using OR logic, if at least one referenced session takes place, the Contract resolves based on the session(s) that occurred; if all referenced sessions are cancelled, all Contracts resolve at the last fair market price. The Exchange may list iterations of the Contract corresponding to variations of <session>.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that indicate <competitor> recorded the fastest valid lap time in the <session> at the <event> in <series>, as officially classified by <governing body>'s final timing and classification for that session.

The following conditions and clarifications apply:

- Only lap times recorded during the specified <session> count. Lap times from other sessions, practice sessions, warm-up laps, installation laps, in-laps, and out-laps do not count, unless the Exchange has explicitly specified a <session> whose result is determined by an aggregate or combined record across multiple component sessions.
- <governing body>'s official timing and scoring system is the sole determinant of lap times for purposes of this Contract. Third-party timing sources are not considered.
- If <governing body> or its designated stewards delete a competitor's fastest lap time (e.g., due to track limit violations, technical inspection failure, or other infractions) before the official final classification for the <session> is published, that lap time is excluded and the next-fastest valid lap time from any competitor is used to determine the outcome. Steward or technical decisions issued after the official final classification for the <session> is published are not incorporated and will not be accounted for in determining the Expiration Value.

- For race sessions (including the primary race, sprint races, and any other competitive race session): If the session is red-flagged or otherwise suspended and not restarted, the fastest valid lap recorded during the completed portion of the session determines the outcome, provided that at least one competitor has completed at least one valid racing lap as determined by <governing body>'s regulations. If no competitor has completed a valid racing lap as recognized by <governing body>, all Contracts for that <session> resolve at the last fair market price. If the session is red-flagged and restarted, lap times from all portions of the session (before and after the red flag, including any shortened restart format) are eligible, and the overall fastest valid lap across all portions governs. In series that do not designate a separate "fastest lap" award but maintain individual lap-by-lap timing records (e.g., NASCAR, IndyCar), the fastest individual lap time as recorded in <governing body>'s official lap chart for the session governs.

- For qualifying sessions (including knockout, time-trial, group, shootout, or segment-based formats): If a qualifying session or segment is red-flagged and restarted, lap times from all portions of that session or segment are eligible. If a qualifying session or segment is red-flagged and not restarted, and at least one competitor has set a valid timed flying lap before the red flag, the fastest valid time recorded before the red flag determines the outcome. If the qualifying session or segment (<session>) is not cancelled and no competitor sets a valid timed flying lap in the applicable session or segment, all Contracts for that <session> resolve No. If qualifying is cancelled entirely and no timed lap times are recorded, all Contracts for that <session> resolve at the last fair market price.

- For endurance formats (including but not limited to WEC and IMSA): Where the Exchange specifies an overall fastest lap, the fastest individual lap time recorded by any competitor in the overall session determines the Underlying regardless of class. Where the Exchange specifies a class-specific fastest lap, the fastest valid lap time recorded by any competitor within the specified class governs. If a class is withdrawn, eliminated, or has no classified competitors, Contracts referencing that class's fastest lap for a <competitor> in that class resolve No. Co-driver substitutions made during the session in accordance with <governing body>'s regulations are encompassed within the same entry; a lap time recorded by any co-driver of an entry constitutes a lap time for that entry for purposes of this Contract, and a specifically named <competitor> must personally record the relevant lap time for a name-based Contract to resolve Yes.

- For rally formats: Fastest lap for a designated Special Stage refers to the fastest individual stage time recorded by any competitor in the applicable stage as officially classified by <governing body>. Scratch times awarded by <governing body> are incorporated into the official stage classification and govern. If a Special Stage is cancelled or neutralized and <governing body> does not issue an official stage time classification, all Contracts for that <session> resolve at the last fair market price.

- If two or more competitors share an identical fastest valid lap time (to the level of precision recorded by <governing body>'s official timing system) in the <session>, all Contracts for those tied competitors resolve Yes, and all Yes-side Contracts pay out at $1 divided by the number of tied competitors, rounded down to the nearest $0.01. No-side holders for contracts involving those competitors will receive $1 minus the applicable Yes payout. Contracts for all other competitors resolve No.
- If the <session> at <event> is postponed but rescheduled to start within 48 hours of its originally scheduled start time at the same circuit or venue, the market remains open and will resolve based on the rescheduled session. If the <event> is moved to a different circuit or venue, all Contracts resolve at the last fair market price, regardless of timing.
- If the <session> at <event> is cancelled outright, or is postponed such that the rescheduled start time is more than 48 hours after the originally scheduled start time, all Contracts related to sessions for which a result is unable to be determined will be resolved at the last fair market price in accordance with the Exchange's rules.
- If the <event> weekend is cancelled in its entirety, all Contracts referencing any <session> at that <event> resolve at the last fair market price.
- If the <event> is postponed such that the rescheduled start time is more than 48 hours after the originally scheduled start time, all Contracts related to sessions for which a result is unable to be determined will be resolved at the last fair market price in accordance with the Exchange's rules.

If a natural person who is the primary subject of a Contract's Underlying or Payout Criterion dies prior to Expiration, Kalshi may, in its sole discretion, settle the Contract at the last traded price prior to the death. If Kalshi determines that trading activity was materially affected by the circumstances giving rise to the death, Kalshi may instead use the last traded price prior to such circumstances becoming known or reasonably anticipated by market participants. For purposes of this Rule, Kalshi may rely on an approximate time where the precise time is unknown or cannot be reasonably determined. If Kalshi determines that no last traded price represents a fair settlement, the Outcome Review Committee shall determine the fair settlement price. Kalshi may halt or pause trading in any such Contract (with public notice on Kalshi's website or the Platform) if it reasonably believes that the death of such person has occurred, is imminent, or that circumstances giving rise to the death may be occurring. Determinations of Kalshi and the Outcome Review Committee under this Rule are final and not subject to review.

**Series-Specific Clarifications:** The following clarifications apply where <series> and <governing body> correspond to the series identified:

For NASCAR series (NASCAR LLC): The fastest lap is the single fastest individual lap time as recorded in NASCAR LLC's official lap chart for the <session>, measured to the precision used in NASCAR LLC's official timing system. Stage results, green-flag pit stop sequences, and caution lap designations do not affect lap time eligibility; all laps on which a competitor crosses

the start/finish line and receives an officially recorded time are eligible regardless of race conditions, unless NASCAR LLC's regulations expressly exclude a specific lap type from the official lap chart. If a NASCAR race is declared official by NASCAR LLC before its scheduled distance is complete, only lap times recorded before officialization are eligible.

For IndyCar (INDYCAR LLC): The fastest lap is the single fastest individual lap time as recorded in INDYCAR LLC's official timing records for the <session>. Laps completed under Full Course Yellow or local yellow conditions remain eligible unless INDYCAR LLC's regulations expressly exclude them. For events using a multi-round qualifying format (including the Indianapolis 500 qualifying procedures), fastest lap for a qualifying <session> refers to the fastest timed lap recorded by a competitor across all qualifying rounds in which that competitor participates, unless the Exchange has specified a particular qualifying round as the <session>, in which case only lap times from that designated round are eligible.

For MotoGP, Moto2, and Moto3 (Dorna Sports/FIM): Long Lap Penalties, ride-through penalties, and similar positional penalties do not affect lap time eligibility; all timed laps are eligible regardless of whether a penalty was served during that lap, except that any lap for which <governing body> expressly excludes the recorded time from its official timing records is ineligible. In two-part sprint/race weekend formats (e.g., the MotoGP Sprint), the Sprint and the Grand Prix are each treated as separate <session> values; lap times from one do not apply to the other unless the Exchange specifies an aggregate. If a class within <series> does not start at a given <event>, all Contracts for that class's <session> at that <event> resolve No.

For WEC and IMSA multi-class endurance formats: A lap time is attributed to the entry (car number) that recorded it, inclusive of all co-drivers for that entry. Where <competitor> is defined by name, only laps personally driven by the named individual count for resolution purposes; laps driven by a co-driver in the same entry do not count toward a name-based Contract, even if that entry as a whole records the fastest overall lap. Where <competitor> is defined by team or manufacturer affiliation, any lap recorded by any co-driver of any entry from that team or manufacturer is eligible. Safety Car laps and neutralized laps remain eligible for fastest lap determination unless <governing body> expressly excludes them from the official lap timing records.

For WorldSBK (FIM): Fastest lap records for the Superpole Race, Race 1, and Race 2 are each treated as separate <session> values. Laps completed under Full Course Yellow conditions remain eligible unless FIM regulations expressly exclude them. Superpole qualifying session fastest laps are determined by the fastest valid flying lap recorded in that session, consistent with the general qualifying session rules above.

For Formula E (FIA): Fastest lap is determined by the fastest individual lap time recorded in <governing body>'s official timing records for the <session>. Attack Mode activation laps remain eligible for fastest lap purposes unless the FIA expressly excludes a specific lap from its

*KalshiEX LLC*

official timing records. Qualifying group sessions and the Duels (or equivalent knockout qualifying format) are each treated as separate session components; if the Exchange specifies "Qualifying" without designating a specific component, the fastest valid lap recorded across all qualifying components in which <competitor> participates governs.

For WRC and rally formats (FIA/<governing body>): Fastest lap for a designated Special Stage refers to the fastest outright stage time recorded by any competitor, as officially published by <governing body>, for that stage. Scratch times assigned by <governing body> are incorporated into the official stage time classification and govern. A competitor who starts a Special Stage but does not finish it and receives no official stage time from <governing body> is treated as not having recorded a valid stage time for purposes of this Contract. If no competitor receives an official stage time for a given Special Stage, all Contracts for that <session> resolve at the last fair market price.

For the Supercars Championship (V8 Supercars Australia): Where an event weekend includes multiple qualifying or race sessions, <session> shall be interpreted as the specific session designated by the Exchange. Fastest lap is determined by the fastest individual lap time as recorded in <governing body>'s official timing records for the designated <session>. If no session is specified, <session> defaults to the primary race of the weekend as designated by <governing body>.

**Examples that would resolve the market to Yes:**

- <competitor> is "Scott Dixon," <series> is "IndyCar," <governing body> is "INDYCAR LLC," <session> is "Race," and <event> is "the 2026 Grand Prix of Portland." Dixon records a lap of 58.431 seconds during the race, which is the fastest individual lap time recorded by any competitor. INDYCAR LLC's official lap chart confirms Dixon recorded the fastest lap. The Contract resolves Yes.
- <competitor> is "Jorge Martín," <series> is "MotoGP," <governing body> is "Dorna Sports/FIM," <session> is "Race," and <event> is "the 2026 Spanish MotoGP Grand Prix." Martín's fastest lap during the race is initially the second-fastest, but the fastest-lap rider's time is deleted by the stewards for track limit violations before the official race classification is published. Martín's lap becomes the fastest valid time. The Contract resolves Yes.
- <competitor> is "the No. 10 Wayne Taylor Racing entry," <series> is "IMSA," <governing body> is "IMSA," <session> is "Race (GTD Pro class)," and <event> is "the 2026 Rolex 24 at Daytona." A co-driver of the No. 10 entry records the fastest lap in the GTD Pro class. The Contract resolves Yes, because <competitor> is defined by team affiliation encompassing the entire entry inclusive of all co-drivers.

- <competitor> is "Toprak Razgatlıoğlu," <series> is "WorldSBK," <governing body> is "FIM," <session> is "Race 1," and <event> is "the 2026 WorldSBK Round at Portimão." Razgatlıoğlu records the fastest individual race lap. The Contract resolves Yes.
- <competitor> is "Ryan Blaney," <series> is "NASCAR Cup Series," <governing body> is "NASCAR LLC," <session> is "Race," and <event> is "the 2026 Coca-Cola 600." Blaney records the fastest individual lap time in NASCAR LLC's official lap chart. The Contract resolves Yes even though Blaney finishes outside the top ten.

**Examples that would NOT resolve the market to Yes:**

- <competitor> is "Will Power," <series> is "IndyCar," <governing body> is "INDYCAR LLC," <session> is "Race," and <event> is "the 2026 Iowa Speedway Race 1." Power's fastest lap time is recorded as the second-fastest in INDYCAR LLC's official timing records. The Contract resolves No.
- <competitor> is "Pecco Bagnaia," <series> is "MotoGP," <governing body> is "Dorna Sports/FIM," <session> is "Race," and <event> is "the 2026 Italian MotoGP Grand Prix." The race is red-flagged before any rider completes a valid timed racing lap as recognized by <governing body> and is not restarted. All fastest lap Contracts for that <session> resolve at the last fair market price.
- <competitor> is "the No. 8 Toyota GR010 entry," <series> is "WEC," <governing body> is "WEC S.A.S./FIA," <session> is "Race (Hypercar class)," and <event> is "the 2026 6 Hours of Spa." The No. 8 Toyota's co-drivers collectively record the second-fastest lap in the Hypercar class. The Contract resolves No.
- <competitor> is "Alex Palou," <series> is "IndyCar," <governing body> is "INDYCAR LLC," <session> is "Race," and <event> is "the 2026 Detroit Grand Prix." Palou does not start the race due to a mechanical failure sustained before he crosses the start/finish line. The Contract resolves No.
- <event> is "the 2026 Rally Finland," <series> is "WRC," <governing body> is "FIA," and <session> is "Special Stage 7." The stage is cancelled and <governing body> issues no official stage time classification for that stage. All Contracts for that <session> resolve at the last fair market price.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be one week after the scheduled date of the <session> of <event>. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration Time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 7.1 of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 7.1 in the Rulebook.

*KalshiEX LLC*

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former officials, stewards, race directors, clerks of the course, and timing and scoring personnel of <governing body> involved in sanctioning, officiating, or classifying competitive sessions within <series>.
- Current and former officials, stewards, race directors, and timing and scoring personnel of any co-sanctioning or host-country body exercising delegated classification authority over any <session> within <series>.
- Current and former competitors (including drivers, riders, co-drivers, and co-riders), team principals, team managers, crew chiefs, race engineers, chief strategists, performance engineers, data engineers, and any other team or manufacturer personnel with non-public access to vehicle performance data, strategy decisions, setup information, or event-weekend plans for any team or manufacturer entered in <series>.
- Current and former employees of the commercial rights holder of <series>, including race operations, broadcast, timing, and scoring personnel with access to non-public data relating to any <session> within <series>.
- Current and former employees of any official tyre supplier, fuel supplier, or homologated parts supplier to <series> or to any team or manufacturer entered in <series>, where such individuals have access to non-public data relating to tyre allocation, compound selection, degradation modeling, fuel strategy, or supplier-held technical data that is not publicly available and that could influence session outcomes.
- Current and former employees of <governing body>'s technical department, safety commission, or equivalent body with access to non-public information about vehicle legality, scrutineering results, technical directives, Balance of Performance determinations, success ballast allocations, or any other regulatory adjustment that could affect competitive outcomes within <series>.
- Current and former employees of any official data, telemetry, or timing services provider contracted by <governing body> or by the commercial rights holder of <series> who have access to non-public real-time or predictive session data.
- In rally formats: current and former route safety officers, clerk of the course personnel, stage safety delegates, and any individual with non-public access to stage route information, surface condition reports, or weather data specific to unpublished special stage routes within <series>.
- In endurance formats: current and former officials and personnel of any co-organizing body (including the Automobile Club de l'Ouest or equivalent) with non-public access to

*KalshiEX LLC*

safety car deployment plans, session timing adjustments, or classification decisions prior to their public issuance.

- Immediate family members (parents, siblings, spouses, and domestic partners) and household members of any of the above individuals.

*KalshiEX LLC*

*KalshiEX LLC*

February 25, 2025

SUBMITTED VIA CFTC PORTAL
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <word> be said by <guest> on <political talk show>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <word> be said by <guest> on <political talk show>?" contract (Contract). The Contract will initially be listed on February 26, 2025. The Exchange intends to list the contract on a [ custom ⌄ ] basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- <word>
- <political talk show>
- <guest>

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

*KalshiEX LLC*

KalshiEX LLC
Official Product Name: "Will <word> be said by <guest> on <political talk show>?"
Rulebook: SHOWMENTION
Summary: Political talk show discussions
Kalshi Contract Category: Political Decision ⌄
Kalshi Internal Category: Politics ⌄
February 25, 2025

CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

I.    Introduction

The "Will <word> be said by <guest> on <political talk show>?" Contract is a contract relating to U.S. politics.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices B, C, and D.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

General Contract Terms and Conditions: The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of

the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2

Based on the above analysis, the Exchange certifies that:
- ❏ The Contract complies with the Act and Commission regulations thereunder.
- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: February 25, 2025

Attachments:

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Further Considerations

Appendix C (Confidential) - Source Agency

Appendix D (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

APPENDIX A – CONTRACT TERMS AND CONDITIONS

Official Product Name:  "Will <word> be said by <guest> on <political talk show>?"
Rulebook: SHOWMENTION

# SHOWMENTION

Scope: These rules shall apply to this contract.

Underlying: The Underlying for this Contract is words used by <guest> during the first broadcast of their appearance on <political talk show> on <date>. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

Source Agency: The Source Agency is <guest> and <political talk show>.

Type: The type of Contract is an Event Contract.

Issuance: The Contract will be issued in conjunction with television appearances by political figures and other influential persons.

<word>: <word> refers to the particular word or phrase potentially to be mentioned by <guest>. It may also refer to a word being said a minimum number of times. It may also refer to one of multiple words/phrases, any of which are acceptable.

<political talk show>: <political talk show> refers to any of Fox's "Fox News Sunday", Fox News' "Sunday Morning Futures", NBC's "Meet the Press", CNN's "State of the Union", or ABC's "This Week".

<guest>: <guest> refers to a particular guest on <political talk show>.

<date>: <date> refers to a specified date.

Payout Criterion: The Payout Criterion for the Contract encompasses the Expiration Values that <word>, or a plural or possessive form of <word> is stated by <guest> during the first broadcast of their appearance on <political talk show> on <date>. Grammatical/tense inflections are otherwise not included. For example, if <word> takes the value of "Immigrant", then "Immigration" will not count but "Immigrants" will count. Hyphenated or compound words used with <word> will not be included.

Similar words and synonyms are also not encompassed by the Payout Criterion.

If <guest> does not appear on <political talk show> on <date>, the associated market will resolve and the Exchange will determine the payouts to the holders of long and short positions based upon the last traded price (prior to the earlier of (1) the announcement that <guest> will not appear on <political talk show>, or (2) the start of the <political talk show> on <date>). If the

Exchange determines at its sole discretion that the last traded prices prior to death do not represent a fair settlement value, the Outcome Review Committee will be responsible for making a binding determination of fair allocation. For the avoidance of doubt, the Exchange will distribute $1.00 between each pair of long and short positions.

Minimum Tick: The Minimum Tick size for the Contract shall be $0.01.

Position Accountability Level: The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

Last Trading Date: The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

Settlement Date: The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

Expiration Date: The latest Expiration Date of the Contract shall be the day after <date>. If an event described in the Payout Criterion occurs, or <political talk show> on <date> is over and a consensus has been reached on all terms, then expiration will be moved to an earlier date and time in accordance with Rule 7.2.

Expiration time: The Expiration time of the Contract shall be 10:00 AM ET.

Settlement Value: The Settlement Value for this Contract is $1.00.

Expiration Value: The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

Contingencies: Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

*KalshiEX LLC*

*KalshiEX LLC*

*KalshiEX LLC*

May 8, 2024

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <movie> have the highest Rotten Tomatoes score in <period>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi) hereby notifies the Commission that it is self-certifying the "Will <movie> have the highest Rotten Tomatoes score in <period>?" contract (Contract). The Exchange intends to list the contract on a custom basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<period>** (the target time period)
- **<movie>** (the target film)

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: Will <movie>  have the highest Rotten Tomatoes score in <period>?**
**Rulebook: RTCOMPARISON**
**Kalshi Contract Category: Entertainment/Popular Culture**
**Rotten Tomatoes comparisons**
**May 8, 2024**

**CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER**

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles, and the Commission's regulations thereunder.

## I.    Introduction

The "Will <movie>  have the highest Rotten Tomatoes score in <period>?" Contract is a contract relating to film reviews. After careful analysis, Kalshi (hereafter referred to as "Exchange") has determined that the Contract complies with its vetting framework.

Rotten Tomatoes is the standard for review aggregation in the film and television industries, widely relied upon by audiences and members of industry alike.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices B, C, and D.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. The Exchange has further imposed position limits (defined as maximum loss exposure) of $25,000 USD on the Contract. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members

*KalshiEX LLC*

will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. After trading on the Contract has closed, the Expiration Value and Market Outcome are determined. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that <movie> has the highest All Critics Tomatometer Score of any movie with a wide release in <period> and which has at least 50 reviews, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.

❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: May 8, 2024

*KalshiEX LLC*

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Further Considerations

Appendix C (Confidential) - Source Agency

Appendix D (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

*KalshiEX LLC*

**APPENDIX A – CONTRACT TERMS AND CONDITIONS**

**Official Product Name: Will &lt;movie&gt;  have the highest Rotten Tomatoes score in &lt;period&gt;?**
**Rulebook: RTCOMPARISON**

*KalshiEX LLC*

*KalshiEX LLC*

# RTCOMPARISON

**Scope:** These rules shall apply to this contract.

**Underlying:** Rotten Tomatoes' Tomatometer "All Critics" Tomatometer score for <movie> the 10:00 AM ET after the last day in <period>. The score used will be the one reported by Rotten Tomatoes, without decimals. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Instructions:** Rotten Tomatoes can be found here.[1] These instructions on how to access the Underlying are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time.

**Source Agency:** The Source Agency is Rotten Tomatoes.

**Type:** The type of Contract is an Event Contract.

**Issuance:** After the initial Contract, Contract iterations will be listed on an as-needed basis at the discretion of the Exchange and corresponding to the risk management needs of Members.

**<period>:** <period> refers to a calendar time period specified by Kalshi. Kalshi may list iterations of the Contract corresponding to variations of <period>.

**<movie>:** <movie> refers to a motion picture specified by Kalshi. Kalshi may list iterations of the Contract corresponding to <movie> values for movies listed on Rotten Tomatoes' site and intends to only list markets for films that have been significantly covered by industry trade publications such as *Variety*, *Vulture*, and *Deadline*.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that <movie> has the highest score of any movie which had its wide release in <period> and has at least 50 reviews. If <movie> is tied with another <movie>, then both would be encompassed by the Payout Criterion.

**Minimum Tick:** The Minimum Tick size for the referred Contract shall be $0.01.

**Position Limit:** The Position Limit for the $1 referred Contract shall be $25,000 per strike, per Member.

---

[1] https://www.rottentomatoes.com/

*KalshiEX LLC*

**Last Trading Date:** The Last Trading Date of the Contract will be the last day in <period>. The Last Trading Time will be 11:59 PM ET.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The Expiration Date of the Contract shall be the 10:00 AM ET after <period> ends.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(c) of the Rulebook.

*KalshiEX LLC*

July 2, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <athlete> be the cover athlete for the next EA Sports college basketball video game?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <athlete> be the cover athlete for the next EA Sports college basketball video game?" contract (Contract). The Contract will initially be listed after close-of-business on **July 2, 2025**; it is listed as the day after because of limitations of the Commission's online submission portal. The Exchange intends to list the contract on a  custom ⏷  basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<date>**
- **<athlete>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

KalshiEX LLC

KalshiEX LLC

**KalshiEX LLC**
**Official Product Name: "Will <athlete> be the cover athlete for the next EA Sports college basketball video game?"**
**Rulebook: COVEREA**
**Summary: athlete cover athlete for**
**Kalshi Contract Category:  Sports**
**Kalshi Internal Category:  Sports**
**July 2, 2025**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I.    Introduction

The "Will <athlete> be the cover athlete for the next EA Sports college basketball video game?" Contract is a contract relating to Sports.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices B, C, and D.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access

the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. If the Market Outcome is "Yes," meaning that an event occurs that is encompassed within the Payout Criterion, then the long position holders are paid an absolute amount proportional to the size of their position and the short position holders receive no payment. If the Market Outcome is "No," then the short position holders are paid an absolute amount proportional to the size of their position and the long position holders receive no payment. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

## CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.

❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: July 2, 2025

*KalshiEX LLC*

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B (Confidential) - Further Considerations

Appendix C (Confidential) - Source Agency

Appendix D (Confidential) - Compliance with Core Principles

*KalshiEX LLC*

*KalshiEX LLC*

**APPENDIX A – CONTRACT TERMS AND CONDITIONS**

**Official Product Name: "Will <athlete> be the cover athlete for the next EA Sports college basketball video game?"**
**Rulebook: COVEREA**

*KalshiEX LLC*

# COVEREA

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the identity of the athlete(s) featured on the cover of the next EA Sports college basketball video game to be officially announced by EA Sports after Issuance. For games with a title including a year designation, only the standard edition for the year specified in the game's title will be considered. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agencies are EA Sports, Electronic Arts Inc., The New York Times, the Associated Press, Bloomberg News, Reuters, Axios, Polygon, IGN, GameSpot, Kotaku, The Athletic, ESPN, Sports Illustrated, CBS Sports, Fox Sports, and The Washington Post.

**Type:** The type of Contract is an Event Contract.

**Issuance:** After the initial Contract, Contract iterations will be listed on an as-needed basis at the discretion of the Exchange and corresponding to the risk management needs of Members.

**<athlete>:** <athlete> refers to a specific individual athlete, group of athletes, or non-athlete entity (such as a mascot or generic player) specified by the Exchange. May include current college athletes, former college athletes, professional athletes who previously played college basketball, or fictional representations. Groups may be specified as "multiple athletes" or by listing specific combinations.

**<date>:** <date> refers to a calendar date specified by the Exchange. The Exchange may list iterations of the Contract corresponding to variations of <date>.

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that <athlete> is officially announced by EA Sports as a cover athlete for the next EA Sports college basketball video game after Issuance and before <date>.

The following specifications apply:

- Only the primary retail edition available in North America will be considered (not special, deluxe, collector's, or regional editions)
  - If there are multiple standard editions, <athlete> will resolve to Yes if they are on any of them
- If both physical and digital standard editions exist with different covers, the physical edition takes precedence.
- If only a digital edition exists, the primary digital storefront image will be considered

- An athlete is considered a "cover athlete" only if they appear as the primary subject of the cover art (background appearances, crowd shots, or small inset images do not qualify)
- For covers featuring multiple athletes equally, all featured athletes will be considered cover athletes

Examples that would resolve to Yes for <athlete> being "Caitlin Clark":

- EA Sports announces "Caitlin Clark will be the cover athlete for EA Sports College Basketball 25"
- EA Sports reveals cover art prominently featuring only Caitlin Clark
- EA Sports announces "Caitlin Clark and Dawn Staley will share the cover" (resolves to Yes for both)

Examples that would NOT resolve to Yes for <athlete> being "Caitlin Clark":

- Caitlin Clark appears in a small photo on the back cover
- Caitlin Clark is announced as cover athlete for a special edition only
- Caitlin Clark is featured in marketing materials but not the actual game cover
- A generic player or mascot is on the cover instead of any real athlete
- EA Sports announces a different athlete as the cover athlete
- No EA Sports college basketball game is announced before <date>

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be <date>. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

January 22, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <team> win <title>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <team> win <title>?" contract (Contract). The Contract will initially be listed on **January 23, 2025**. The Exchange intends to list the contract on a  custom ⌄ basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<team>**
- **<title>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: "Will <team> win <title>?"**
**Rulebook: TITLE**
**Kalshi Contract Category:** Sports ˅
**January 22, 2025**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix E), and the Commission's regulations thereunder.

### I.    Introduction

The "Will <team> win <title>?" Contract is a contract relating to American sports leagues.[1]

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new

---

[1] The Contract has not been endorsed by the National Football League, the National Hockey League, the National Basketball Association, or the National Collegiate Athletic Association. The use of the terms National Football League, National Hockey League, National Basketball Association, or National Collegiate Athletic Association does not indicate an endorsement of this product.

Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

❏ The Contract complies with the Act and Commission regulations thereunder.

❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

By: Xavier Sottile
Title: Head of Markets
Date: January 22, 2025

**<u>Attachments:</u>**

Appendix A - Contract Terms and Conditions

Appendix B - Trading Prohibitions

Confidential Appendices

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will <team> win <title>?"**
**Rulebook: TITLE**

*KalshiEX LLC*

# TITLE

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the winner of <title>. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agencies are the Associated Press, ESPN, The Wall Street Journal, and Fox Sports.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent event. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to the next year that <title> is awarded.

**<team>:** <team> refers to an entity participating in a sport.

**<title>:** <title> refers to a given sports title, and will include a specified year and/or other distinguishing information, e.g., "The 2025 National Football League Super Bowl" or "The 2025 National Football League American Football Conference Championship". <title> may refer to the titles of the National Football League, the National Hockey League, National Basketball Association, or the National Collegiate Athletic Association.[2]

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that it is reported that the first official final result of <title> event is that <team> holds the title.

- If the <title> event is postponed past its scheduled date (e.g. because of severe weather or other emergencies), then the market will remain open and will resolve after the sooner of (1) the winner being reported or (2) two years following the <title> event's original scheduled date.
- If the <title> event is suspended during play, then the market will remain open and will resolve after the sooner of (1) the winner being reported or (2) two years following the <title> event's original scheduled date.
- If the <title> event is moved to be earlier than its scheduled date, then the market will remain open and will resolve after the winner is reported.

---

[2] The Contract has not been endorsed by the National Football League, the National Hockey League, the National Basketball Association, or the National Collegiate Athletic Association. The use of the terms National Football League, National Hockey League, National Basketball Association, or National Collegiate Athletic Association does not indicate an endorsement of this product.

- If the <title> event is cancelled outright (or declared "no contest") before it is played, or after it has started, then the markets for eligible teams (not disqualified or eliminated) will resolve so "Yes" holders receive $1/[the number of eligible teams (not disqualified or eliminated) remaining for which there is a strike listed] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout.
- If multiple teams are reported <title> holders, then the markets for those teams will resolve so "Yes" holders receive $1/[the number of teams declared <title> holders] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout. For example, if two teams tie in the <title> event and both teams are reported as <title> holder, both "Yes" and "No" holders for each <team> shall receive $0.50 per share.
- If <team> forfeits the <title> event, the market will resolve to "No" for the forfeiting team.
- If the <title> event is ended early, before regulation time has ended, but the associated governing body declares that the event is over and there is a winner or multiple winners, or a tie, then the market will resolve based on that determination.
- If <team> is disqualified before the Contract expires – even if the <title> event has finished – the market for <team> will resolve to "No". If this causes another team to be formally declared the winner of <title>, the contract will resolve on the basis of which team is named <title> holder.
- Note that any revisions after Expiration will not be considered. Therefore if <team> or its opponent is disqualified or stripped of its title after the Contract expires, that will not impact the market's resolution.
- If <team> was eliminated from contention for <title>, then the market will resolve "No". A team is eliminated from contention for <title> when it is reported so by the Source Agency.
- If <team> is eliminated from contention for <title>, and the market for <team> resolved to No, but then <team> is re-entered into contention (for example, because a team that was originally in contention was disqualified), then a new market with the same <team> may be created. The original market will remain resolved to No.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be the day after the day the title event has an official final result. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00, unless otherwise specified in accordance with the Contract's terms and conditions.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

*KalshiEX LLC*

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will be instituting additional prohibitions for trading the TITLE contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the National Football League, the National Hockey League, National Basketball Association, and the National Collegiate Athletic Association;
- Paid employees of the league and league participants;
- Owners of teams and the league;
- and household members and immediate family of all above.

These prohibitions apply to the appropriate values of <title>. For example, former players of the National Football League are not prohibited from trading on iterations of the Contract related to the National Basketball Association unless they are part of any other group listed for that league. To clarify, "league" here refers to any of the four organizations in the first bullet point.

February 7, 2025

SUBMITTED VIA CFTC PORTAL
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <team> win <event>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <team> win <event>?" contract (Contract). The Contract will initially be listed on February 8, 2025. The Exchange intends to list the contract on a custom ▾ basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- <team>
- <event>

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

KalshiEX LLC
Official Product Name: "Will <team> win <event>?"
Rulebook: EVENT
Summary: Events
Kalshi Internal Category:  Sports  ˅
Kalshi Contract Category:  Sports  ˅
February 7, 2025


CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix E), and the Commission's regulations thereunder.

I.    Introduction

The "Will <team> win <event>?" Contract is a contract relating to American sports leagues.[1]

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

General Contract Terms and Conditions: The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new

---

[1] The Contract has not been endorsed by any league or association as of self-certification. The use of any names of leagues or associations does not indicate an endorsement of this product.

Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2

Based on the above analysis, the Exchange certifies that:

- ❏ The Contract complies with the Act and Commission regulations thereunder.
- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: February 7, 2025

Attachments:
Appendix A - Contract Terms and Conditions
Appendix B - Trading Prohibitions
Confidential Appendices

*KalshiEX LLC*

APPENDIX A – CONTRACT TERMS AND CONDITIONS


Official Product Name: "Will <team> win <event>?"
Rulebook: EVENT

*KalshiEX LLC*

# EVENT

Scope: These rules shall apply to this contract.

Underlying: The Underlying for this Contract is the first official final result of <event>. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

Source Agency: The Source Agencies are the league, association, or organization(s) that governs <event>, the Associated Press, ESPN, The Wall Street Journal, and Fox Sports.

Type: The type of Contract is an Event Contract.

Issuance: The Contract is based on the outcome of recurrent events. Thus, Contract iterations will be issued on a recurring basis.

<team>: <team> refers to a participant in <event>. <team> may also take the value of "tie". A tie may occur between up to all of the teams participating in the event.

<event>: <event> refers to a given event, and will include a specified date and/or other distinguishing characteristics, e.g., "The National Basketball Association meeting between the New York Knickerbockers and the Houston Rockets scheduled to be played February 3, 2025".[2]

Payout Criterion: The Payout Criterion for the Contract encompasses the Expiration Values that it is reported that the first official final result of <event> is that <team> has won, placed first, or whatever the relevant form of prevailing in <event> is.

- If <event> is postponed past its scheduled date (e.g. because of severe weather or other emergencies), then the market will remain open and will resolve after the sooner of (1) the winner being reported; (2) a final result or cancellation otherwise being announced; or (3) two years following <event>'s original scheduled date.
- If <event> is suspended during play, then the market will remain open and will resolve after the sooner of (1) the winner being reported; (2) a final result or cancellation otherwise being announced; or (3) two years following the <event>'s original scheduled date.
- If <event> is moved to be earlier than its scheduled date, then the market will remain open and will resolve after the winner is reported.

---

[2] The Contract has not been endorsed by any league or association as of self-certification. The use of any names of leagues or associations does not indicate an endorsement of this product.

- If <event> is cancelled outright (or the final result is declared "no contest" without a winner) before there is a first official final result, then the associated market will resolve and the Exchange will determine the payouts to the holders of long and short positions based upon the last traded price prior to cancellation. If a last traded price is not available or is not logically consistent (for example, if the Yes prices for each <team> do not sum to one dollar), or if the Exchange determines at its sole discretion that the last traded prices prior to cancellation do not represent a fair settlement value, the Outcome Review Committee will be responsible for making a binding determination of fair allocation. For the avoidance of doubt, the Exchange will distribute $1.00 in total between each pair of "Yes" and "No" holders.
- If two teams are reported <event> winners, or there is a tie (or the equivalent for <event>), then the markets for those teams will resolve so "Yes" holders for those teams receive $1/[the number of participants declared as the winners of <event>] rounded down to the nearest cent, and "No" holders receive $1 minus the Yes payout. For example, if two participants are the reported winners of <event>, both "Yes" and "No" holders for each of those participants shall receive $0.50 per share. In that case, additionally, if a strike labeled "tie" exists, it will be determined as Yes while each team that did not tie (if any) will be determined as No.
- If <team> forfeits the <event> before first official final result of <event> is reported, the market will resolve to "No" for the forfeiting team unless other teams forfeit as well and no winner is declared, in which case, the <event> will be considered to have been cancelled outright and will resolve accordingly.
- If the <event> is ended early, before regulation time has ended, if the first official final result of <event> is that there is a winner or multiple winners, or a tie, then the market will resolve based on that determination.
- If <team> is disqualified before the Contract expires – even if the <event> has finished – the market for <team> will resolve to "No" unless one of the other above conditions is met prior to Expiration (e.g. all participants are disqualified leading to the cancellation of <event> – in which case, cancellation rules apply). If the disqualification of one team causes another team to be formally declared the winner of <event>, that declaration will be considered the first official final result of <event> if it has not been rescinded or otherwise changed at the time of the contract's Expiration.
- Note that any revisions after Expiration will not be considered. Therefore if <team> or its opponent is disqualified after the Contract expires, that will not impact the market's resolution.

Minimum Tick: The Minimum Tick size for the Contract shall be $0.01.

Position Accountability Level: The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

*KalshiEX LLC*

Last Trading Date: The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

Settlement Date: The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

Expiration Date: The latest Expiration Date of the Contract shall be the day after the day the event has an official final result. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

Expiration time: The Expiration time of the Contract shall be 10:00 AM ET.

Settlement Value: The Settlement Value for this Contract is $1.00, unless otherwise specified in accordance with the Contract's terms and conditions.

Expiration Value: The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

Contingencies: Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the EVENT contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the league, association, or organization(s) governing <event>.
  - For college leagues/associations specifically, or where otherwise appropriate (as identified by the Exchange), this applies to current and former players/coaches/staff of the specific teams in <event> rather than the league/association as a whole (e.g., if the Division I Gonzaga Men's Basketball Team is playing in <event>, this prohibition will restrict trades by current/former players of that team, rather than all current/former players/coaches/staff in any NCAA sport);
- Paid employees of the league and league participants;
- Ultimate beneficial owners of teams and the league; and
- household members and immediate family of all above.

These prohibitions apply to the appropriate values of <event>. For example, former players of the National Football League are not necessarily prohibited from trading on iterations of the Contract related to the National Basketball Association, unless they are part of any other group listed for that league.[3]

---

[3] The Contract has not been endorsed by any league or association as of self-certification. The use of any names of leagues or associations does not indicate an endorsement of this product.

# Exhibit D

Derek Brown
Utah Attorney General
Joshua B. Cutler (16434)
Mark C. Gillespie (19265)
Assistant Solicitors General
Office of the Utah Attorney General
P.O. Box 140858
Salt Lake City, Utah 84114-0858
Telephone: (801) 366-0533
jbcutler@agutah.gov
markgillespie@agutah.gov

*Counsel for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KALSHIEX LLC;<br><br>*Plaintiff,*<br><br>v.<br><br>SPENCER J. COX, in his official capacity as Governor of Utah; DEREK BROWN, in his official capacity as Attorney General of Utah; DANIEL BURTON, in his official capacity as Chief Deputy Attorney General and General Counsel of Utah; STEWART YOUNG in his official capacity as Criminal Deputy Attorney General of Utah; and DOUGLAS CRAPO in his official capacity as Public Protection Attorney General of Utah.<br><br>*Defendants.* | **DECLARATION OF JOSHUA CUTLER**<br><br>Case No. 2:26-cv-00151-RJS-CMR<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

I, Joshua Cutler, am older than 18-years of age and have personal knowledge of the facts set forth herein.

1

1.      Exhibits A, B, and C to the Motion to Dismiss or Alternatively Motion for Summary Judgment are true and accurate copies of documents related to Kalshi that I obtained from the CFTC's official website.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

At Salt Lake City, Utah, this 2nd day of May, 2026.

                                    _/s/ Joshua Cutler_____
                                    Joshua Cutler

2