Derek Brown
Utah Attorney General
Joshua B. Cutler (16434)
Mark C. Gillespie (19265)
Assistant Solicitors General
Office of the Utah Attorney General
P.O. Box 140858
Salt Lake City, Utah 84114-0858
(801) 366-0533
jbcutler@agutah.gov
markgillespie@agutah.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KALSHIEX LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> SPENCER J. COX, in his official capacity as Governor of Utah; DEREK BROWN, in his official capacity as Attorney General of Utah; DANIEL BURTON, in his official capacity as Chief Deputy Attorney General and General Counsel of Utah; STEWART YOUNG in his official capacity as Criminal Deputy Attorney General of Utah; and DOUGLAS CRAPO in his official capacity as Public Protection Deputy Attorney General of Utah, <br><br> *Defendants.* | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS OR ALTERNATIVELY MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:26-cv-00151-RJS-CMR <br><br> Judge Robert J. Shelby <br><br> Magistrate Judge Cecilia M. Romero |

# Table of Contents

Table of Contents...............................................................................................i

Table of Authorities .........................................................................................ii

   I.   Kalshi Mischaracterizes the Purpose of the CEA's 1974 Amendments. .......... 1

   II.  The CEA Does Not Expressly Preempt Relevant State Law. ........................... 3

        A.    The Presumption Against Preemption Applies. ...................................... 3

        B.    Section 2(a)(1)(A) Differs from Typical Express-Preemption Provisions. ................................................................................................ 4

        C.    Sections 16(e)(2) and 16(h) Undermine Kalshi's Position. ...................... 5

        D.    The CEA's Purposes Indicate a Limited Scope of CFTC Authority. ......... 6

        E.    Kalshi's Position Leads to Absurd Results Congress Could Not Have Intended. ...................................................................................... 7

   III.  The CEA Does Not Preempt Utah's Generally Applicable Laws from Any Field Kalshi Has Identified......................................................................... 9

   IV.  Kalshi Identifies No Preemptive Conflict Between the CEA and Any Utah Law.............................................................................................................. 11

   V.  All or Most Bets Offered on Kalshi Are Outside the CFTC's Jurisdiction................................................................................................... 11

Conclusion....................................................................................................... 12

Certificate of Compliance ................................................................................ 14

Certificate of Service........................................................................................ 15

## Table of Authorities

**Cases**

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago,*
 977 F.2d 1147 (7th Cir. 1992) ............................................................................... 3, 4

*Bibbo v. Dean Witter Reynolds, Inc.,*
 151 F.3d 559 (6th Cir. 1998) ..................................................................................... 3

*BNSF Ry. Co. v. Hiett,*
 22 F.4th 1190 (10th Cir. 2022).................................................................................. 5

*Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board,*
 162 F.4th 631 (6th Cir. 2025)..................................................................................... 3

*FTC v. Ken Roberts Co.,*
 276 F.3d 583 (D.C. Cir. 2001)..................................................................................... 8

*Heart of Am. Grain Inspection Serv., Inc. v. Missouri Dep't of Agric.,*
 123 F.3d 1098 (8th Cir. 1997) .................................................................................... 5

*Ho-Chunk Nation v. Kalshi Inc.,*
 2026 WL 1284077 (W.D. Wis. May 11, 2026) ...................................................... 11

*International Trading, Ltd. v. Bell*
 556 S.W.2d 420 (Ark. 1977)...................................................................................... 8

*KalshiEX LLC v. Martin,*
 793 F. Supp. 3d 667 (D. Md. 2025) .......................................................................... 7

*Medtronic, Inc. v. Lohr,*
 518 U.S. 470 (1996) ............................................................................................... 3, 4

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
 456 U.S. 353 (1982) ................................................................................................... 1

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.,*
 608 F.2d 175 (5th Cir. 1979) ..................................................................................... 8

*Rice v. Santa Fe Elevator Corp.*
 331 U.S. 218 (1947) .............................................................................................. 9, 10

*Slaney v. The Int'l Amateur Athletic Fed'n,*
 244 F.3d 580 (7th Cir. 2001) ..................................................................................... 5

*United States v. Brien,*
  617 F.2d 299 (1st Cir. 1980) .................................................................................. 8

**Statutes**

7 U.S.C. § 2 .......................................................................... 1, 2, 3, 4, 5, 8, 9, 11

7 U.S.C. § 5 ......................................................................................................... 7

7 U.S.C. § 7a-2 ................................................................................................... 6

7 U.S.C. § 16 ...................................................................................................... 6

21 U.S.C. § 678 .................................................................................................. 4

The preemption question in this case turns on the meaning of Section 2(a)(1)(A)'s exclusive-jurisdiction and savings clauses. *See* 7 U.S.C. § 2(a)(1)(A). As explained in Defendants' Motion to Dismiss, the Court should interpret the exclusive-jurisdiction provision, consistent with the CEA's text, its codified purposes, and the Supreme Court's decision in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982), only "to separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Id.* at 386. The provision may preempt States from (1) creating supplemental rules for admission to CFTC-regulated markets or (2) imposing additional reporting or compliance requirements for CEA-regulated activities. But it never precludes States from enforcing generally applicable laws against activities just because those activities occur on a regulated exchange.

In contrast, Kalshi seeks this Court's declaration that "event contracts *never violate* [*any*] *state law* when they are traded on a DCM." Dkt. 1, ¶ 6. Kalshi's proposed field ("trading on DCMs") is overly broad because it has no limit as to the type of State law that would be preempted. Kalshi identifies no other federal law that preempts every State law in this way. Nor does Kalshi provide a principled basis for its revised position that only gambling laws (and not bribery, money-laundering, or other laws) are preempted. Response at 13. Indeed, as discussed below, none of Kalshi's new arguments justify its overly broad position.

## I.    Kalshi Mischaracterizes the Purpose of the CEA's 1974 Amendments.

Kalshi's interpretation of Section 2(a)(1)(A) appears to rest primarily on its constructed narrative regarding the purpose of amendments to the CEA in 1974. This

argument is circular—Kalshi's interpretation of Section 2(a)(1)(A) is based on Kalshi's constructed narrative, and Kalshi's constructed narrative is based on Kalshi's interpretation of Section 2(a)(1)(A). *See* Response at 1, 6, 9, 11-13, 23. Kalshi concedes that for over 40 years, States remained free to enforce their generally applicable criminal laws (including gambling laws) against activity occurring on exchanges regulated by the federal government under the CEA. Response at 1-2. Kalshi argues, however, that Congress made a "sharp turn" in 1974 when it added the exclusive-jurisdiction provision. *Id.* at 2.

Kalshi's interpretation is inconsistent with the Supreme Court's 1982 decision in *Curran*. Kalshi argues that *Curran* "did not describe the intent of the exclusive-jurisdiction provision as enacted into law; it referred to an earlier provision '*in the bill passed by the House.*'" Response at 7. True, the Supreme Court did mention a bill passed by the House. That bill included the exclusive-jurisdiction clause—"to separate the functions of the [CFTC] from those of" other regulatory agencies—but not the savings clause. 456 U.S. at 386. The Court explained that the House version of Section 2(a)(1)(A) "raised concerns that the jurisdiction of state and federal courts might be affected," so the "Senate added a saving clause." *Id.* It then interpreted Section 2(a)(1)(A), with both the exclusive-jurisdiction and savings clauses, to not preempt private rights of action and reiterated that the sole purpose of the exclusive-jurisdiction clause was "only to consolidate" regulatory functions. *Id.* at 387. *Curran's* treatment of Section 2(a)(1)(A) thus directly bears on this case.

2

More importantly, the issue resolved in *Curran* is analogous to the legal issue here. In *Curran*, the Court analyzed whether the 1974 amendments to the CEA had abolished the CEA's private causes of action. *Id.* at 356. The Court recognized that "an implied cause of action under the CEA was a part of the 'contemporary legal context' in which Congress legislated in 1974." *Id.* at 381 (citation omitted). And the Court concluded that Congress intended to preserve that legal context. *Id.* at 378-88. That reasoning applies equally to States' established authority to enforce generally applicable laws against exchange activity—another part of the "contemporary legal context" in 1974. Had Congress truly intended a "sharp turn" from that context, it would have expressly preempted State laws using traditional preemption language.

## II.    The CEA Does Not Expressly Preempt Relevant State Law.

### A.    The Presumption Against Preemption Applies.

Contrary to Kalshi's assertions, the presumption against preemption applies. Section 2(a)(1)(A) is not an express preemption clause; even Kalshi's cited authorities recognize this. *See Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1154 (7th Cir. 1992); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563 (6th Cir. 1998). In any event, the presumption supports a narrow reading of any claimed express-preemption provision. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

Kalshi's attempt to avoid the presumption by reframing the relevant field, *see* Response at 5-6, ignores that Kalshi seeks to escape from *all* generally applicable Utah laws, many in traditional spheres of State regulation. And the contrary reasoning in Kalshi's principal cited authority, *Churchill Downs Technology*

3

*Initiatives Co. v. Michigan Gaming Control Board*, 162 F.4th 631 (6th Cir. 2025), is erroneous. The Supreme Court has held that the presumption against preemption applies "[i]n *all* pre-emption cases"—even those not involving areas of traditional State regulation. *Medtronic*, 518 U.S. at 485.

### Section 2(a)(1)(A) Differs from Typical Express-Preemption Provisions.

The differences between Section 2(a)(1)(A) and other preemption provisions matter. The many examples of unambiguous preemption provisions cited in the Motion show that Congress knows how to preempt State law when it wants to—and it did not do so here.

Kalshi disregards the language used in other express-preemption provisions because those provisions are more limited in scope. *Id.* at 6-7. But that limited scope underscores that Congress typically uses unambiguous language to narrowly identify the types of State laws to be preempted. *See, e.g.*, 21 U.S.C. § 678. In contrast, Kalshi would have the Court interpret Section 2(a)(1)(A) to encompass *all* State laws as applied to transactions on a DCM, regardless of their nature, purpose, or relation to provisions within the CEA. Dkt. 1, ¶ 6.

Kalshi also downplays the difference between the exclusive-jurisdiction clause and traditional preemption provisions by stating that the clause does "supersede [and] limit" State laws. Response at 6. But the quoted language is from the *savings* clause, not the exclusive-jurisdiction clause. And as the Seventh Circuit has explained, to interpret Section 2(a)(1)(A) as broadly as Kalshi now proposes would deprive the savings clause of "any meaning." *Am. Agric.*, 977 F.2d at 1155.

4

Cases construing other "exclusive jurisdiction" provisions confirm that such clauses separate regulatory functions; they do not categorically preempt generally applicable State law. *See, e.g.*, *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1197 (10th Cir. 2022) (federal statute governing "railroad operations" preempted State "Blocked Crossing Statute" that had as "[i]ts primary directive" the aim to regulate "the movement of trains"); *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001) (holding that "*strict questions of athletes' eligibility* are preempted by [statute's] grant of exclusive jurisdiction" over eligibility matters (emphasis added)); *Heart of Am. Grain Inspection Serv., Inc. v. Missouri Dep't of Agric.*, 123 F.3d 1098, 1104-05 (8th Cir. 1997) (State's attempt to "usurp [regulatory] function entirely" within exclusive jurisdiction of federal law triggers preemption).

Finally, Kalshi argues that the fact that Congress chose to focus on regulatory functions in Section 2(a)(1)(A) instead of employing language clearly preempting State law is "a distinction without a difference." Response at 7-8. But the words Congress chooses matter. Here, they mean the difference between immunizing activity on a DCM from all laws other than the CEA (Kalshi's position) and merely preventing other regulatory agencies from duplicating the CFTC's statutorily assigned functions—something Utah has never sought to do.

### C.    Sections 16(e)(2) and 16(h) Undermine Kalshi's Position.

Kalshi's attempt to repair the damage done to its position by Sections 16(e)(2) and 16(h)—express-preemption provisions that do not preempt Utah law generally—also fails. If Congress had wanted to preempt on-exchange and off-exchange swaps

5

equally, it would have done so in a single, clear preemption provision. By expressly preempting only *off-exchange* swaps, Congress ensured that the two types of swaps be treated differently. *See* 7 U.S.C. § 16(e)(2). Similarly, Section 16(h)'s express preemption of state insurance laws to avoid a "patchwork," Response at 9, underscores that Congress knew how to address specific State-law categories, but declined to preempt generally applicable gambling laws for on-exchange trading.

### D. The CEA's Purposes Indicate a Limited Scope of CFTC Authority.

As demonstrated in Defendants' Motion, the CEA's stated purposes and text establish a self-regulatory framework ensuring financially secure markets free from manipulation and fraud. Motion at 16-20. Congress did not attempt to establish the legality of the underlying subject matter of transactions via the CEA, and the CFTC's authority is tailored accordingly. *Id*.

Nothing in Kalshi's Response undermines this. Response at 10-11. Self-certification under 7 U.S.C. § 7a-2 requires only compliance with the CEA, not with all other State or federal laws. The Special Rule in § 7a-2(c)(5) permits the CFTC to bar trading certain event contracts in limited circumstances (including where a contract is illegal in one State), reflecting preservation of State-law judgments about underlying conduct. Importantly, the Special Rule does *not* give the CFTC authority to criminalize related conduct on exchanges, prosecute parties for criminal conduct, or regulate derivative markets to alleviate societal ills that State laws (especially criminal laws) address. Rather, the Special Rule "clearly reflects an affirmative intent

to *preserve* state laws governing whether particular conduct is lawful or unlawful." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 680 (D. Md. 2025).

Kalshi's related argument that the CEA's purpose is "uniformity" also fails. *See* Response at 11. Kalshi identifies no provision of the CEA stating that purpose. *See id*. Instead, the language in Sections 2(a)(1)(A) and 5 establish a federal "system" of derivatives trading in a manner entirely consistent with Defendants' reading. *See* 7 U.S.C. § 5(b); Motion at 14-20 & n.16.

### E.    Kalshi's Position Leads to Absurd Results Congress Could Not Have Intended.

Finally, Kalshi fails to adequately address the absurd results that necessarily follow from its interpretation of Section 2(a)(1)(A). As previously explained, under Kalshi's view "criminal conduct would be insulated from State law whenever a person conceives of a way to use an exchange (that is self-regulated) to commit their crimes," including such crimes as bribery and money laundering. Motion at 22. Kalshi's Response states only that "Kalshi does not contend that a person can use a DCM to immunize bribery, prostitution, money laundering, or any other underlying criminal conduct." Response at 13. Yet Kalshi is seeking a judicial declaration that "[e]vent contracts *never violate [any] state law* when they are traded on a DCM." Dkt. 1, ¶ 6. And Kalshi never attempts to explain why Utah's gambling laws would be preempted, but not Utah's bribery or money-laundering laws.

Kalshi similarly fails to rebut the absurd result that, under Kalshi's view, all sports bets nationwide would be required to be traded on a DCM. According to Kalshi, "[b]ets or wagers placed with sportsbooks are not swaps." Response at 13. Yet Kalshi

7

argues at length that sports bets constitute swaps under the CEA without distinguishing between on-exchange or off-exchange transactions. *See id*. at 24-26. Kalshi also fails to address Section 2(e) of the CEA, a provision that makes it "unlawful for any person . . . to enter into a swap unless the swap is entered into on" an exchange regulated by the CFTC. 7 U.S.C. § 2(e). If any sports bet qualifies as a swap, then all sports bets are illegal unless made through a DCM.

These untenable consequences are one reason that no court has ever adopted Kalshi's overly broad reading of Section 2(a)(1)(A)—as Kalshi's cited authorities attest. For example, in *International Trading, Ltd. v. Bell*, the Arkansas Supreme Court concluded that the CEA preempted certain State-law securities provisions— but that a generally applicable criminal statute could be used to "prosecute an offender" because "[s]uch action[] could not constitute any realistic interference with the federal regulatory scheme." 556 S.W.2d 420, 425 (Ark. 1977). Kalshi's other cited cases similarly fail to support its broad reading. *See FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001) (preemption argument "makes no sense insofar as it suggests that the scope of the CFTC's exclusive jurisdiction is *broader* than the scope of the agency's authority to regulate under the CEA"); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) (noting preemptive effect of CEA on "commodities futures regulation," but finding no preemption as to commodities trading activity within "purview" of criminal statute); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam opinion

8

affirming district court's dismissal of gambling claim on ground that it was "inconsistent" with CEA, with no additional analysis or reasoning).

### III. The CEA Does Not Preempt Utah's Generally Applicable Laws from Any Field Kalshi Has Identified.

Kalshi's field-preemption claim fails for the reasons explained in the Motion. Kalshi argues that its proposed field is correct and that the long list of cases Defendants cites in their Motion are "inapposite" because they deal with "different statutes and regulatory regimes." Response at 14. It further suggests that the Court should disregard the preemption principles established in those cases because Section 2(a)(1)(A) "lays out the field clearly": "trading on DCMs." *Id.* at 15-16.

That proposed field is overly broad because it provides no limit as to the type of State law that would be preempted. Kalshi seeks preemption of any State law as applied to trading on DCMs regardless of the law's nature or purpose. Dkt. 1, ¶¶ 5-6. But as previously explained, Kalshi has not identified any other preemption provision or preemption case that would preempt every single State law in this way,[1] or explained how only gambling laws (and not bribery or money-laundering laws) could be preempted. Response at 13.

Kalshi cites *Rice v. Santa Fe Elevator Corp.*, which analyzed a statute containing an exclusive-jurisdiction provision and found preemption as to a "matter

---

[1] Supreme Court precedent makes clear that the target of a State law matters in a field-preemption analysis. Motion at 29-33. And although courts need not accept pretextual labelling of a State law where its effect is clearly to target an area of federal regulation, the Court has repeatedly emphasized that generally applicable State laws do not impermissibly overlap with fields of preemption. *Id.* at 32-33.

on which the State asserts the right to act" if it "is in any way regulated by the Federal Act." 331 U.S. 218, 236 (1947). But as explained in Defendants' Motion, *Rice*'s analysis proceeded more carefully than Kalshi would like. Motion at 27. Instead of categorically concluding that all laws were preempted as to warehouses, the *Rice* Court analyzed twelve State-law provisions separately, finding that Congress acted "so unequivocally as to make clear that it intend[ed] no regulation except its own" as to nine of them. *Rice* 331 U.S. at 235-36. The three remaining State-law provisions were not preempted because there was no specific, overlapping provision in federal law. *Id*. at 236-38. That is how field-preemption analysis should work for federal statutes with exclusive-jurisdiction provisions.

Kalshi fails to use a similarly careful approach. Instead, it points to only one potential overlapping federal provision—the Special Rule. But, as explained in the Motion and above, Kalshi mischaracterizes the purpose and function of the Rule, which does not preempt Utah's generally applicable laws. *See* Motion at 39-41.

In contrast to Kalshi's approach, Defendants propose a field that is defined by the CEA's text and limited as to the types of State laws that would be preempted. Because this field does not impermissibly overlap with Utah's generally applicable criminal laws, there is no field preemption in the case.[2]

---

[2] Kalshi also argues that "Utah's proposed application of state law" unambiguously seeks the removal of sports-event contracts from a DCM. Response at 16. But Utah is seeking to enforce its generally applicable laws to activity occurring only within the borders of Utah. This does not constitute direct regulation by Utah in any way that usurps the CFTC's role under the CEA outside of Utah. That is true even if Kalshi blocks Utah residents from participating in gambling through its platform in response to Utah's enforcement efforts.

IV.   **Kalshi Identifies No Preemptive Conflict Between the CEA and Any Utah Law.**

The Court should reject Kalshi's impossibility claim for the reasons outlined in the Motion. Kalshi's "impartial access" theory fails for the reasons in the Motion and found by multiple other courts. And Kalshi's own Member Agreement imposes state-specific age restrictions, undermining its claim that impartial access forbids state-specific exclusions. *See* Ex. A at 3 (Kalshi Member Agreement requiring user to be "the age of majority in . . . state of residence").

Kalshi's obstacle-preemption argument also fails. Kalshi's uniformity argument depends on its incorrect readings of Section 2(a)(1)(A) and the Special Rule. Response at 21-22. Correctly construed, those provisions create no obstacle to Utah enforcing its generally applicable gambling laws.[3]

V.   **All or Most Bets Offered on Kalshi Are Outside the CFTC's Jurisdiction.**

The Court should reject Kalshi's arguments that all hosted bets qualify as swaps. Kalshi argues that Defendants' interpretation of the term *swap* "adds a hedging requirement that the statute does not contain." Response at 24. But Defendants' interpretation follows from the phrase "associated with" and the context of other swap subparts being tied to traditional financial instruments. Motion at 41-

---

[3] Kalshi's discussion of the UIGEA is misplaced. "[T]he UIGEA prevents using the internet to circumvent existing state, tribal and federal gambling laws, but does not create any additional substantive prohibitions." *Ho-Chunk Nation v. Kalshi Inc.*, 2026 WL 1284077, at *8 (W.D. Wis. May 11, 2026). "[J]ust because Kalshi's conduct is not *prohibited* by the UIGEA, does not make its offering of sports contracts legal anywhere." *Id.*

45. Kalshi's interpretation, in contrast, writes the phrase "associated with" out of the statute and renders the other subparts superfluous. *Id.* at 44.

Kalshi also fails to address any of the specific bets identified in the Motion. For example, Kalshi never explains what economic consequences flow from an announcer saying "tush push" during the Superbowl broadcast. *See* Motion at 43. For that bet to qualify as a swap, the occurrence of that event would have to be "associated with" economic consequences. Because it is not, the Court would err to categorically declare that all Kalshi's bets are swaps.

Finally, reading "event" to include any sports outcome ignores ordinary meaning in context. Response at 26. Kalshi's interpretation isolates terms rather than construing them within the statute's financial framework. *See* Motion at 45-47.

## Conclusion

The Court should dismiss the Complaint with prejudice.

Respectfully submitted on May 29, 2026

Derek Brown
Utah Attorney General


 */s/ Joshua Cutler*
Joshua Cutler
Mark Gillespie
Assistant Solicitors General
*Counsel for Defendants*

13

## Certificate of Compliance

I, Joshua B. Cutler, certify that this **Reply in Support of Motion to Dismiss or Alternatively Motion for Summary Judgment** contains 3,089 words and complies with DUCivR 7-1(a)(4).

> */s/ Joshua Cutler*
> Joshua Cutler
> Assistant Solicitor General
> *Counsel for Defendants*

## Certificate of Service

I hereby certify that on May 29, 2026, I caused a true and correct copy of the foregoing **REPLY IN SUPPORT OF MOTION TO DISMISS OR ALTERNATIVELY MOTION FOR SUMMARY JUDGMENT** to be filed using the Court's electronic filing system, which effectuated service of such filing upon all counsel who have entered an appearance.

/s/ Joshua Cutler
Joshua Cutler
Assistant Solicitor General
*Counsel for Defendants*

# Ex. A



# KALSHI MEMBER AGREEMENT

PLEASE CAREFULLY READ AND MAKE SURE YOU UNDERSTAND THIS ENTIRE MEMBER AGREEMENT ("AGREEMENT"), INCLUDING ALL DOCUMENTS INCORPORATED BY REFERENCE, BEFORE YOUR CREATION AND USE OF A KALSHI ACCOUNT. CLICKING THE BUTTON TO CONTINUE PAST THIS AGREEMENT IS THE LEGAL EQUIVALENT OF MANUALLY SIGNING AND AGREEING TO BE BOUND BY THIS AGREEMENT.

### I.    Introduction

Welcome to KalshiEX, LLC ("Kalshi" or the "Exchange"), a U.S. Commodity Futures Trading Commission ("CFTC") designated contract market ("DCM"). This Agreement sets out the terms and conditions pursuant to which an individual or entity ("You", "Your" in the possessive form)) may acquire trading privileges on the Exchange.  You must read and accept this Agreement, including all documents incorporated by reference, to trade on the Exchange.

### II.    Services

Kalshi will provide You with access to a platform for trade execution (the "Platform") as provided in the Kalshi Rulebook and as required by the CFTC and applicable law, as well as related services ("the Services"). Your access to and use of the Services is fully and exclusively subject to your acceptance of and compliance with this Agreement, the Kalshi Klear Self-Clearing Member Agreement, the KalshiEX Rulebook, the Kalshi Klear Rulebook, and any other terms and agreements duly posted by on https://kalshi.com/regulatory or otherwise (together the "Terms"). Services may include, but are not limited to: facilitating the funding of a trading account on the Platform; facilitating withdrawals from a trading account on the Platform; facilitating the purchase of assets on the Platform; and facilitating the sale of assets on the Platform. Each of the Services is distinct, fully rendered and delivered upon completion, and not subject to cancellation, refund, return, reimbursement, rollback, or any other form of reversal other than as explicitly specified in the KalshiEX Rulebook.

### III.    Event Contracts Trading Risk Disclosure

<u>There are numerous risks associated with trading on Kalshi and you hereby acknowledge and assume those risks. The risk of loss in trading Event Contract on Kalshi can be substantial and is a highly speculative activity involving volatile markets. Trading may also incur fees, which will add to losses and may significantly reduce earnings. Each Event Contract listed on the Exchange has specific rules that dictate, in addition to the Kalshi rulebook, terms including trading period, settlement, payout, outcome determination, among others. You are responsible for reading, understanding, and accepting the terms of an Event Contract prior to trading.</u>

v1.6

**IV.    Electronic Trading Risk Disclosure**

Trading through the internet or other dedicated lines of communication involves many interrelated systems, including hardware, software, telephonic, cable, and power generation, all of which are subject to failure or malfunction that may adversely affect the ability to trade, place or cancel orders, and see market data. In the event that the Kalshi system becomes unavailable, for a period of time, it may not be possible to enter new orders, execute existing orders, modify or cancel orders that were previously entered, or access market data. Although Kalshi and its third party provider(s) have taken precautions to prevent such an occurrence, if the Kalshi System or one of its components suffers a catastrophic failure, orders and their priority in the order queue may be lost. Kalshi bears no responsibility or liability for any effect on the ability to trade caused by any of the foregoing. You understand that at various times trading of a particular Event Contract on Kalshi may cease due to a lack of bids or offers and, on certain specific trading dates, an Event Contract will expire pursuant to its terms even if the Kalshi System is not accessible. You freely assume these risks and hold Kalshi, the Parent Company, their affiliates and their respective directors, officers, employees, agents harmless against any such losses resulting from these risks.

**V.    Member Obligations and Consent to Jurisdiction of Kalshi**

    A.  You shall pay the fees and charges for the Services as specified from time to time on the Kalshi website ("Website"). Kalshi will post written notice of any changes to fees on the Website prior to implementing the changes.

    B.  You will be bound by, and comply with, the rules and regulations established by Kalshi applicable to the Services contained in the Kalshi rules (as supplemented or amended from time to time, the "Kalshi Rulebook"). In the event of any conflict between this Agreement and the Kalshi Rulebook, the Kalshi Rulebook will govern.

    C.  You hereby consent and are subject to the jurisdiction of Kalshi and its Terms. Upon the prior written request of Kalshi, You will promptly (within five Business Days, as defined in the Kalshi Rulebook) provide to Kalshi any such information as may be deemed necessary for its fulfillment of these Services. You hereby acknowledge and agree that You have received and read the Kalshi Rulebook.

    D.  You hereby agree and consent that Kalshi may utilize a Derivatives Clearing Organization ("DCO") of its choosing for clearing services so long as that DCO is registered by and remains in good standing with the CFTC. In the event that Kalshi determines to change from one DCO to another, You hereby agree, unless You provide affirmative notice to the Exchange otherwise and timely close your count, that You consent to the change, and You consent to the movement of Your positions and Your funds from one DCO to another.

E.  You hereby agree that You will not allow any person not identified to Kalshi to access or use these Services.

## VI.  Representations and Warranties

You hereby represent, warrant and covenant to Kalshi, and each time You enter an order, effect a transaction or otherwise use the Services, You will be deemed by such act to represent, warrant and covenant to Kalshi, that: if You are not a natural person, You are duly organized, validly existing and in good standing under the laws of Your jurisdiction of organization and each other jurisdiction in which the nature or conduct of Your business requires such qualification; if You are an individual, You are of the age of majority in Your state of residence; You have all requisite legal authority and capacity to enter into this Agreement and to use the Services on Your own behalf and to perform Your obligations as a Member; You are and will be in compliance with all material respects of the CEA, CFTC regulations and all other applicable laws, rules, regulations, judgments, orders and rulings of any governmental authority or self-regulatory organization, authority, agency, court or body, including the laws of any jurisdiction applicable to an order or transaction (collectively, "Applicable Law") (including data protection and privacy laws and laws with respect to recording messages of Member employees, including providing and obtaining required notices or consents); and You are not statutorily disqualified from acting as a Member and there is no pending, or to the best of Your knowledge threatened, any action, suit or proceeding before or by any court or other governmental, regulatory or self-regulatory body to which it is a party that seeks to affect the enforceability of this Agreement or Your ability to act as a Member.

You hereby further represent, warrant, and covenant to Kalshi that you are not domiciled in, organized in, or located in any jurisdiction in which access to, use of, or trading on the Platform is prohibited under Applicable Law or by Kalshi policy. Without limiting the foregoing, you acknowledge and agree that you are prohibited to access, use, or trade Contracts on the Platform if you are domiciled in, organized in, or located in any of the following jurisdictions (collectively, the "Restricted Jurisdictions"): Afghanistan, Algeria, Angola, Australia, Belarus, Belgium, Bolivia, Bulgaria, Burkina Faso, Cameroon, Canada, Central African Republic, Côte d'Ivoire, Cuba, Democratic Republic of the Congo, Ethiopia, France, Haiti, Hungary, Iran, Iraq, Ireland, Italy, Kenya, Laos, Lebanon, Libya, Mali, Monaco, Mozambique, Myanmar (Burma), Namibia, New Zealand, Nicaragua, Niger, North Korea, People's Republic of China, Poland, Portugal, Russia, Singapore, Somalia, South Sudan, Sudan, Switzerland, Syria, Taiwan, Thailand, Ukraine, United Arab Emirates, United Kingdom, Venezuela, Yemen, and Zimbabwe, or any jurisdiction or territory that is the subject of comprehensive country-wide, territory-wide, or regional economic sanctions imposed by the United States.

## VII.  Member Acknowledgements

You further acknowledge and agree that:

A.  You will abide by and be subject to the Kalshi Rulebook, as now existing and as hereafter duly amended from time to time, including the obligation to submit to arbitration;

B.  Your status as a Member may be limited, conditioned, restricted or terminated by Kalshi in accordance with the Kalshi Rulebook;

C.  You understand that pursuant to Rule 2.12 of the Kalshi Rulebook, Kalshi's board of directors approved Kalshi Trading LLC ("Trading"), an affiliate of Kalshi, to be a member of Kalshi. More information can be found here: https://kalshi-public-docs.s3.amazonaws.com/regulatory/notices/emergency_rule_filing_v2_2021.09.21.pdf

D.  This Agreement binds You and is enforceable against You;

E.  This Agreement may be amended unilaterally by Kalshi upon notice to You. You will be deemed to agree to each such amendment if You do not terminate this Agreement prior to the effective date of the amendment;

F.  You may fund your trading account in accordance with Kalshi's Rulebook. You have no right to a refund, cancellation, or return of the funds used to fund your trading account other than in a manner as may be described in Kalshi's Rulebook, including withdrawal of deposited or earned funds. The Service of account funding is complete, and the benefits are fully delivered and nonrefundable, upon the addition of funds to Your account on the Platform. Deposits are not subject to cancellation, refund, return, reimbursement, rollback, or any other form of reversal other than as explicitly specified in the KalshiEX Rulebook;

G.  You may place a trade on the Platform and purchase assets using the funds in your trading account. The funds used for those trades will be removed from your trading account, and You will only receive further payment(s) related to those trades upon the sale of those assets on the Platform or upon a favorable final settlement of those assets;

H.  You may fund your account by ACH transaction. By confirming your transaction, You acknowledge your consent to debit your linked account via ACH. You acknowledge the nature of ACH transactions and that ACH transactions may incur additional fees. You further agree that Kalshi, in its sole discretion, may use any means which Kalshi considers suitable to execute your ACH transfers, and that Kalshi may reject any ACH transfer request in the event of suspected fraud or other potential illicit activity. You understand that in the event of an ACH return or reversal, Kalshi may charge additional fees or temporarily restrict your account privileges. You further understand that an ACH debit transfer may be returned, reversed, or rejected for a variety of reasons, including, for example, a lack of sufficient funds or when the transaction is denied by the bank holding your external account. You agree that you are solely liable and responsible for any ACH fees that you incur for a returned, reversed, or rejected transaction;

I.  You agree that in the event of an ACH return, reversal, or rejection of a debit transfer of funds that were utilized for trading, you will, upon Kalshi's request, deposit at least the amount of the funds that were utilized for trading into your Kalshi account. You also

agree to pay Kalshi for any fees, charges, or expenses incurred by Kalshi as a direct result of the reversal of Your ACH debit transfer in any manner directed by Kalshi;

J.  You understand that within 90 days of your ACH transfer to fund your trading account, those funds may only be withdrawn to the external account from which they were debited;

K.  You will provide such other information as may be reasonably requested by Kalshi from time to time as may be necessary or desirable to verify Your qualifications as a Member;

L.  You authorize Kalshi to verify, on an initial and a periodic basis, by investigation, the statements provided to Kalshi, which may include a criminal background check, a review of Your credit report, and such other action reasonably deemed necessary by Kalshi;

M.  You authorize any governmental, regulatory or self-regulatory body, futures exchange, swap execution facility, securities exchange, national securities association, national futures association or other entity to furnish to Kalshi, upon its request, any information such entity may have concerning You, and You hereby release such entity from any and all liability of whatsoever nature by reason of furnishing such information to Kalshi;

N.  You authorize Kalshi to make available to any governmental, regulatory or self-regulatory body, futures exchange, swap execution facility, securities exchange, national securities association, national futures association, bank or other entity (upon such entity's showing of proper authority and need) any information Kalshi may have concerning You, and You hereby release Kalshi from any and all liability of whatsoever nature by reason of furnishing any such information;

O.  You hereby authorize Kalshi to deduct from its account maintained on the books and records of Kalshi all fees or other charges accruing to You;

P.  You will keep confidential all information related to Your account ("Member Account"), including but not limited to Your account number, except as necessary to perform Kalshi-related transfers;

Q.  You hereby declare that the statements in this Agreement and in any application materials provided to Kalshi are true, complete and accurate, and that You will promptly notify Kalshi in writing if any representation, warranty or covenant made herein changes or ceases to be true;

R.  You will be solely responsible, at Your own risk and expense, for acquiring, installing and maintaining all equipment, hardware and software (other than any applications, algorithms, software, interfaces or code that Kalshi may provide to You pursuant to the terms of this Agreement for purposes of accessing and utilizing the Platform), and shall ensure that any systems, facilities, servers, routers, and other equipment and software used to access and transact on the Platform are at all times protected by, and at all times

comply with, all applicable information security and firewall precautions, but at all times at a level of security not less than that prevailing in the industry;

S.  You acknowledge that failure to comply with this Agreement may, in Kalshi's sole discretion, lead to suspension of Services or termination of this Agreement;

T.  You acknowledge that Kalshi's Rulebook allows Kalshi to implement market maker programs. Kalshi believes that these programs will promote liquidity and orderliness on the Kalshi Exchange. Under the rules, market makers will make markets on Kalshi in exchange for receiving benefits. The benefits can include monetary benefits, such as discounts on fees, rebates on fees, revenue share from fees, and other monetary benefits. Market makers who receive these benefits may be able to price their quotes in ways that are materially different from other Kalshi members who are not eligible to receive these financial benefits. Market makers may also be eligible for sophisticated risk management tools, such as order protections whereby orders are canceled if the market maker's trading session disconnects from the Exchange, and may be eligible to greater throughput to the Exchange. These risk management tools enable market makers to effectively manage the risks of their market making activity, and may not be available to members who are not market makers. These tools may give market makers a trading advantage over members who are not market makers; and

U.  You further acknowledge that market makers may be required, during specific times, to maintain a maximum spread size and may be required to maintain a minimum depth within the spread. Outside of the required times, market makers are not required to, and potentially will not, maintain the maximum spread size and minimum depth. Therefore, pricing and liquidity outside of the required times may be worse than during the required times.

## VIII.    Investment of Member Funds

Except as prohibited by the regulations of the CFTC, all cash and other property in Your Member Account or otherwise held by Kalshi's Derivatives Clearing Organization on Your behalf may, from time to time, without notice to You, be invested by Kalshi consistent with Commission Regulations, including Regulations 22.2(e)(1) and 1.25.

## IX.    Submitting Suggestions

Kalshi allows Members to submit ideas, concepts, designs or inventions for contracts or any other relevant topic (collectively "Suggestions"). However, Members should not reveal to Kalshi any Suggestions for which a Member wants to receive any compensation or credit. By submitting Suggestions to Kalshi, You expressly agree to give up any and all rights You may have to such Suggestions and You agree to transfer to Kalshi all of Your rights pertaining to such Suggestions. By submitting any Suggestions to Kalshi, You expressly authorize Kalshi to use and benefit from the Suggestions as Kalshi may decide. Kalshi will not provide You with any compensation or credit for any Suggestions You submit, unless otherwise announced by Kalshi.

By submitting Suggestions to Kalshi, You give up all control You might otherwise have concerning such Suggestions.

## X.    Indemnity

You hereby agree to indemnify and hold harmless Kalshi and its directors, officers, employees, members, affiliates and agents (each, a "Related Party") from and against all expenses and costs and damages (including any legal fees and customary expenses), directly and actually incurred by Kalshi (including consequential damages awarded to the third party) as a result of third-party claims resulting from, in connection with, or arising out of Your use of the Services or Your activities or arising out of or relating to this Agreement, including any failure by You, for any reason, fraudulent, negligent, or otherwise, to comply with Your obligations and requirements set forth in this Agreement, or any failure to comply with the agreements, representations or covenants contained in this Agreement. Within 10 Business Days after Kalshi receives written notice of a claim that Kalshi reasonably believes falls within the scope of this paragraph, Kalshi will provide You with written notice of such claim; provided, however, that failure to provide such notice will not relieve You of its indemnity obligations hereunder except to the extent You are materially prejudiced thereby and will not be responsible for those expenses, costs and damages that Kalshi incurs solely as a result of any such delay. Your indemnity obligation will not apply to the extent there has been a final determination (including exhaustion of any appeals) by a court or arbitrator of competent jurisdiction that the expense, cost or damage arose from Kalshi's gross negligence, fraud or willful misconduct.

## XI.    Limitations on Liability

YOU ACKNOWLEDGE AND AGREE THAT IN NO EVENT SHALL KALSHI, ITS AFFILIATES, SUBSIDIARIES, SUPPLIERS, AND LICENSORS OR ANY OF THE OFFICERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES, STOCKHOLDERS, OR OWNERS OF ANY OF THE FOREGOING BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES, SPECIAL DAMAGES, TRADING LOSSES, LOSS OF ANTICIPATED PROFITS OR GAIN RELATING IN ANY WAY TO TRADING, INCLUDING LOSS OF ANY TRADING INCENTIVE OR BONUS, LOSS BY REASON OF SHUTDOWN IN OPERATION OR FOR INCREASED EXPENSES OF OPERATION, SPECIAL PUNITIVE DAMAGES, INCIDENTAL LOSS, LOST PROFITS, LOSS OF OPPORTUNITY, OR INDIRECT DAMAGES, ARISING FROM ANY CAUSE WHATSOEVER, INCLUDING CAUSES RELATED TO OR ARISING FROM YOUR USE OF THE PLATFORM, EVEN IN THE EVENT KALSHI OR ANY OF THE FOREGOING PERSONS OR ENTITIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH CLAIMS, AND REGARDLESS OF THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT, OR OTHERWISE) UPON WHICH SUCH CLAIM IS BASED. YOU AGREE THAT THESE LIMITATIONS WILL SURVIVE AND APPLY EVEN IN THE EVENT ANY LIMITED REMEDY IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

WITHOUT LIMITATION OF THE FOREGOING, KALSHI'S AGGREGATE MAXIMUM LIABILITY RELATED TO OR ASSOCIATED WITH YOUR USE OF THE PLATFORM SHALL IN NO EVENT EXCEED THE LESSER OF (1) THE PURCHASE PRICE OF ANY

OF YOUR ASSETS PURCHASED VIA THE PLATFORM ASSOCIATED WITH THE CLAIM; OR (2) THE TOTAL FUNDS YOU HAVE DEPOSITED TO THE PLATFORM PRIOR TO MAKING A CLAIM.

## XII.    Data Use Consent

You hereby grant Kalshi a worldwide, perpetual, irrevocable, royalty-free, full sublicensable and freely assignable license to store, use, copy, display, disseminate and create derivative works from: (i) the price and quantity data for each transaction entered into by You that is executed via the Services and (ii) each bid, offer and/or order provided via the Services by You. You acknowledge and agree that Kalshi may use such information for business, marketing and other purposes.

## XIII.    Termination

Subject to Applicable Law and the Kalshi Rulebook, Kalshi or You may terminate this Agreement by giving the other prior written notice. Termination of this Agreement will not affect liability accrued as of termination. Paragraph IX will survive termination of this Agreement and continue in full force and effect.

## XIV.    No Warranty

YOU UNDERSTAND THAT KALSHI, ITS AFFILIATES, AND ITS SOFTWARE, HARDWARE, AND SERVICE PROVIDERS PROVIDE THE KALSHI PLATFORM "AS IS" AND WITHOUT ANY WARRANTY OR CONDITION, EXPRESS, IMPLIED OR STATUTORY. KALSHI, ITS AFFILIATES AND ITS SOFTWARE, HARDWARE AND SERVICE PROVIDERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTY OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.

## XV.    Complete Agreement

This Agreement constitutes the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereunder) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

## XVI.    Severability

In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal

or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

## XVII.    Counterparts

This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other customary means of electronic transmission, including by PDF file, shall be as effective as delivery of an original signed counterpart of this Agreement.

## XVIII.    Assignment

You may not assign this Agreement, in whole or in part, without the prior written consent of Kalshi.

## XIX.    USA PATRIOT Act Notice

Kalshi hereby notifies You that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies You, which information includes Your name and address and other information that will allow Kalshi to identify You in accordance with the USA PATRIOT Act.

## XX.    Governing Law

This Agreement will be governed by the laws of the State of New York. Any dispute between Kalshi and You arising from or in connection with this Agreement will be settled in accordance with the procedures set forth in the Kalshi Rulebook.

**BY CLICKING THE BUTTON TO CONTINUE PAST THIS AGREEMENT YOU HEREBY AGREE TO THE TERMS OF THIS AGREEMENT AND EXPRESSLY ACKNOWLEDGE THAT YOU HAVE RECEIVED, READ AND UNDERSTOOD ALL DOCUMENTS INCORPORATED HEREIN BY REFERENCE.**

Derek Brown
Utah Attorney General
Joshua B. Cutler (16434)
Mark C. Gillespie (19265)
Assistant Solicitors General
Office of the Utah Attorney General
P.O. Box 140858
Salt Lake City, Utah 84114-0858
Telephone: (801) 366-0533
jbcutler@agutah.gov
markgillespie@agutah.gov

*Counsel for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KALSHIEX LLC;<br><br>*Plaintiff,*<br><br>v.<br><br>SPENCER J. COX, in his official capacity as Governor of Utah; DEREK BROWN, in his official capacity as Attorney General of Utah; DANIEL BURTON, in his official capacity as Chief Deputy Attorney General and General Counsel of Utah; STEWART YOUNG in his official capacity as Criminal Deputy Attorney General of Utah; and DOUGLAS CRAPO in his official capacity as Public Protection Attorney General of Utah.<br><br>*Defendants.* | **DECLARATION OF JOSHUA CUTLER**<br><br>Case No. 2:26-cv-00151-RJS-CMR<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

I, Joshua Cutler, am older than 18-years of age and have personal knowledge of the facts set forth herein.

1

1.      Exhibit A to the Reply in Support of the Motion to Dismiss or Alternatively Motion for Summary Judgment is a true and accurate copy of a Kalshi Membership Agreement that I obtained from Kalshi's official website.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

At Salt Lake City, Utah, this 29th day of May, 2026.


　　　　　　　　　　　　　　 _/s/ Joshua Cutler_____
　　　　　　　　　　　　　　 Joshua Cutler