IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KALSHIEX LLC,<br><br>          Plaintiff,<br><br>v.<br><br>SPENCER J. COX, in his official capacity as Governor of Utah; DEREK BROWN, in his official capacity as Attorney General of Utah; DANIEL BURTON, in his official capacity as Chief Deputy Attorney General and General Counsel of Utah; STEWART YOUNG, in his official capacity as Criminal Deputy Attorney General of Utah; and DOUGLAS CRAPO, in his official capacity as Public Protection Attorney General of Utah,<br><br>          Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:26-cv-00151-RJS-CMR<br><br>District Judge Robert J. Shelby<br><br>Chief Magistrate Cecilia M. Romero |

Online prediction platforms have in recent years begun using a financial trading tool to facilitate trading on the outcome of sporting events.[1] States around the country have challenged this practice as a form of sports betting prohibited by various State gambling laws.[2] Plaintiff

---

[1] *See KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 224–25 (3d. Cir. 2026); *see also KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026).

[2] *See e.g.*, *Flaherty*, 172 F.4th at 224–25; *Schuler*, 2026 WL 1295806 at *1; *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025); *KalsiEX LLC v. Martin*; 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026); *Ky. Gambling Recovery LLC v. Kalshi Inc.*, No. 3:25-cv-00054-GFVT, 2026 WL 596107 (E.D. Ky. Mar. 4, 2026); *KalshiEX LLC v. Johnson*, No. CV-26-01715-PHX-MTL, 2026 WL 1223373 (D. Ariz. May 5, 2026); *Ohio Gambling Recovery, LLC v. Kalshi Inc.*, No. 4:25-CV-1573, 2026 WL 865788 (N.D. Ohio Mar. 30, 2026); *Ill. Gambling Recovery, LLC v. Kalshi Inc.*, No 25-CV-11374, 2026 WL 1164703 (N.D. Ill. Apr. 29, 2026); *Ga. Gambling Recovery LLC v. Kalshi, Inc.*, No. 4:25-cv-310-CDL, 2026 WL 279375 (M.D. Ga. Feb. 3, 2026); *Washington v. KalshiEX, LLC*, No. C26-1062-JCC, 2026 WL 1217743 (W.D. Wash. May 5, 2026); *KalshiEX v. Williams*, 25 Civ. 8846 (AT), 2026 WL 2017466 (S.D.N.Y. Jul. 13, 2026).

Kalshi LLC preemptively seeks a declaration that Utah may not enforce its anti-gambling laws against it.[3]  Now pending before the court are two motions on this issue: a motion for a preliminary injunction[4] and a motion for summary judgment.[5]  As explained below, the court concludes the federal law relied upon by Kalshi does not preempt Utah's ability to enforce its anti-gambling laws.  Defendants are entitled to summary judgment on Kalshi's claim.  Kalshi's motion for a preliminary injunction is denied.

## BACKGROUND

### A.  The Commodity Exchange Act

In 1936, Congress passed the Commodity Exchange Act (CEA) "to regulate futures contracts in agricultural commodities."[6]  Futures contracts enable parties to allocate financial risk.  For example, farmers allocate risk to account for fluctuations in market prices for crops.[7]  Futures contracts are "derivatives"—"a financial contract whose value is derived from the performance of underlying market factors."[8]  Although futures contracts began in the agricultural sector, the CEA has expanded derivative trading to many types of commodities.[9]

In 1974, Congress passed the Commodity Futures Trading Commission Act (CFTCA).[10]

---

[3] Dkt. 1, *Complaint.*

[4] Dkt. 29, *Plaintiff's Renewed Motion and Memorandum of Law in Support of a Preliminary Injunction* (*Motion for Preliminary Injunction*).

[5] Dkt. 34, *Defendants' Motion to Dismiss or Alternatively Motion for Summary Judgment* (*Motion for Summary Judgment*).

[6] *Schuler*, 2026 WL 1295806, at *1.

[7] *Id*.

[8] *Derivatives*, Office of the Comptroller of the Currency, https://occ.gov/topics/supervision-and-examination/capital-markets/financial-markets/derivatives/index-derivatives.html [https://perma.cc/6JR9-BZXL].

[9] *Schuler*, 2026 WL 1295806, at *1.

[10] *Flaherty*, 172 F.4th at 226; *see also* Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 (1974).

The CFTCA established the Commodity Futures Trading Commission (CFTC) to oversee and regulate derivative markets under the CEA.[11]  Section 5 of the CEA states the purposes of the Act: (1) "to serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [CFTC]"; (2) "deter and prevent price manipulation or any other disruptions to market integrity"; (3) "ensure the financial integrity of all transactions subject to the [CEA] and [avoid systemic risk]"; (4) "protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets"; and (5) "promote responsible innovation and fair competition among boards of trade, other markets and market participants."[12]

The CEA definition of "commodity" includes common agricultural products, both consumable and non-consumable, and "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in."[13]  However, under the CFTCA, the CFTC lacked the authority to regulate "swaps"—a financial tool "that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."[14]  "Contrary to futures and traditional options, which contemplate delivery of or a performance related to a commodity at some future time, swaps are pure financial instruments based on the difference between two fluctuating values."[15]

---

[11] *Schuler*, 2026 WL 1295806, at *1.

[12] 7 U.S.C. § 5(b).

[13] *Id*. § 1a(9).

[14] *Id.* § 1a(47)(A)(ii).

[15] *United States v. Phillips*, 155 F.4th 102, 112 (2d. Cir. 2025) (citation modified).

Swaps include "event contracts"—contracts "for which the 'payoff is based on a specified event, occurrence, or value'" that enable businesses and individuals "to hedge against economic risk."[16]  Generally, the return on event contracts turns on the outcome of an event, for example, whether a crop is destroyed by a storm or an earthquake occurs in a certain city on a certain date.[17]  Swaps are bought, sold, and traded on federally regulated exchanges known as "Designated Contract Markets" (DCMs).[18]

Trading in swaps greatly expanded in the early 2000s and is believed to be a causal factor of the 2008 financial crisis.[19]  In response to this crisis, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Dodd-Frank Act) which, among other things, expanded the CEA's authority to regulate swaps.[20]  Significant here, under 7 U.S.C. § 2, the CEA provides "[t]he [CFTC] shall have exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a [DCM]."[21]  Section 2 further provides that the CFTC's jurisdiction does not "supersede or limit the jurisdiction" of the Securities and Exchange Commission (SEC) from "carrying out [its] duties and responsibilities," or "supersede or limit the jurisdiction conferred on courts of the United States or any State."[22]  This latter provision of § 2 is often referred to as "the savings clause."[23]

---

[16] *KalshiEX LLC v. Commodity Futures Trading Commission (CFTC)*, 119 F.4th 58, 61 (D.C. Cir. 2024) (quoting CFTC, *Contracts & Products: Event Contracts* [https://perma.cc/4FPT-L2SN]).

[17] *See id.*; *Flaherty*, 172 F.4th at 224.

[18] *CFTC*, 119 F.4th at 61; *see also Flaherty*, 172 F.4th at 224; *Schuler*, 2026 WL 1295806, at *2.

[19] *Phillips*, 155 F.4th at 113 (explaining Congress drafted a "broad" definition of swap because swaps "were considered a driving factor in the 2008 financial crisis").

[20] *Schuler*, 2026 WL 1295806, at *1; *see also* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).

[21] 7 U.S.C. § 2(a)(1)(A); *see also id.* § 7.

[22] *Id.*

[23] *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1155 (7th Cir. 1992).

The CEA also specifies that 7 U.S.C. § 16(e)(2) applies to swaps.[24]  Section 16(e)(2) sets out the relationship between the CEA and "other law, departments, or agencies," and states:

> This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—
>
> (A) an electronic trading facility excluded under section 2(e) of this title; and
>
> (B) an agreement, contract, or transaction that is excluded from this chapter under [sections governing transactions in foreign currency and government securities, hybrid instruments, or banking products] or exempted under [the section governing public interest exemptions] (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).[25]

In other words, § 16(e)(2) provides the CEA preempts only State gaming laws that govern certain swaps that occur off DCMs[26] and other designated swaps[27] not applicable here.

The CEA allows for DCMs to self-certify to the CFTC that its contracts comply with the CEA.[28]  It also contains a "Special Rule" that authorizes the CFTC to review and prohibit certain

---

[24] 7 U.S.C. § 2(d).

[25] *Id*. § 16(e)(2).

[26] *Id.* § 16(e)(2)(A) (preempting State gaming laws that govern "electronic trading facilit[ies] excluded under section 2(e) of [the CEA]"); *id.* § 2(e) (stating only an "eligible contract participant" may enter into swaps on markets that are not DCMs); *id.* § 1a(18) (defining "eligible contract participant" as (1) any of the following acting on their own account: (a) financial institutions, (b) State- or foreign-regulated insurance companies, (c) regulated investment companies, (d) certain designated commodity pools and businesses, (e) governmental entities, (f) brokers regulated by the SEC, (g) investment bank holding companies, (h) regulated futures commission merchants; (2) investment advisors subject to the Investment Advisers Act and commodity trading advisors; and (3) "any other person that the [CFTC] determines to be eligible in light of the financial or other qualifications of the person").

[27] *See id.* § 16(e)(2)(B) (preempting a swap that is "excluded under [the CEA] under section 2(e) or 2(f) of [the CEA] or sections 27 to 27f of [the CEA] or exempted under section 6(c) of [the CEA]"); *id.* § 2(c) (governing agreements, contracts, and transactions in foreign currency, government securities, and certain other commodities); *id.* § 2(f) (providing exclusion for qualifying hybrid instruments); *id.* § 6(c) (providing the CFTC may exempt swaps that are in the public interest).

[28] *Flaherty*, 172 F.4th at 226 ("Once designated, a DCM does not need pre-approval before listing contracts, although it must self-certify compliance with the applicable laws and regulations."); 7 U.S.C. § 7a-2(c) ("A registered entity may elect to list for trading . . . any new contract . . . by providing to the [CFTC] . . . a written certification that the new contract . . . complies with this chapter (including regulations under this chapter.")).

event contracts if it determines the transaction involves gaming or an activity that is unlawful under State law.[29]

### B. Utah Law

Utah's criminal code includes a chapter governing gambling.[30]  Utah's code defines gambling as

> risking anything of value for a return or risking anything of value upon the outcome of a contest, game, gaming scheme, or gaming device when the return or outcome:
>
> > (i)  is based on an element of chance, regardless of:
> >
> > > (A)  the existence of a preview or pre-reveal feature in the device, contest, or game; or
> > >
> > > (B)  whether the preview or pre-reveal feature . . . allows users to see individual or successive outcomes; and
> >
> > (ii) is in accord with an agreement or understanding that someone will receive anything of value in the event of a certain outcome.[31]

Under Utah law, gambling includes lotteries and "proposition bets"—bets "on individual action, statistic, occurrence, or non-occurrence."[32]  But "lawful business transactions" are not in the gambling ambit.[33]

Any individual or entity that "intentionally provides or offers to provide a form of online gambling" to anyone in the state of Utah is guilty of a third-degree felony,[34] and an entity that "induces or aids another individual to engage in gambling" and "derives, or intends to derive, an

---

[29] *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

[30] Utah Code §§ 76-9-1401 *et seq.*

[31] *Id.* § 76-9-1401(8)(a).

[32] *Id.* § 76-9-1401(8)(b)(ii), (17).

[33] *Id.* § 76-9-1401(8)(c)(i).

[34] *Id.* § 76-9-1404(2)–(3).

economic benefit other than personal winnings from gambling" is subject to an enhanceable class A misdemeanor.[35]

### C. Kalshi

Kalshi is a DCM that offers event contracts.[36]  In January 2025, Kalshi began offering event contracts on the outcome of sports events.[37]  For example, Kalshi offers event contracts involving the "greatest seeding upset margin" in a sporting competition,[38] which sports team will have the longest losing streak in a season,[39] whether a certain team will win a sporting event by a particular margin,[40] whether a specific team or player will score a designated touchdown within a certain time period of a specified game,[41] and who will sing at the Super Bowl.[42]  At oral argument, the court asked Kalshi whether there is any limiting principle on the type of event or occurrence that could be designated as an event contract; for example, could the sale of a vehicle between private parties or the outcome of an abduction be designated as an event contract?[43] Kalshi responded only that it would not offer such a contract and did not identify any restraints other than the CFTC's ability to define swaps and review derivative contracts.[44]

---

[35] *Id.* § 76-9-1405(2)–(3).

[36] *Motion for Preliminary Injunction* at 3, 7; *Motion for Summary Judgment* ¶¶ 1–2; *id.* at 58–60 (*Order of Designation*).

[37] *Flaherty*, 172 F.4th at 224; Dkt. 29-1, *Declaration of Xavier Sottile* (*Sottile Declaration*), ¶ 7 (stating Kalshi responded to a "demonstration of compliance for two sports-event contracts" the CFTC requested in January 2025).

[38] *Motion for Summary Judgment* at 65–76.

[39] *Id.* at 78–89.

[40] *Id.* at 90–100.

[41] *Id.* at 143–54.

[42] *Id.* at 155–62.

[43] Dkt. 60, *Minute Entry*; *Transcript* at 74:2– 97:23.

[44] *Minute Entry*; *Transcript* at 74:2– 97:23.

In February 2026, the current CFTC Chairman made an announcement on X[45] that the CFTC intended to defend its jurisdiction over derivative markets.[46]  In response, Defendant Utah Governor Spencer J. Cox posted the following:

> I don't remember the CFTC having authority over the "derivative market" of LeBron James rebounds.  These prediction markets you are breathlessly defending are gambling—pure and simple.  They are destroying the lives of families and countless Americans, especially young men.  They have no place in Utah.
>
> Let me be clear, I will use every resource within my disposal as governor of the sovereign state of Utah, and under the Constitution of the United States to beat you in court.[47]

Two days later, Governor Cox posted the following: "Rebranding betting as a financial product doesn't reduce the harm it causes . . . .  We're ready to defend our laws in court and protect Utahns from companies that drive addiction, isolation, and serious financial harm."[48]

## PROCEDURAL HISTORY

Concerned that Utah intends to bring a criminal enforcement action against it to prohibit it from offering sporting event contracts, Kalshi filed the Complaint on February 23, 2026.[49] Kalshi asserts one claim seeking declaratory judgment that, under the Supremacy Clause of the U.S. Constitution, the CEA preempts any Utah law that "effectively regulates" Kalshi's DCM.[50] On April 24, 2026, Kalshi filed a motion for a preliminary injunction and temporary restraining

---

[45] Formerly known as "Twitter."

[46] Dkt. 29-2, *Declaration of Karen Wong* (*Wong Declaration*) ¶¶ 2–5; *id*., *Exhibit 4*.

[47] *Id*., *Exhibit 1*.

[48] *Id*., *Exhibit 2*.

[49] *Sottile Declaration* ¶¶ 11–17; *Complaint*.

[50] *Complaint* at 25–27.

order.[51]  On May 1, 2026, Defendants filed a motion to dismiss or, in the alternative, a motion for summary judgment.[52]  Additionally, 23 federally-recognized Indian tribes and Indian gaming associations moved for leave to file an amicus curiae brief.[53]  All motions are fully briefed, and the court heard oral argument on June 25, 2026.[54]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[55]  A defendant may move under Rule 12(b)(6) to dismiss a complaint for failure to meet this standard.[56]  When considering a motion to dismiss, the court is generally limited to considering only the allegations in the complaint.[57]  If "matters outside the pleadings are presented and not excluded by the court" on a Rule 12(b)(6) motion, "the motion must be treated as one for summary judgment."[58]

When converting a motion to dismiss to a motion for summary judgment, the parties must be given adequate notice and a reasonable opportunity to provide all pertinent materials to

---

[51] *Motion for Preliminary Injunction*.  This Motion renews a previous motion for a preliminary injunction or restraining order Kalshi subsequently withdrew after the parties agreed Defendants would refrain from enforcing Utah's anti-gambling laws against Kalshi for a period of time.  *See* Dkt. 9, *Plaintiff's Motion and Memorandum of Law in Support of a Preliminary Injunction and Temporary Restraining Order*; Dkt. 28, *Stipulated Motion to Lift Stay and for Expedited Briefing and Oral Argument Schedule* at 2.

[52] *Motion for Summary Judgment*.

[53] Dkt. 42, *Motion for Leave to File Brief as Amici Curiae in Support of Defendants* (*Motion to File Amici Curiae Brief*).

[54] *Motion for Preliminary Injunction*; *Motion for Summary Judgment*; Dkt. 54, *Plaintiff's Reply in Support of a Temporary Restraining Order and Preliminary Injunction and Opposition to Defendants' Motion to Dismiss* (*Motion for Summary Judgment Opposition*); Dkt. 55, *Defendants' Reply in Support of Motion to Dismiss or Alternatively Motion for Summary Judgment* (*Motion for Summary Judgment Reply*); Dkt. 60, *Minute Entry*.

[55] Fed. R. Civ. P. 8(a)(2).

[56] *Id.* 12(b)(6).

[57] *See Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) (citation modified) (stating under the "usual rule," the "court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss").

[58] Fed. R. Civ. P. 12(d).

the court.[59]  This standard is met here.  Defendants titled their Motion as a "motion to dismiss or alternatively motion for summary judgment"[60] and the court considered matters outside of the pleadings presented by both parties.[61]  Additionally, oral argument focused on the merits of Kalshi's claim, not the sufficiency of the Complaint.[62]  Accordingly, the court considers the Defendants' Motion as a motion for summary judgment.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" such that the moving party is "entitled to judgment as a matter of law."[63]  When a party submits a properly supported motion for summary judgment, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."[64]  Summary judgment is appropriate when the nonmoving party fails to make a sufficient showing on an essential element of his or her prima facie case for which he or she has the burden of proof.[65]  In ruling on a motion for summary judgment, courts "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[66]

---

[59] *Id.*; *Bldg. & Constr. Dep't v. Rockwell Intern. Corp.*, 7 F.3d 1487, 1495–96 (10th Cir. 1993) (stating the opposing party must be given ten days notice prior to a hearing on the motion).

[60] *Motion for Summary Judgment*; *Carter v. Plyer*, 115 Fed. App'x 532, 536 (3d. Cir. 2004) ("[M]otions for summary judgment that are presented to the court as motions in the alternative constitute sufficient notice to a non-moving party that the court may convert a motion to dismiss into a motion for summary judgment.").

[61] *See Motion for Preliminary Injunction* (including attached exhibits); *Motion for Summary Judgment* (including attached exhibits); *Motion for Summary Judgment Opposition* (including an attached exhibit).

[62] *See Minute Entry*; *Transcript*.

[63] Fed. R. Civ. P. 56(a).

[64] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation and quotation marks omitted).

[65] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ); *see also Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012).

[66] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

The Supremacy Clause of the U.S. Constitution provides that the Constitution and any federal law enacted pursuant thereto "shall be the supreme Law of the Land."[67]  State statutes are presumed to be constitutional,[68] but federal law may preempt them.[69]  "[T]he scope of a statute's pre-emptive effect is guided by the rule that 'the purpose of Congress is the ultimate touchstone' in every pre-emption case."[70]  Courts assume "'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"[71]  This is especially true in "area[s] traditionally occupied by the States."[72]  "Matters left unaddressed in [a federal statutory] scheme are presumably left subject to the disposition provided by state law."[73]

Preemption may be express or implied.[74]  Implied preemption takes two forms: (1) field preemption, and (2) conflict preemption.[75]  Plaintiff contends both express and implied

---

[67] U.S. CONST. art. VI, cl. 2; *see also Arizona v. United States*, 567 U.S. 387, 399 (2012) ("The Supremacy Clause provides a clear rule that federal law shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.") (citation modified).

[68] *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. . . .  We start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.") (citation modified).  At oral argument, Kalshi argued *Medtronic* has been superseded by a more recent Supreme Court case and the presumption against preemption does not apply for express preemption.  *Transcript* at 63:6–65:15 (citing *Commonwealth of Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016)).  But *Franklin* is not in tension with *Medtronic* because an express preemption provision is a "clear and manifest" expression of Congress' purpose.  *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 613 (2011) (J. Breyer, dissenting) ("Ordinarily, an express pre-emption provision in a federal statute indicates a particular congressional intent in preventing States from enacting laws that might interfere with Congress' statutory objectives." (citing *Int'l Paper Co. v. Ouelette*, 479 U.S. 481, 494 (1987) (emphasis omitted)).

[69] *See Kidneigh v. UNUM Life Ins. Co. of Am.*, 345 F.3d 1182, 1185 (10th Cir. 2003).

[70] *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Medtronic*, 518 U.S. at 485).

[71] *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

[72] *Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1204 (10th Cir. 2009).

[73] *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 85 (1994).

[74] *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010) ("Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." (quoting *Altria*, 555 U.S. 70 at 76)).

[75] *Id.*

11

preemption apply here.[76]  The court first addresses express preemption and then turns to implied preemption.[77]  As explained below, the court concludes the CEA does not preempt Utah's anti-gambling laws under either theory.

### I.        Express Preemption

State laws are expressly preempted when they "fall[] within the scope of a federal preemption provision."[78]  In determining whether Congress explicitly preempted state law, the "ordinary principles of statutory interpretation" apply.[79]  The court primarily discerns congressional intent from "the plain language of the federal statute"[80] and the "'statutory framework' surrounding it."[81]  "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'"[82]  Additionally, the scope of preemption is narrowly construed "'when Congress has legislated in a field traditionally occupied by the States.'"[83]

Kalshi argues the CEA's jurisdiction provision expressly preempts any application of Utah's anti-gambling laws as they relate to DCMs.[84]  Specifically, it points to 7 U.S.C.

---

[76] *Motion for Preliminary Injunction* at 19–33; *Motion for Summary Judgment Opposition* at 14–33.

[77] *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 867 (2000) (analyzing express preemption and then implied preemption); *see also Day v. SkyWest Airlines*, 45 F.4th 1181, 1184 (10th Cir. 2022) ("Express preemption applies when Congress defines explicitly the extent to which its enactments pre-empt state law.") (citation modified).

[78] *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010) (citation omitted).

[79] *Id.*

[80] *Id.*; *see also Medtronic*, 518 U.S. at 486.

[81] *Medtronic*, 518 U.S. at 486 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111–12 (1992)).

[82] *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014) (quoting *Altria Grp.*, 555 U.S. at 77)).

[83] *Id.*

[84] *Motion for Preliminary Injunction* at 19–26; *Motion for Summary Judgment Opposition* at 14–18.

§ 2(a)(1)(A) that provides the CFTC has "exclusive jurisdiction" for swaps traded or executed on DCMs.[85]

Defendants contend Kalshi reads the jurisdiction provision too broadly, and Kalshi's interpretation is inconsistent with other CEA provisions and leads to absurd results.[86]  The court agrees with Defendants: § 2(a)(1)(A) does not expressly preempt Utah's enforcement of its anti-gambling laws.

While the CEA jurisdiction provision gives the CFTC exclusive jurisdiction over swaps traded on DCMs, the statute also curtails the CFTC's authority.  Specifically, § 2(a)(1)(A) states the CFTC does not supersede or limit the SEC's regulatory authority, nor does it "supersede or limit the jurisdiction conferred on courts of the United States or any State."[87]  On its face, this language strongly signals there is room for State regulation as it relates to the province of the CEA.

Section 2(a)(1)(A) must also be interpreted in "context and with a view to [its] place in the overall statutory scheme."[88]  "Congress' enactment of the Special Rule in 7 U.S.C. § 7a-2(c) demonstrates its intent that some state law and regulation should operate in tandem with the CEA."[89]  The CEA also includes a section that applies to swaps[90] and outlines the CFTC's

---

[85] 7 U.S.C. § 2(a)(1)(A).

[86] *Motion for Summary Judgment* at 20–54; *Reply* at 7–16.

[87] 7 U.S.C. § 2(a)(1)(A).

[88] *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1291 (10th Cir. 2024) ("Tools of statutory interpretation include examination of the statute's text, structure, purpose, history, and relationship to other statutes." (citation modified)).

[89] *Williams*, 2026 WL 2017466, at *7; *see also* 7 U.S.C. § 7a-2(c)(5)(C) (providing the CFTC may determine an event contract is contrary to the public interest if it involves "activity that is unlawful under any Federal or *State law*" (emphasis added)).

[90] 7 U.S.C. § 2(d) (including § 16(e)(2) in the CEA statutes that govern or apply to swaps).

"[r]elation to other law, departments, [and] agencies."[91]  Section 16(e)(2) provides the CEA

"supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates

gaming or the operation of bucket shops (other than antifraud provisions of general applicability)

*in the case of*" (1) certain swaps that occur off DCMs;[92] and (2) contracts or transactions

involving foreign currency, government securities, qualifying hybrid instruments, and certain

banking products.[93]  The language "in the case of" narrows the CFTC's preemption power.[94]

When transactions fall within these enumerated categories, State law is preempted by the CEA.

But when a transaction falls outside of the categories, which is the case here, preemption does

not apply.

Kalshi argues § 16(e)(2) is not applicable to its sporting event contracts because it

pertains only to off-DCM transactions.[95]  Kalshi contends Congress added § 16(e)(2) because

"§ 2(a)(1)(A)'s preemptive effect extended only to on-exchange transactions" and "additional

legislation was needed to preempt certain off-exchange transactions."[96]  But § 16(e)(2) does not

---

[91] *Id.* § 16(e).

[92] *Id.* § 16(e)(2)(A) (preempting State gaming laws that govern "electronic trading facilit[ies] excluded under section 2(e) of [the CEA]"); *id.* § 2(e) (stating only an "eligible contract participant" may enter into swaps on markets that are not DCMs); *id.* § 1a(18) (defining "eligible contract participant" as (1) any of the following acting on their own account: (a) financial institutions, (b) State- or foreign-regulated insurance companies, (c) regulated investment companies, (d) certain designated commodity pools and businesses, (e) governmental entities, (f) brokers regulated by the Securities Exchange Act, (g) investment bank holding companies, (h) regulated futures commission merchants; (2) investment advisors subject to the Investment Advisers Act and commodity trading advisors; and (3) "any other person that the [CFTC] determines to be eligible in light of the financial or other qualifications of the person").

[93] 7 U.S.C. 16(e)(2) (emphasis added); *Id.* § 2(c) (governing agreements, contracts, and transactions in foreign currency, government securities, and certain other commodities); 7 U.S.C. § 2(f) (providing exclusion for qualifying hybrid instruments); *Id.* §§ 27–27(f) (excluding certain banking products).

[94] *See In the Case of Someone/Something*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/in-the-case-of (last visited Jul. 16, 2026).

[95] *Motion for Summary Judgment Opposition* at 17.

[96] *Id.*

include language confining its applicability to off-DCM swaps.[97]  Had Congress wanted to confine its application, "Congress knew how to do so."[98]  It did not.  Indeed, the CEA jurisdiction provision itself states § 16(e)(2) applies to swaps generally.[99]  Section 16(e)(2) then limits preemption to State gaming laws that govern certain swaps by that occur off DCMs[100] and other designated swaps[101] that do not include sporting event swaps.  Because § 16(e)(2) confines preemption to only certain swaps not applicable here, the CEA does not preempt State gaming laws that occur on DCMs like Kalshi.

At minimum, there is "more than one plausible reading" of the CEA's jurisdictional provisions, and "courts ordinarily accept the reading that disfavors pre-emption."[102]  Accordingly, the court concludes the CEA does not expressly preempt the enforcement of Utah's anti-gambling laws.

---

[97] *See* 7 U.S.C. § 16(e)(2).

[98] *Pugin v. Garland*, 599 U.S. 600, 608 (2023); *see also Pulsifer v. United States*, 601 U.S. 124, 174 (2024) (J. Gorsuch, dissenting) ("Congress is a careful drafter and each word it chooses 'is there for a reason.'" (quoting *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017)).

[99] 7 U.S.C. § 2(d) (stating § 16(e)(2) "governs or applies to a swap").

[100] *Id.* § 16(e)(2)(A) (preempting State gaming laws that govern "electronic trading facilit[ies] excluded under section 2(e) of [the CEA]"); *id.* § 2(e) (stating only an "eligible contract participant[s]" may enter into swaps on markets that are not DCMs); *id.* § 1a(18) (defining "eligible contract participant" as (1) any of the following acting on their own account: (a) financial institutions, (b) State- or foreign-regulated insurance companies, (c) regulated investment companies, (d) certain designated commodity pools and businesses, (e) governmental entities, (f) brokers regulated by the Securities Exchange Act, (g) investment bank holding companies, (h) regulated futures commission merchants; (2) investment advisors subject to the Investment Advisers Act and commodity trading advisors; and (3) "any other person that the [CFTC] determines to be eligible in light of the financial or other qualifications of the person").

[101] *See id.* § 16(e)(2)(B) (preempting a swap that is "excluded under [the CEA] under section 2(e) or 2(f) of [the CEA] or sections 27 to 27f of [the CEA],or exempted under section 6(c) of [the CEA]"); *id.* § 2(c) (governing agreements, contracts, and transactions in foreign currency, government securities, and certain other commodities); *id.* § 2(f) (providing exclusion for qualifying hybrid instruments); *id.* § 6(c) (providing the CFTC may exempt swaps that are in the public interest).

[102] *Waldburger*, 573 U.S. at 19 (internal quotation marks and citation omitted); *see also Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1030 (10th Cir. 2022) (J. Lucero, dissenting) ("[W]hen express preemption language is susceptible to equally 'plausible alternative reading[s],' we 'have a duty to accept the reading that disfavors pre-emption." (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005))).

## II.    Implied Preemption

Even if not expressly preempted, federal law may still preempt a State law by implication.  Where there is no express preemption, there is a strong presumption against preemption in "a field traditionally occupied by the States."[103]  And Congress has stated, "States should have the primary responsibility for determining what forms of gambling may legally take place within their borders."[104]  Even so, State law may still be preempted by implication if (1) "federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it,'"[105] or (2) the state law "actually conflicts with federal law."[106]  The court addresses both forms of implied preemption in turn.

### A.  Field Preemption

Field preemption occurs when Congress determines a field "must be regulated by its exclusive governance."[107]  Field preemption is rare.[108]  Under this theory, State law is preempted if the "framework of regulation is so pervasive that Congress left no room for the States to supplement it."[109]  The court may infer field preemption "where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"[110]

---

[103] *Altria Grp.*, 555 U.S. at 77 (citation omitted).

[104] 15 U.S.C. § 3001(a)(1).

[105] *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982)).

[106] *Id.* (citation omitted).

[107] *Arizona*, 567 U.S. at 399 (citation omitted).

[108] *See Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (stating the Supreme Court has found field preemption "[i]n rare cases").

[109] *Arizona*, 567 U.S. at 399 (citation modified).

[110] *Hillsborough Cnty. v. Automated Med. Lab'ys., Inc.*, 471 U.S. 707, 713 (1985) (quoting *Rice*, 331 U.S. at 230).

16

"Undoubtedly, every subject that merits congressional legislation is, by definition, a subject of national concern.  That cannot mean, however, that every federal statute ousts all related state law."[111]  Further, fields related to "state police power regulations" are construed narrowly,[112] and, "[g]iven the presumption that state and local regulation related to matters of health and safety can normally coexist with federal regulations, [federal courts] will seldom infer, solely from the comprehensiveness of federal regulations, an intent to pre-empt in its entirety a field related to health and safety."[113]

The first step is to define the field.[114]  Here, the parties focus on different fields.  Kalshi focuses on trading on DCMs,[115] and Defendants primarily address the field of generally-applicable gambling laws.[116]  But under either framing, the field is not preempted for two reasons.

First, the CEA includes the savings clause.[117]  The Supreme Court has explained a savings clause "negates the inference that Congress 'left no room' for state causes of action."[118]

---

[111] *Id.* at 719; *see also id.* at 715 (stating there is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause").

[112] *See Cipollone*, 505 U.S. at 523 (narrowly construing a section of the Federal Cigarette Labeling and Advertising Act and the Public Health Cigarette Smoking Act of 1969 "in light of the strong presumption against pre-emption"); *see also United States v. Texas*, 97 F.4th 268, 278 (5th Cir. 2024) ("When analyzing field preemption, the relevant field should be defined narrowly." (citation modified)); *Farina v. Nokia Inc.*, 625 F.3d 97, 121 n.25 (3d Cir. 2010) (stating "the scope of a field deemed preempted by federal law may be narrowly defined" and "cases have used narrow conceptions of the relevant field"); *Nat'l Fed'n of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 734 (9th Cir. 2016) (emphasizing "the importance of delineating the pertinent area of regulation with specificity before proceeding with the field preemption inquiry").

[113] *Hillsborough*, 471 U.S. at 718.

[114] *Garcia*, 589 U.S. at 208.

[115] *Motion for Preliminary Injunction* at 19–29; *Motion for Summary Judgment Opposition* at 23–29.

[116] *Motion for Summary Judgment* at 33–44.

[117] 7 U.S.C. § 2(a)(1)(A) (providing CFTC's jurisdiction does not "supersede or limit the jurisdiction" of the SEC from "carrying out [its] duties and responsibilities," or "supersede or limit the jurisdiction conferred on courts of the United States or any State").

[118] *Int'l Paper Co.*, 479 U.S. at 492; *see also Am. Agric. Movement*, 977 F.2d at 1155 (stating the savings clause in § 2(a)(1)(A) "tells us that Congress did not intend to preempt the field of futures trading"); *R.J. Reynolds Tobacco*

Second, the CEA includes additional carve outs that permit State action.[119]  And Kalshi concedes gambling is a field that has been "traditionally regulated by the states," not the federal government.[120]

The Supreme Court has stated that it is "quite sure the Government has a substantial interest in supporting the policy of [non-gambling] States, as well as not interfering with the policy of States that permit [gambling]."[121]  Congress has attempted to support States in these efforts "since the early 19th century."[122]  It is simply implausible that Congress would silently reverse course though an Act addressing the 2008 housing financial crisis.[123]

Given the CEA's framework and the history of State regulation of gambling, the court cannot conclude the CEA is so pervasive that there is no room for the State of Utah to supplement it.[124]

---

*Co. v. Durham Cnty., N.C.*, 479 U.S. 130, 140 (1986) ("Chief among the indications of an intent to pre-empt is where Congress has legislated so comprehensively that it has no room for supplementary state legislation.").

[119] *See* 7 U.S.C. § 16(e)(2); *id.* § 16(h).

[120] *Flaherty*, 172 F.4th at 232 (J. Roth, dissenting) ("[G]ambling has traditionally been regulated by the states."); *Motion for Summary Judgment Opposition* at 24 (recognizing that gambling is a "broader and traditionally state-regulated field" (quoting *Flaherty*, 172 F.4th at 229)); *see also Transcript* at 58:12–15 ("[T]here is all manner of regulation that goes on every single day in this country on a state level of regulated casinos and regulated sportsbooks.").

[121] *Id.*

[122] *Id*.

[123] *See Medtronic, Inc.*, 518 U.S. at 485 ("Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. . . ."); *see also Phillips*, 155 F.4th at 113 (explaining Congress drafted a "broad" definition of swap because swaps "were considered a driving factor in the 2008 financial crisis"); *Collins v. Yellen*, 594 U.S. 220, 226 (2021) (describing the 2008 financial crisis as "the housing crisis"); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (including the "Mortgage Reform and Anti-Predatory Lending Act" and "Regulatory Improvements" to "reform[] the housing finance system").

[124] *See Garcia*, 589 U.S. at 208.

## B. Conflict Preemption

Even absent express or field preemption, State law may still be "pre-empted if that law actually conflicts with federal law."[125]  Conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility," or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[126]  What constitutes "a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . ."[127]  The court addresses impossibility and then whether compliance frustrates the purposes of the CEA, concluding that Utah's enforcement of its anti-gambling laws is not conflict-preempted.

### 1. Compliance Is Not Impossible.

Conflict preemption applies if it is impossible for Kalshi to comply with both the CEA and Utah's anti-gambling laws.  Kalshi argues this is the case because Utah would require it to "block the exchange solely from persons located in Utah" and the CFTC mandates a DCM "provide its members, persons with trading privileges, and independent software vendors with impartial access to its markets and services."[128]  Kalshi further contends that permitting state enforcement of gambling laws would thwart Congress' purpose to establish a "national market under a uniform set of regulations."[129]  Defendants argue Kalshi "misconstrues the impartial-

---

[125] *Cipollone*, 505 U.S. at 516.

[126] *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 647 (5th Cir. 2025) (citation modified).

[127] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

[128] *Motion for Summary Judgment Opposition* at 20–24; *see also Motion for Preliminary Injunction* at 26–28; 17 C.F.R. § 38.151(b).

[129] *Motion for Summary Judgment Opposition* at 20–33; *see also Motion for Preliminary Injunction* at 26–29.

19

access requirement,"[130] and some State regulation does not obstruct the purposes of the CEA.[131]

The court agrees with Defendants.

A DCM must provide its members access that is "impartial, transparent, and applied in a non-discriminatory manner"; and members, traders, and software vendors must have "[c]omparable fee structures" for "receiving equal access to, or services from" the DCM.[132] CFTC commentary shows the impartial access requirement is meant to prevent DCMs from discriminating based on monetary resources. For example, 75 FR 80572 provides:

> The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants. Access to a DCM should be based on the financial and operational soundness of a participant, rather than discriminatory or other improper motives. Any participant should be able to demonstrate financial soundness either by showing that it is a clearing member of a DCO that clears products traded on that DCM or by showing that it has clearing arrangements in place with such a clearing member. Furthermore, granting impartial access to participants that satisfy a DCM's access requirements may enhance the DCM's liquidity and the overall transparency of the swaps and futures markets.[133]

The commentary also states, "[t]he [CFTC] believes that the requirement to provide impartial access requires DCMs to avoid the creation of exclusive membership standards that focus on high net worth."[134]

Kalshi argues the regulations and commentary that discuss access in the financial context are "stray reference[s]" that do not limit the impartial access requirement because the rule does

---

[130] *Motion for Summary Judgment* at 44.

[131] *Id.* at 44–48.

[132] 17 C.F.R. § 38.151(b).

[133] Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (Dec. 22, 2010).

[134] *Id.* at 80579 n.51.

"not specifically mention geographic discrimination."[135]  And the court acknowledges that some courts have agreed that the impartial-access requirement encompasses geography.[136] Nevertheless, the court is not persuaded.  The CEA, regulatory rules, and CFTC commentary better align with a limited financial interpretation than a silent expansive geographical one.

First, it is not "stray references" that place the impartial access mandate in the financial context.[137]  It is the only context discussed.  The language of the regulation includes a requirement for comparable fee structures and CFTC commentary states the purpose of the impartial access requirement is to prevent competition leverage, ensure financial soundness, and promote DCM liquidity and transparency.[138]  The stated purpose does not suggest any discrimination beyond financial discrimination.  Indeed, the CFTC contrasts discriminatory access with "financial and operational soundness."[139]  This suggests the impartial access requirement is a rule for fair play, not one concerning who is allowed on what playground.

Second, Kalshi has not demonstrated it would be impossible to comply with both Utah anti-gambling law and the CEA.  Other than making conclusory statements that subjecting Kalshi to Utah law could eventually result in a "state-by-state patchwork" that "would make

---

[135] *Motion for Summary Judgment Opposition* at 30.

[136] *See Johnson*, 2026 WL 1223373, at *8 (concluding enforcing Arizona's anti-gambling laws would make impartial access impossible because a DCM operator would be required to "exclude Arizona residents from trading event contracts on its platform"); *Orgel*, 2026 WL 474869, at *9 (stating that enforcing Tennessee's anti-gambling laws would require a DCM "to create a Tennessee-only exchange . . . and those elsewhere could not bet with people in Tennessee").

[137] *Motion for Summary Judgment Opposition* at 30.

[138] *See* 17 C.F.R. § 38.151(b)(2) (requiring comparable fee structures); Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (Dec. 22, 2010).

[139] Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. at 80579 ("Access to a DCM should be based on the financial and operational soundness of a participant, rather than discriminatory or other improper motives."); *id.* at 80579 n.51 (stating the impartial access requirement is meant to "avoid the creation of exclusive membership standards;" rather "participant[s] should be able to demonstrate financial soundness either by showing that it is a clearing member of a DCO that clears products on that DCM or by showing that it has clearing arrangements in place with such a clearing member").

operating a DCM functionally impossible,"[140] Kalshi has not explained why or how it would be impossible to manage different State requirements.[141] Indeed, Kalshi's event contracts each contain an appendix of "Trading Prohibitions"—some of which are specific to individual groups of people.[142] Adding an additional category of prohibited participants in a sports-related event contract does not appear to be onerous. In short, Kalshi has not shown that compliance with both federal and state law is impossible.

Third, the CEA provides for some State regulation.[143] It would be inconsistent for Congress to allow States to regulate their gambling laws but to simultaneously require States to provide citizens access to every event contract, including those that constitute gambling under State law.[144]

2. Utah Law Does Not Frustrate the Purposes of the CEA

Finally, Utah's anti-gambling laws may be preempted by implication if they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of" the CEA.[145] The CEA explains its purposes: (1) "to serve the public interests . . . through a system

---

[140] *Motion for Preliminary Injunction* at 19.

[141] *See generally id.*

[142] *See, e.g.*, *Motion for Summary Judgment* at 76 (prohibiting "current and former players, coaches, and staff" of a league, along with employees, beneficial owners, officials, training personnel, etc. from trading); *id.* at 89 (prohibiting participation of current and former players, employees, beneficial owners, and household members and immediate family of the same); *id.* at 111 (same); *id.* at 124 (prohibiting participation of current and former players, caddies, coaches, tournament sponsors, and household members and immediate family of the same); *id.* at 204 (prohibiting participation by officials, stewards, race directors, timing and scoring personnel, competitors, riders, co-drivers, team principals, current and former employees of any official "tyre" or fuel suppliers, employees of the contracted official data, telemetry, or timing services provider; current and former route safety officers, etc.).

[143] *See* 7 U.S.C. § 2(a)(1)(A) (savings clause); *id.* § (2)(d) (stating § 16(e)(2) applies to swaps); *id.* § 16(e)(2) (stating the CEA preempts the application of any State gaming law "in the case of" swaps involving an electronic trading facility or specified non-sports-related products).

[144] *Griffing v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

[145] *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 647 (5th Cir. 2025) (cleaned up).

of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the [CFTC]"; (2) "deter and prevent price manipulation or any other disruptions to market integrity"; (3) ensure the financial integrity of all transactions subject to the [CEA] and [avoid systemic risk]"; (4) "protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets"; and (5) "promote responsible innovation and fair competition among boards of trade, other markets and market participants."[146]

Kalshi primarily argues the purpose of the CEA is to establish uniform federal oversight of DCMs and avoid "fragmented regulatory demands that could differ by jurisdiction."[147] Kalshi contends the CFTC has exclusive authority to prevent event contracts and any State-law enforcement conflicts with the CEA's federal scheme.[148] It maintains States may only "police those who offer fraudulent *off-exchange* investments" and "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC"—contracts traded on DCMs.[149]

Defendants respond that Kalshi's "uniformity argument is undermined by the fact that Congress also made it illegal under *Federal* law to operate a business within a State in a manner that violates State gambling laws[,]" the CEA operates in a federal framework that recognizes gambling laws differ from State to State, and Kalshi misconstrues the statutory language that prescribes the CFTC's power.[150]

---

[146] 7 U.S.C. § 5(b).

[147] *Motion for Preliminary Injunction* at 21 (quoting *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001)); *see also id.* at 27; *Motion for Summary Judgment Opposition* at 20–22, 30.

[148] *Motion for Preliminary Injunction* at 21–22.

[149] *Id.* at 25 (emphasis in original) (citation omitted).

[150] *Motion for Summary Judgment* at 46–48 (citing 18 U.S.C. § 1955 and 15 U.S.C. § 3001(a)(1)) (emphasis in original)).

The court agrees that enforcement of State gambling laws is not inconsistent with the CFTC's regulation and oversight of derivatives markets. Congress is aware that some States permit gambling while others do not,[151] and the CEA explicitly provides for State jurisdiction.[152] Additionally, § 16(e)(2) explicitly provides for State regulation of its gaming laws in all but a few specified cases.[153] And, contrary to Kalshi's contention, the application of § 16(e)(2) is not limited to off-DCM transactions. Section 2(d) specifically states that § 16(e)(2) applies to swaps.[154] Section § 16(e)(2) makes clear that Congress intended States to have the power to regulate its swaps involving gaming except in certain specified situations.

Further, State regulation of its gambling laws does not prevent the CFTC from serving the public interest in regulating derivates markets, preventing price manipulation, ensuring financial integrity, protecting market participants, and promoting innovations.[155] Kalshi has not met its burden of showing otherwise.[156] Accordingly, the court concludes State regulation of its gambling laws does not frustrate the CEA's purpose.

## CONCLUSION

The court concludes the CEA does not preempt Utah's enforcement of its anti-gambling laws against Kalshi. Defendants' Motion for Summary Judgment is GRANTED.[157] The

---

[151] *See United States v. Edge Broad. Co.*, 509 U.S. 418, 421 (1993).

[152] *See* 7 U.S.C. § 2(a)(1)(A) ("Nothing in this section shall supersede *or limit* the jurisdiction conferred on courts of the United States or *any State*." (emphasis added)).

[153] 7 U.S.C. § 16(e)(2) (listing specific, limited situations in which the CEA preempts "the application of any State or local law that prohibits or regulates gaming").

[154] *Id.* § 2(d) (listing § 16(e)(2) in this list of subsections that "govern[] or appl[y] to a swap").

[155] *See id.* § 5(b).

[156] *See Doe*, 667 F.3d at 1122 (requiring the party who has the burden of proof at trial to make a sufficient showing of the elements of its case on summary judgment).

[157] Dkt. 34.

Plaintiff's Motion for a Preliminary Injunction[158] and the Motion to File Amici Curiae Brief[159]

are DENIED as moot.  The Clerk of Court is directed to close the case.

SO ORDERED this 4th day of August 2026.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[158] Dkt. 29.

[159] Dkt. 42.