Derek Brown
Utah Attorney General
Stanford E. Purser (13440)
Utah Solicitor General
Joshua B. Cutler (16434)
Mark C. Gillespie (19265)
Assistant Solicitors General
Office of the Utah Attorney General
P.O. Box 140858
Salt Lake City, Utah 84114-0858
(801) 366-0533
spurser@agutah.gov
jbcutler@agutah.gov
markgillespie@agutah.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

KALSHIEX LLC;

*Plaintiff*,

v.

SPENCER J. COX, in his official capacity as Governor of Utah; DEREK BROWN, in his official capacity as Attorney General of Utah; DANIEL BURTON, in his official capacity as Chief Deputy Attorney General and General Counsel of Utah; STEWART YOUNG in his official capacity as Criminal Deputy Attorney General of Utah; and DOUGLAS CRAPO in his official capacity as Public Protection Attorney General of Utah.

*Defendants.*

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR AN INJUNCTION PENDING APPEAL**

Case No. 2:26-cv-00151-RJS

Judge Robert J. Shelby

Magistrate Judge Cecilia M. Romero

Pursuant to Rule 62 of the Federal Rules of Civil Procedure, the Defendants identified in the above caption file this Opposition to Plaintiff's Motion for an Injunction Pending Appeal. Dkt. 70.

**REQUESTED RESOLUTION AND GROUNDS**

Last week, on August 4, 2026, the Court denied Kalshi's renewed preliminary injunction motion that sought to enjoin Defendants from enforcing Utah's gambling laws against Kalshi. Dkt. 65. The requested relief would have altered the status quo between the parties by barring Defendants from fulfilling their constitutional duties to enforce Utah law and by insulating Kalshi from the legal consequences of its conduct within the State. Dkt. 65. In the current Motion, Kalshi again requests the Court to award this relief. The Court should reject that request for the reasons stated below.

**ARGUMENT**

The Court should deny Kalshi's Motion under Rule 62. To obtain "a stay or an injunction pending appeal, the movant must 'demonstrate[ ] a clear and unequivocal right to relief'" under the same factors courts use in considering a motion for preliminary injunction: "(a) the likelihood of success on appeal; (b) the threat of irreparable harm if the stay or injunction is not granted; (c) the absence of harm to opposing parties if the stay or injunction is granted; and (d) any risk of harm to the public interest." *W. Watersheds Project v. Zinke*, 2017 WL 1208410, at *2 (D. Utah Mar. 31, 2017). As with its motion for preliminary injunction, Kalshi fails to establish

any of these factors, let alone all four. Indeed, Kalshi does not even address each factor under the proper standard.

## I. Kalshi Has Failed to Show a Likelihood to Succeed on the Merits.

First, the Court should reject Kalshi's Motion because Kalshi has failed to show a likelihood of success on appeal. In fact, at multiple places Kalshi argues only that its appeal "raises serious questions" or "substantial legal questions," not that it is likely to succeed on the merits. Dkt. 70 at 1, 2, 4, 7. But raising a serious or substantial question is not a sufficient basis for an injunction pending appeal. *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016) (concluding that the "substantial question" test had been overruled by the Supreme Court in favor of the "substantial likelihood" test). Rather, Kalshi must demonstrate "a clear and unequivocal right" to an injunction by showing that it is *likely* to succeed on the merits. Kalshi has failed to make this showing. Instead, Kalshi "only repeats arguments that th[e] court has already considered and rejected" in denying Kalshi's motion for preliminary injunction. *W. Watersheds Project*, 2017 WL 1208410, at *2 (rejecting motion for injunction on this ground). The Court should again reject those arguments.

**First**, Kalshi argues that the presumption against preemption does not apply in this case because, according to Kalshi, there is an express-preemption provision in the CEA. Dkt. 70 at 4. As the Court concluded, there isn't an express-preemption provision. Dkt. 65 at 12-15. But Kalshi also errs on the presumption point. The presumption against preemption can apply in two forms to a Court's interpretation:

(1) when determining whether there is any preemption and (2) when determining the *scope* of preemption, including for ambiguous express-preemption provisions.

When the preemptive effect of a statute is clear as to the existence and scope of preemption, neither form of presumption is needed. Kalshi's cited cases stand for nothing more than that unremarkable proposition. *See, e.g., Commonwealth of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016) (relying on "*plain* wording of the [express-preemption] clause" instead of the presumption (emphasis added)). However, as the Court noted in its opinion, "[w]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" Dkt. 65 at 12; *see also id*. at 11 n.68 (explaining that language in "*Franklin* is not in tension" with this because a true "express preemption provision is a 'clear and manifest' expression of Congress's purpose"). In this way, the presumption against preemption parallels the "major questions doctrine"—a doctrine that requires clear statutory language before adopting an interpretation that would mark a significant policy change. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

**Second**, Kalshi challenges the Court's interpretation of Section 2(a) of the CEA. Motion at 5. Kalshi even argues that "[n]o other court" has interpreted Section 2(a) similarly to the Court. But the Court's interpretation of Section 2(a) is not only correct, it is consistent with the interpretation of multiple courts across the country, including the Supreme Court. *See* Dkt. 65 at 13 ("On its face, this language strongly signals there is room for State regulation as it relates to the province of the CEA.");

*KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *8 (S.D. Ohio Mar. 9, 2026) (Section 2(a) "leaves ample room for states to legislate and regulate"); *QCX LLC v. Nessel*, 2026 WL 1895958, at *10 (W.D. Mich. June 17, 2026) (Section 2(a) "'give[s] the CFTC the authority to enforce the Act' and 'bar[s] enforcement by state authorities,' but does not preempt 'the underlying state law' and 'allow[s] States to enforce state laws.'" (citation omitted)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982) (Section 2(a) was only intended to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies").

**Third**, Kalshi challenges the Court's "reliance" on the express preemption provisions in Section 16(e)(2). Dkt. 70 at 6. But Kalshi fails to plow any new ground on this point and fails to adequately address the significance of the provision or the Court's reasoning. *Id.* Indeed, Kalshi argues only that "most" (but not all) of the applications of express preemption are transactions "excluded" or "exempted" from "any on-DCM trading requirement." *Id.* But Kalshi ignores the Court's finding that Section 2(d) specifically states that Section 16(e)(2) "applies to swaps generally" and that Section 16(e) "limits preemption to State gaming laws that govern certain swaps that occur off DCMs *and other designated swaps* . . . not applicable here." Dkt. 65 at 15 (emphasis added). The Court interpreted Section 16(e) correctly.

**Fourth**, Kalshi argues that the CEA's special rule is inconsistent with the Court's ruling. Motion at 6-7. Not so. Section 7a-2 "clearly reflects an affirmative intent to preserve state laws governing whether particular conduct is lawful or unlawful." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 680 (D. Md. 2025). Indeed,

by authorizing the CFTC to prohibit transactions on any nationwide exchange if the "event contracts" are unlawful under the laws of one State, Congress contemplated that there would be situations in which States treated the underlying legality of an event contract differently. Instead of expressly preempting these State laws, Congress merely provided the CFTC with the discretion to prohibit them nationwide if the CFTC determined that doing so would be in the public interest.

**Fifth**, in a single, three-sentence paragraph, Kalshi argues that field preemption applies. Motion at 7. Again, Kalshi raises no new issues. And Kalshi cites only the Supreme Court's decision in *Merrill Lynch* in support. *Id*. But, as Defendants have argued and other courts have noted, the Court in *Merrill Lynch* interpreted the CEA's "exclusive jurisdiction" provision as being limited to separating "the functions of the [CFTC] from those of the [SEC] and other regulatory agencies" 456 U.S. at 386. This Court's field-preemption analysis is correct and consistent with *Merrill Lynch*.

**Sixth**, Kalshi takes aim at the Court's conflict-preemption analysis. Motion at 7-8. But Kalshi applies the wrong standard, arguing that the differing opinions in *Johnson* and *Orgel* "establish[] a substantial question." *Id*. at 7. As discussed above, Kalshi must do more than establish a substantial question to be entitled to an injunction pending appeal: it must establish a likelihood of success on the merits. And Kalshi does not come close to meeting that burden. After recycling its argument about the impartial-access requirement—which requires only impartial access requirements (not *uniform* access nationwide)—Kalshi points to a nonbinding amicus brief filed by the CFTC and an action taken by the CFTC that is not relevant to the

impartial-access requirement or the preemption issue raised in this case (the CFTC ordered Kalshi to not cancel existing contracts; the order does not require Kalshi to offer illegal contracts in every state). Kalshi thus offers nothing to undermine the Court's conflict-preemption analysis.

In sum, the Court's merits analysis was correct on all points and consistent with the reasoning of many courts across the country. Accordingly, as the 6th and 9th Circuit Courts have already done, the Court should deny Kalshi's request for an injunction pending an appeal.

## II. Kalshi Will Not Suffer Irreparable Harm in the Absence of an Injunction.

Next, Kalshi has made no "strong showing" that it will suffer irreparable harm without an injunction. *Whole Woman's Health v. Jackson,* 141 S. Ct. 2494, 2495 (2021). To demonstrate irreparable harm, a movant must "show[] actual or significant risk of loss" that "cannot be remedied by money damages." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005). That showing is "not an easy burden to fulfill." *First W. Cap.*, 874 F.3d at 1141 (internal quotation marks omitted). In short, "[t]o constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks omitted).

Kalshi asserts a few potential harms in the absence of an injunction. But even if any of those alleged injuries were to materialize, none of them can satisfy Kalshi's burden to show irreparable harm—largely because, as Kalshi openly admits, all of them are conditioned upon future decisions by Kalshi to violate Utah law. Such

"speculative harm does not amount to irreparable injury," *Schrier*, 427 F.3d at 1267 (internal quotation marks omitted).

*First*, Kalshi argues that it faces harm in the form of the "threat of prosecution." Dkt. 70 at 8-9. But any harm Kalshi alleges is conditional on its own decision to violate statutes duly enacted by the Utah Legislature. This is not a situation in which Kalshi must "take affirmative steps" to "avoid the risk of harm" by the operation of State law. *Meese v. Keene*, 481 U.S. 465, 475 (1987). "The possibility of criminal prosecution for law violation is always present" and that, "standing alone . . . violates no constitutional rights." *May v. Harper*, 306 F. Supp. 1222, 1224 (N.D. Fla. 1969). Whether or not an injunction is in place, Kalshi faces no risk of criminal penalties unless and until it consciously decides to violate the laws of the State. That does not satisfy the heavy "burden" required for a showing of irreparable harm.

Kalshi also argues that it would incur "economic and reputational harms" if it refuses to stop violating Utah's gambling laws. Once again, these harms are speculative and conditional, not the type of "loss [that] threatens the very existence of [Kalshi]'s business." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). Indeed, Kalshi already engages in the very geolocation that it now claims would constitute irreparable injury. Kalshi concedes that it "screen[s]" new customers "against prohibited lists *and geographies*" and that its "surveillance team tracks their trading behavior." Frequently Asked Questions, *Kalshi*, available at https://kalshi.com/faq (emphasis added). And two courts have already ordered Kalshi to use geolocation to prevent violation of State laws. *See* Massachusetts order dated

Jan. 20, 2026; Nevada TRO dated Mar. 20, 2026. Requiring Kalshi to avoid violating the laws of a *third* state would not lead to irreparable harm.

Kalshi also briefly suggests that the lack of an injunction would harm Kalshi's users. This alleged harm is just as speculative as the others Kalshi identifies. But more importantly, it is not a harm to Kalshi itself. "A plaintiff seeking a preliminary injunction must show that *he* is likely to succeed on the merits, [and] that *he* is likely to suffer irreparable harm in the absence of preliminary relief"—not that someone else is likely to do so. *Winter*, 555 U.S. at 20 (emphasis added). So, "[i]f *the plaintiff* isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (first emphasis added). Potential harm to third parties is thus not relevant to the irreparable-harm analysis as to Kalshi. And even if it were, there is no record evidence showing that Kalshi is incapable of "giv[ing] its users reasonable notice to allow them to exit their positions voluntarily if they so choose," a practice that Kalshi represents it "want[s]" to engage in. Dkt. 9-1 ¶ 40.

Finally, Kalshi briefly suggests that the lack of an injunction could imperil Kalshi's designation as a DCM. Dkt. 70 at 9. Once again, Kalshi's alleged harms depend entirely on Kalshi's own future conduct. And once again, those harms may never emerge at all—because they depend on the independent decisions of third parties. The "links in the chain of causation" projected by Kalshi here are supported only by conjecture, making them "too speculative" and "too attenuated" to form an actionable injury. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (internal

quotation marks omitted). And Kalshi's concern that it may violate the CFTC's "Core Principles" if some of its event contracts are terminated is particularly unfounded; the CFTC's own guidance expressly instructs organizations like Kalshi to "account[] for" and manage risks arising from "State regulatory actions and pending and potential litigation, including enforcement actions." CFTC Advisory No. 25-36 (Sept. 30, 2025). Kalshi's failure to follow this guidance does not justify an injunction.

Kalshi cannot receive an injunction without showing harm that is "certain, great, actual and not theoretical." *Heideman*, 348 F.3d at 1189. The harms Kalshi has purported to show are none of those things. Kalshi's Motion can be denied on that basis alone.

### III. The Balance of the Equities and the Public Interest Weigh Against an Injunction.

Because Kalshi seeks an injunction against a State government, the final two preliminary injunction factors—the balance of equities and the public interest—"merge" together and are considered as one. *Denver Homeless*, 32 F.4th at 1278 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, that combined factor heavily favors the State.

An injunction would inflict serious harm on both the State and the public. As the Supreme Court has recognized, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). And the Tenth Circuit has repeatedly made clear that a State "government has a strong interest

generally in the enforcement of its criminal laws." *Aid for Women v. Foulston*, 441 F.3d 1101, 1119 (10th Cir. 2006) (collecting cases).

An injunction in this case would be particularly harmful. The harms of gambling are widely acknowledged. "[G]ambling is associated with a wide range of financial, cultural and crime-related harms," and it is "recognized by the WHO [(World Health Organization)] as a health-harming activity."[1] "Self-harm and suicide are two of the most severe gambling-related harms."[2] Indeed, those with serious gambling problems are up to fifteen times more likely to die by suicide.[3] And fifteen percent of adults ages 18-34 reported concerning gambling behavior.[4] If Kalshi obtains an injunction preventing Utah from enforcing its gambling laws, Utah's residents will be statistically more likely to die by suicide.

Gambling also affects more than the individual who gambles. "[G]ambling problems of one person negatively impact an average of six others," with the negative consequences of gambling often "persist[ing] well after the gambling problem is resolved" and "resulting in decreases in quality of life by 10 percent to 36 percent."[5] "Increased relationship strain, financial debt, . . . domestic violence," and "adverse

---

[1] Ukhova D, Marionneau V, Volberg R. et. al., *The Expansion of Gambling Across the Americas Poses Risks to Mental Health and Wellbeing*, The Lancet Regional Health–Americas 37 (2024) at 1.
[2] *Id*. at 2.
[3] https://www.who.int/news-room/fact-sheets/detail/gambling.
[4] https://www.ncpgambling.org/news/national-council-on-problem-gambling-survey-shows-drop-in-problem-gambling-risk-highlights-ongoing-challenges/
[5] N.A. Dowling et. al., *Addressing Gambling Harm to Affected Others: A Scoping Review*, Clinical Psychology Review 116 (2025) 102542 at 13, https://doi.org/10.1016/j.cpr.2025.102542 (last accessed April 2, 2026).

effects on work and education" are all recognized harms stemming from gambling.[6] In short, both the State and its residents will suffer significant harm from an injunction that prevents Utah from enforcing its duly enacted laws.

On the other side of the balance, Kalshi faces no irreparable harm if the status quo remains in place. As explained above, any potential harms to Kalshi are just that—potential, and conditioned upon Kalshi's decision to violate preexisting law that is not preempted. Kalshi briefly acknowledges Utah's sovereign interest and "addiction-related harms," but it insists that the Court should disregard these harms because Kalshi is federally regulated. Motion at 10. Not so. The CEA says nothing about gambling harms, nor does it confer on the CFTC or a DCM the regulatory authority to address those harms.

Kalshi also argues that an injunction would merely preserve the status quo. That's incorrect. At no point has Kalshi been immune or exempt from Utah state law. And, with the exception of a brief stipulated stay of enforcement during the briefing period, Utah has always been free to bring an enforcement action against Kalshi. Indeed, the only relief Kalshi sought in this case was to alter the status quo by obtaining an injunction. Now that Kalshi has lost on the merits, it should not be awarded the relief to which the Court has already concluded Kalshi is not entitled.

Kalshi's self-inflicted potential future alleged harms do not outweigh the State's interests in exercising its police power and enforcing generally applicable laws

---

[6] Ukhova, *supra* note 2 at 2.

enacted by its people's representatives. The balance of equities and public interest thus both favor the State.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion for an Injunction Pending Appeal.

Respectfully submitted on August 11, 2026,

Derek Brown
Utah Attorney General

*/s/ Joshua Cutler*
Joshua Cutler
Assistant Solicitor General
*Counsel for Defendants*

**Certificate of Compliance**

I, Joshua B. Cutler, certify that this **Opposition to Plaintiff's Motion for an Injunction Pending Appeal** contains 3,029 words and complies with DUCivR 7-1(a)(4).

*/s/ Joshua B. Cutler*
Joshua Cutler
Assistant Solicitor General
*Counsel for Defendants*

CERTIFICATE OF SERVICE

I hereby certify that on August 11, I caused a true and correct copy of the foregoing **Opposition to Plaintiff's Motion for an Injunction Pending Appeal** to be filed using the Court's electronic filing system, which effectuated service of such filing upon all counsel who have entered an appearance.

*/s/ Joshua Cutler*
Joshua Cutler
Assistant Solicitor General
*Counsel for Defendants*